IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00721-CMA-KMT

JAMIE HAGGARD,

      Plaintiff-Counterclaim Defendant,

v.

SYNTHES SPINE,

      Defendant-Counterclaimant.

---

## DEFENDANT-COUNTERCLAIMANT'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND VERIFIED COUNTERCLAIM

---

### ANSWER TO COMPLAINT

      Defendant-Counterclaimant, Synthes USA Sales, LLC (incorrectly named as "Synthes Spine" in the Complaint) ("Defendant" or "Synthes"), by and through its undersigned counsel, answers Plaintiff-Counterclaim Defendant Jamie Haggard's ("Haggard") Complaint as follows:[1]

      1.    The allegations contained in Paragraph 1 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

      2.    Denied.

---

[1] This Pleading answers Haggard's Complaint, originally filed in Colorado State Court, raises affirmative defenses under the Federal Rules of Civil Procedure, which apply after Synthes removed this case on April 1, 2009, and includes a Verified Counterclaim, which is also the basis for a Motion for a Temporary Restraining Order Synthes is filing in this Court.

3.      Synthes admits that its principal place of business is 1302 Wrights Lane East, West Chester, Pennsylvania 19380.   The remaining allegations contained in Paragraph 3 of the Complaint are denied.

4.      Admitted.

5.      Denied.   By way of further response, Synthes avers that Haggard commenced his employment with Synthes on May 1, 2000.

6.      Denied.

7.      Denied.

8.      Admitted.

9.      Admitted.

10.     The allegations contained in Paragraph 10 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

11.     Admitted.

12.     Denied.

13.     Admitted.

14.     Denied.

## ANSWER TO FIRST CLAIM FOR RELIEF
## (ALLEGED RIGHT TO DECLARATORY JUDGMENT)

15.     Paragraph 15 of the Complaint is a transition paragraph to which no responsive pleading is required.

16.     The allegations contained in Paragraph 16 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

17.     Admitted.

18.     The allegations contained in Paragraph 18 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

19.     The allegations contained in Paragraph 19 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

## ANSWER TO SECOND CLAIM FOR RELIEF
## (ALLEGED RIGHT TO INJUNCTION)

20.     Paragraph 20 of the Complaint is a transition paragraph to which no responsive pleading is required.

21.     The allegations contained in Paragraph 21 of the Complaint are denied or are legal conclusions to which no response is required, and they are therefore denied.

22.     The allegations contained in Paragraph 22 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

## ANSWER TO THIRD CLAIM FOR RELIEF
## (ALLEGED VIOLATION OF THE COLORADO WAGE ACT CRS 8-4-109)

23.     Paragraph 23 of the Complaint is a transition paragraph to which no responsive pleading is required.

24.     Admitted.   By way of further response, Plaintiff was discharged for misconduct, in that he was operating a separate business in conflict with his duties and responsibilities to Synthes.

25.     Denied.

26.     Denied.

27.     Denied.

28.     The allegations contained in Paragraph 28 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

29.     Denied.

30.     The allegations contained in Paragraph 30 of the Complaint constitute legal conclusions to which no response is required, and they are therefore denied.

31.     Defendant denies that Plaintiff is entitled to any relief whatsoever.

32.     Defendant denies each and every allegation in the Complaint not specifically admitted.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Haggard's Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Haggard failed to mitigate his damages, if any.

### THIRD AFFIRMATIVE DEFENSE

Some or all of Haggard's claims are barred by the equitable doctrines of unclean hands, laches, waiver, and estoppel.

### FOURTH AFFIRMATIVE DEFENSE

Haggard failed to exhaust his administrative remedies under the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-109 *et seq*.

### FIFTH AFFIRMATIVE DEFENSE

Haggard's Complaint fails to state a claim for relief under the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-109 et seq. because the sum Haggard claims does not constitute "Wages" within the meaning of the Act.

WHEREFORE, having been fully addressed, Synthes respectfully requests that Haggard's Complaint be dismissed with prejudice in its entirety, with all costs, including reasonable attorneys' fees, taxed to Haggard.

## VERIFIED COUNTERCLAIM

Counterclaimant Synthes, by and through its undersigned counsel, files this Verified Counterclaim against Counterclaim Defendant Jamie Haggard ("Haggard"), and states as follows: [2]

## INTRODUCTION

CC1.    This Verified Counterclaim seeks relief against Haggard to prevent the harm he has or will cause Synthes; to recover damages resulting from Haggard's use and/or disclosure of Synthes' trade secrets in the solicitation of former Synthes customers for Globus Medical, Inc. ("Globus"), a direct competitor, in Haggard's former Synthes territory; and to recover damages for property Haggard failed to return to it upon separation from the company.

CC2.    This Counter-claim further supports Synthes' motion for injunctive relief.

CC3.    Haggard has improperly conducted himself both while working for and since leaving Synthes.   He has breached his post-employment Non-Disclosure and Non-Competition Agreements with Synthes, as well as statutory and common law obligations.

_____

[2] Synthes' Counterclaim paragraphs are numbered as CC in order to avoid confusion with the Synthes' Answer to Haggard's Complaint.

CC4.    This Counterclaim, and Motion for Injunctive Relief to be filed by Synthes same date, are necessary because Haggard not only filed a pre-emptive suit in State Court on March 20, 2009, to invalidate what Synthes alleges are two binding agreements, but obtained *ex parte* relief in the State Court on March 25, 2009.

CC5.    This case involves the highly competitive industry of medical implants and instrumentation related to spine surgeries in the hospitals located in and around Fort Collins, Colorado.

CC6.    At the center of this dispute is that Haggard undertook a plan to file a lawsuit and obtain *ex parte* relief against Synthes and then begin directly competing with Synthes - in his same territory and for the same customers – by working as an employee for Globus.

CC7.    While this matter is only at the earliest stages of the litigation, Haggard has already filed an affidavit in the Colorado State Court evidencing his clear intention to dishonor his agreements with Synthes and engage in immediate and unfettered competition with his former employer.

CC8.    Through this Counterclaim, Synthes seeks relief and/or damages against Haggard for:

    A.    Haggard's violations of his post-employment Confidentiality, Non-Solicitation and Non-Competition Agreement ("Non-Competition Agreement") with Synthes;

    B.    Haggard's violations of his post-employment Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement") with Synthes;

    C.    Haggard's breach of his duty of loyalty and/or fiduciary duty;

    D.    Haggard's violations of the Colorado Trade Secrets Act;

E.     Haggard's tortious interference with Synthes' current and prospective customers;

F.     Haggard's conversion of Synthes' property; and/or

G.     Haggard's negligence in failing to return Synthes' property.

## PARTIES TO SYNTHES' COUNTERCLAIM

CC9.     Counterclaimant Synthes is a citizen of the State of Delaware and the Commonwealth of Pennsylvania.   It is a Delaware limited liability company and maintains its principal place of business at 1302 Wrights Lane East, West Chester, Pennsylvania 19380.   Synthes is a successor by conversion under Delaware law of Synthes Spine Company, L.P.  Synthes USA HQ, Inc. is the sole member of Synthes. Synthes USA HQ, Inc. is a citizen of the State of Delaware and the Commonwealth of Pennsylvania.  It is a Delaware corporation and maintains its principal place of business at 1302 Wrights Lane East, West Chester, Pennsylvania 19380.

CC10.     Counterclaim Defendant Haggard is a citizen of the State of Colorado. Haggard is a former Synthes employee.   Upon information and belief, Haggard maintains a residence at 201 Commerce, Unit 1, Fort Collins, Colorado 80524.

## JURISDICTION AND VENUE

CC11.     This Court has subject matter jurisdiction over this Counterclaim under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

CC12.   Venue is appropriate in this judicial district, under 28 U.S.C. § 1391(a), because Haggard is a resident within the District of Colorado and the harm Haggard is causing Synthes is occurring and will continue to occur within the District of Colorado.

CC13.   On March 20, 2009, Haggard filed a Complaint for Declaratory and Injunctive Relief, along with a Motion for Temporary Injunction, against Synthes in the District Court of Larimer County, Colorado, captioned *Jamie Haggard v. Synthes Spine,* Case No. 2009CV265 ("Haggard's Colorado State Court Action").   (Pl's. Compl., attached in Exhibit A-6).

CC14.   Also on March 25, 2009, Haggard obtained an *ex parte* injunction against Synthes in the Colorado State Court Action, prohibiting Synthes "from attempting to restrict Plaintiff's employment in the industry," and scheduling a hearing on the Motion for Temporary Injunction for April 1, 2009.  (Order, attached in Exhibit A-6).  This Order violated Colo. R. Civ. P. 65 in that it failed to state why Synthes did not receive notice and it failed to require security to protect Synthes against an improper issuance of the injunction.

CC15.   On April 1, 2009, Synthes removed Haggard's Colorado State Court Action to this Court pursuant to 28 U.S.C. § 1441.

### FACTS SUPPORTING SYNTHES' COUNTERCLAIMS

### Synthes is in the Highly Competitive Business of Medical Implants and Devices.

CC16.   Synthes is a worldwide leader in the medical device industry.

CC17.    Synthes manufactures, produces, and markets medical implants and instrumentation, such as plates, screws, rods, and other devices for orthopedic surgery used for internal fixation of broken bones and for facial surgery.

CC18.    Synthes markets and sells instrumentation and implants including plates, screws, rods, discs and other devices for spinal surgery.

CC19.    Synthes markets and distributes products to medical institutions and medical professionals nationwide and globally.

CC20.    Synthes is in a highly competitive business.

CC21.    The protection of its confidential, proprietary and trade secret information is vital in order to prevent competitors or would-be competitors from obtaining an unfair competitive advantage.

CC22.    In order to compete and to serve its customers and the patient community, Synthes invests millions of dollars annually in resources to develop its technology, systems, and products.

**The Predatory Tactics by Globus on Synthes and its Impact on Haggard's Employment.**

CC23.    Globus and Synthes directly compete in the marketplace.

CC24.    Globus' founding was the subject of three years of federal litigation that concluded in August 2007.  *(Synthes (USA) v. Globus Med. Inc.*, No. 04-1235, 2007 U.S. Dist. LEXIS 50812 (E.D. Pa. July 12, 2007), attached as Exhibit A-1)).

CC25.    The litigation centered around claims against Globus for misappropriation of trade secrets and confidential information as well as claims against Globus' two top executives and founders, and former Synthes' employees, for: (1)

breaching their contractual and fiduciary duties as well as duties of loyalty to Synthes; (2) unlawfully inducing other Synthes' employees to breach their agreements with Synthes – the very same agreements at issue here; and (3) aiding and abetting Synthes' employees in breaching their fiduciary duties to Synthes while still employed there.

CC26.    With the help and assistance of Globus, three Synthes sales consultants arranged for Synthes' surgeon customers to visit Globus and see its products *while they were still employed with Synthes.*

CC27.    These three employees coordinated their resignations from Synthes having already successfully switched the business.

CC28.    After Synthes' individual lawsuits against these three employees were resolved by the entry of a consent order, two of these three former Synthes employees persisted in their unlawful conduct.  Eventually and after a further hearing, the United States District Court for the Eastern District of Pennsylvania found these two employees to be in contempt of the consent order by virtue of their subsequent actions.

CC29.    Globus executives were complicit in at least some of the activities which formed the basis of the contempt finding.

CC30.    Globus and its top-level employees demonstrated a lack of appropriate concern and respect for the contractual obligations of individuals Globus had decided to hire from Synthes.

CC31.    This litigation was vigorously contested and settled after a three-week trial in which evidence of the conduct described was presented before a jury.  The

litigation settled a year and a half ago, with Globus agreeing to pay Synthes $13.5 million and not to hire any Synthes employees for a period of one year in order to settle Synthes' claims against it and its founders.

CC32.    The one-year non-solicitation provision of the settlement expired on August 10, 2008.

CC33.    Four weeks after the one-year non-solicitation provision above expired, Jacqueline Myer – the former Group Manager for Synthes' Surgeon Response Group, a group dedicated to designing, manufacturing and delivering custom and specialty implants and instruments to select spine surgeons within Synthes' customer base – resigned to go work for Globus in violation of her restrictive covenants with Synthes.

To protect its legitimate business interests, Synthes filed a suit in the Court of Common Pleas of Chester County, Pennsylvania against Myer stating a claim for breach of contract and seeking injunctive relief.   (Complaint, *Synthes (USA) and Synthes Spine Company, L.P. v. Jacqueline Myer*, No. 2008-10358 (C.P. Chester County, Nov. 23, 2008), attached in Exhibit A-2)).

CC34.    The court entered a TRO enjoining Myer from working for Globus pending a determination on Synthes' motion for preliminary injunction, and ordered expedited discovery in anticipation of a preliminary injunction hearing.

CC35.    Synthes learned that from the date Myer commenced working at Globus until the date the court issued the TRO enjoining her from working for Globus, Myer worked at Globus without restraint.   Globus did not issue any instructions or take any reasonable precautions to protect Synthes' proprietary, confidential and trade secret

11

information from disclosure.  Instead, Globus allowed and encouraged Myer to engage in activities on its behalf that directly related to Myer's work for Synthes and infringed on Synthes' legitimate business interests and common law rights.

CC36.    The Chester County, Pennsylvania Court of Common Pleas granted Synthes' motion, enjoined Myer to comply with the terms of her Non-Competition Agreement, and specifically, to refrain from working for Globus.  (Order of J. Streitel, *Synthes (USA) and Synthes Spine Company, L.P. v. Jacqueline Myer*, No. 2008-10358 (C.P. Chester County,  Jan. 7, 2009), attached in Exhibit A-2)).

CC37.    As a result of the discoveries made over the course of the Myer litigation, including those described above and others, Synthes filed a separate action against Globus, again in the Court of Common Pleas of Chester County, Pennsylvania. (Complaint, *Synthes USA LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC v. Globus Medical, Inc.* No. 09-02695 (C.P. Chester County, March 11 2009), attached in Exhibit A-2)).

CC38.    The suit, which is still pending, alleges claims for (1) tortious interference with contractual relations based on Globus' interference with Myer's Non-Competition Agreement; (2) tortious interference with contractual relations based on Globus' interference with Myer's Confidentiality and Non-Disclosure Agreement; and (3) unfair competition.

## Synthes' Extraordinary Efforts to Protect Its Trade Secrets.

CC39.    Due to the nature of this industry, Synthes takes extraordinary steps to protect its trade secrets.

CC40.   Synthes protects its business relationships and confidential information by requiring its employees, as a condition of employment, to agree not to disclose Synthes' confidential and/or proprietary information, not to solicit Synthes' customers and not to compete with Synthes for a reasonable period of time following their employment with Synthes.

CC41.   Synthes requires its employees to sign an Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement") which protects against the use or disclosure of confidential, proprietary, and trade secret information, defined to cover, among other things, product technology, product development information, project information, and manufacturing methods and technology.   (Non-Disclosure Agreement, attached in Exhibit A-3).

CC42.   Key employees in capacities which involve sales and marketing, among others, are also required to sign a Confidentiality, Non-Solicitation and Non-Competition Agreement ("Non-Competition Agreement").   (Non-Competition Agreement, attached in Exhibit A-3).

CC43.   The combination of the Non-Competition and Non-Disclosure Agreements is expressly designed to protect Synthes against disclosure of confidential information, prohibiting solicitation of Synthes' customers, and prohibiting post-employment activities with or on behalf of a direct competitor, subject to reasonable scope and temporal limitations. (Exhibit A-3).

CC44.   Upon separation from employment, Synthes requires its employees to return, and not retain any copies of, all correspondence files, business card files,

customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contain any of this information. (Exhibit A-3).

### Globus Also Takes Extraordinary Efforts to Protect Its Trade Secrets and Confidential Information

CC45.   Globus takes equally extraordinary efforts to protect its trade secrets and confidential and proprietary information.

CC46.   In fact, it requires potential employees to sign its own, "Globus Medical, Inc. No Competition and Non-Disclosure Agreement" ("hereinafter the Globus Non-Compete"). (Globus Non-Compete, attached as Exhibit A-4).

CC47.   Like Synthes, the Globus Non-Compete defines the "No Competition Territory" to include the territory in which the employee worked during the last 12 months of his or her employment.  (Exhibit A-4 at p. 1).

CC48.   But the Globus Non-Compete defines the "No Competition Territory" even more broadly than Synthes, so that where an employee is assigned to specific accounts versus a geographic location, it defines the "No Competition Territory" to include "the geographic area within a 10-mile radius of each assigned account." (Exhibit A-4 at p. 1).

CC49.   The Globus Non-Compete also requires the employee to acknowledge that he or she "will receive information and be trained in the highly technical, competitive and specialized business of spine surgery and spinal implants and instrumentation." (Exhibit A-4 at p. 2).

14

CC50.   Globus defines its confidential, proprietary and trade secret information

to include:

> [C]ustomer lists; product specifications and attributes; pricing
> information; technology development plans; forecasts;
> financial information; sales strategies and techniques;
> business records; models; prototypes; schematics; manuals;
> handbooks; literature; vendors; business terms between
> Company and suppliers; business terms between Company
> and Hospitals; business terms between Company and
> distributors; business terms between Company and Medical
> Personnel.   Employee acknowledges that Company owns
> such Confidential Information and that Employee has no
> ownership   interest   in   such   Confidential   Information.
> Furthermore, Employee acknowledges that the disclosure of
> such Confidential Information to unauthorized third parties,
> including Competitive Companies (as defined below) would
> cause   great   and   irreparable   harm   to   the   Company.
> Furthermore, Employee acknowledges that Company has a
> legitimate   business   interest   in   the   protection   of   the
> Confidential Information.  (Exhibit A-4 at pp. 1-2 (emphasis
> added).)

CC51.   Accordingly, in order to safeguard this information from use by

competitors,    the Globus Non-Compete includes four separate non-competition

covenants.  (Exhibit A-4 at p. 2).

CC52.   It defines the "No Competition Period" as "the last 12-month period

immediately following the termination of the Employment Agreement." (Exhibit A-4 at p.

2).

CC53.   And  during that 12-months period, it specifically prohibits the employee

not to "directly or indirectly, either for the Employee's benefit or the benefit of another

entity, solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to

any customer, Hospital or Medical Personnel in the No Competition Territory." (Exhibit A-4 at p. 2).

CC54.   When employees breach the Globus Non-Compete, Globus takes aggressive steps to enforce its contract with them.

CC55.   Synthes is currently aware of at least two recent suits initiated by Globus to enforce and seek damages for the breach of its restrictive covenants. (Complaint, *Globus Medical, Inc. v. Michael Reeder,* No. 08-893 (S.D. Oh. Sept. 22, 2008); *see also* Complaint, *Globus Medical, Inc. v. Christine Ann Stingle,* (C.P. Chester County April 15, 2008), attached in Exhibit A-5)).

## Haggard's Employment with Synthes, Sales in the Fort Collins Territory, and Extensive Knowledge and Access to Synthes' Trade Secrets.

CC56.   Haggard commenced his employment with Synthes on May 1, 2000, as a Spine Sales Consultant assigned to the Fort Collins, Colorado Territory.  His Territory also included Greeley, Loveland, Steamboat Springs and Yuma, Colorado, Scottsbluff, Nebraska and Cheyenne, Laramie, Rawlins, Torrington and Wheatland, Wyoming.

CC57.   Over the course of the next eight- plus years, Haggard had significant contacts with Synthes' surgeon customers and hospitals in this territory with whom he developed extensive relationships.

CC58.   Synthes invested a significant amount of resources to support Haggard's business relationships with these surgeons.  This included training, providing education and workshops for surgeons and their staff, and providing custom instruments to those surgeons.

16

CC59.   Additionally, Synthes provides its sales consultants with its proprietary database of clients and customers that contained, among other things: (1) the identity of these customers and prospects; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; and (3) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies specific to those clients and/or prospects.

CC60.   Haggard completed an annual business plan that included highly confidential information and analysis about each customer and prospect in his territory. This information is not known to the general public and Synthes takes significant steps to keep this proprietary information confidential.

CC61.   Haggard was uniquely positioned to learn the particular preferences in the surgeries of each physician, along with other non-public information, that aided in his ability to sell Synthes' products.

### Haggard's Contractual Obligations to Protect Synthes' Trade Secrets.

CC62.   Haggard's employment was contingent on his signing the Non-Competition Agreement, which he signed on March 5, 2000.  (Exhibit A-3 at p. 4). Haggard signed his Non-Disclosure Agreement on April 1, 2000.  (Exhibit A-3 at p. 5).

CC63.   Haggard promised, among other things, not to disclose Synthes' confidential and proprietary information at any time after leaving Synthes' employ. (Exhibit A-3).  This "proprietary and confidential information includes: (1) the identity of customers and prospects, their specific requirements, and the names, addresses and

17

telephone numbers of individual contacts; [and] (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals…" (Exhibit A-3 at p.2).

CC64.   To protect Synthes' legitimate interest in maintaining the confidentiality of its customer relations, the non-competition covenant in Haggard's Non-Competition Agreement specifically provides that Haggard will not compete with Synthes in any capacity for one year following his employment:

> I am employed by Synthes in a sales, account management or maintenance, or customer services or support, with an assigned territory, and ***I agree I will not, for a period of one year after my employment terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of Synthes in the territory or territories that I am now, or have been responsible for*** at any time during the last year of my employment with Synthes.

(Exhibit A-3 at p. 3 (emphasis supplied)).

CC65.   At the time he executed the Non-Competition Agreement, Haggard acknowledged that: (i) "Synthes expends substantial time and money, on an ongoing basis, to train its employees, …to develop and maintain a proprietary data base of prospects, maintain and expand its customer base, and improve and develop its technologies, products and services;" (ii) "Synthes would be irreparably harmed by my subsequent employment by a competitor of Synthes, regardless of the position or territory, due to the high likelihood or possibility that there would be inadvertent or other disclosures of Synthes' proprietary and confidential information"; (iii) he "received adequate consideration for signing" the Agreement; and (iii) "the restrictions in [the

18

Agreement] are reasonable and necessary to protect Synthes' legitimate business interests." (Exhibit A-3 at p.1).

CC66.   Haggard expressly agreed that Synthes would be "entitled to enforce this agreement by obtaining a court order prohibiting [Haggard] (and any other involved) from breaching this agreement." (Exhibit A-3 at p.3).

CC67.   The restrictions in the Non-Competition Agreement are limited in scope and time.

CC68.   Haggard, who held a key sales position at Synthes, is prohibited from working for a competitor of Synthes for a period of only one year.

CC69.   The restrictions do not impose restraints greater than necessary to protect Synthes' legitimate business interests.

**Haggard's Violation of His Contractual Obligations to Protect Synthes' Interests.**

CC70.   Haggard was separated from Synthes on February 2, 2009.

CC71.   On or about February 16, 2009, Synthes sent a letter to Haggard reminding him of his obligations under the Non-Competition and Non-Disclosure Agreements and included copies of those executed Agreements. (Exhibit A-7).

CC72.   Synthes at all times took reasonable efforts to remind Haggard of his obligations and evidenced its intent to protect its interests if Haggard acted improperly.

CC73.   Synthes separated Haggard because it learned that he was running an unrelated cigar business while he should have been working for Synthes.

CC74.   Haggard is now significantly in debt as a result of his cigar business' financial distress.

CC75.   Haggard has an incentive to act improperly for the benefit of his new employer.  Synthes understands that Haggard is employed or intends to be employed by Globus, in the area of medical implants and instrumentation including spinal inter-body fusion products and other devices for spinal surgery.

CC76.   Haggard admitted in his State Court papers that Globus will be his new employer. (Pl's. Mot. Supp. TRO, attached in Exhibit A-6).

CC77.   Haggard further admits that "I have been in contact with Globus Medical and Globus Medical has indicated a willingness to hire me in a sales consultant position in Northern Colorado essentially covering much of the same territory previously covered in working for the Defendant [Synthes]." (Pl's. Aff. Supp. TRO, attached in Exhibit A-6).

CC78.   Haggard has been selling spinal products and has been involved in Synthes' marketing efforts related to these products since he was hired in 2000.  As a sales consultant, he spent over eight years interacting with Synthes' surgeon and hospital customers.

CC79.   Haggard now advises that absent the enforcement of his Non-Competition and Non-Disclosure Agreements, he intends to work for Synthes' direct competitor in the *same position* and in the *same territory* he worked for Synthes.

CC80.   Due to the extensive similarity in Synthes' and Globus' product and business lines and the identical nature of his new position with Globus in the same sales territory he covered for Synthes for the past eight years, it is certain that Haggard has or will use and/or disclose Synthes' confidential trade secrets to his or Globus' advantage.

CC81.   Haggard has or will directly violate his Non-Competition and Non-Disclosure Agreements by working for a direct competitor, Globus, in his former territory.

### Haggard's Failure to Return Synthes' Field Equipment.

CC82.   Following Haggard's separation from Synthes, Synthes conducted an inventory of field equipment samples it had loaned to Haggard.  Synthes' inventory revealed that significant field equipment samples supplied to Haggard were missing. In total, this missing property is valued at $549,276.50

CC83.   Despite Synthes' request, Haggard has not returned Synthes' field equipment samples that are in his possession or control.

CC84.   In addition to the fact that Synthes is the rightful owner of this property, pursuant to the confidentiality provision contained in his Non-Competition Agreement, Haggard is required to return this property.  (Exhibit A-3 at p. 2).

### CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT (NON-COMPETITION AGREEMENT)

CC85.   Defendant re-alleges Paragraphs CC1–CC84 as set forth above.

CC86.   The Non-Competition Agreement between Haggard and Synthes is a valid and enforceable agreement.

CC87.   Haggard is contractually prohibited from competing with Synthes during his employment and for a period of one year after terminating his employment with Synthes.

CC88.   Haggard has breached his contractual duties to Synthes by, directly or indirectly, servicing a territory on behalf of Globus that includes the territory he serviced while employed by Synthes, within one year after termination of his employment with Synthes, in violation of the non-competition obligations in his Non-Competition Agreement.

CC89.   Haggard has further breached his contractual duties to Synthes by, directly or indirectly, inevitably providing confidential, proprietary, and/or trade secret information about that territory and its customers to Globus and/or its agents or representatives, in violation of his confidentiality obligations in the Non-Competition Agreement.

CC90.   By representing Globus in his former Synthes territory and in the same capacity as during his employment with Synthes, and by selling or attempting to sell competitive products to those customers to which he sold during his employment with Synthes, Haggard inevitably will continue to violate his confidentiality obligations in his Non-Competition Agreement.

CC91.   Haggard has further breached his contractual duties to Synthes by, directly or indirectly, soliciting Synthes' customers on behalf of Synthes' competitor, Globus, in his former Synthes territory within one year after his termination of employment with Synthes, in violation of the non-solicitation obligations in his Non-Competition Agreement.

CC92.   Unless the relief requested herein and in the Motion for Injunctive Relief Synthes filed this same date is granted, Haggard will continue, among other things, to

compete with his former employer, take advantage of the access that Synthes gave him to its valuable business relationships, trade secrets, and confidential and proprietary business information, and to continue to solicit Synthes' current and prospective customers, all in violation of Haggard's contractual obligations.

CC93.   Haggard's breaches of contract are a direct and proximate cause of Synthes' damages.

CC94.   All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

CC95.   The equities are with Synthes and against Haggard.

CC96.   The public interests are served by ordering the relief sought by Synthes.

CC97.   Synthes has no adequate remedy at law.

CC98.   Haggard's acts alleged herein were performed without the consent of Synthes.

CC99.   Synthes has suffered irreparable damage by Haggard's unlawful activities and Haggard's activities will continue to cause Synthes irreparable harm.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

A.   For actual damages that Synthes is entitled to recover as a result of Haggard's breach of his Non-Competition Agreement with Synthes;

B.   For incidental and consequential damages as permitted by law;

C.   For a temporary restraining order and preliminary and permanent injunction compelling Haggard to comply with the terms of the Non-Competition Agreement;

D.   For an Order vacating the Order issued by the Colorado State Court on March 25, 2009, enjoining Synthes from attempting to restrict Haggard's employment in the industry;

E.      For Synthes' attorneys fees and costs incurred in enforcing the terms of Non-Competition Agreement, as permitted by the Non-Competition Agreement; and

F.      For all such other relief as this Court deems appropriate.

## COUNT II – BREACH OF CONTRACT (INNOVATION AND NON-DISCLOSURE AGREEMENT)

CC100.  Defendant re-alleges Paragraphs CC1–CC99 as set forth above.

CC101.  The Innovation and Non-Disclosure Agreement between Haggard and Synthes is a valid and enforceable agreement.

CC102.  Haggard breached his contractual duties to Synthes by inevitably disclosing to Globus, a direct competitor of Synthes, the identities of customers in his Synthes territory,  as well as other confidential information of Synthes.

CC103.  Haggard has further breached his contractual duties to Synthes by, directly or indirectly, inevitably providing confidential, proprietary, and/or trade secret information about that territory and its customers to Synthes' competitor, Globus, and/or its agents or representatives, in violation of his non-disclosure and confidentiality obligations in his Innovation and Non-Disclosure Agreement.

CC104.  By representing Globus in his former territory and in the same capacity as during his employment with Synthes, and by selling or attempting to sell competitive products to those customers to which he sold during his employment with Synthes, Haggard inevitably will continue to violate his non-disclosure and confidentiality obligations in his Non-Disclosure Agreement.

CC105.  Unless the relief requested herein and in the Motion for Injunctive Relief Synthes filed this same date is granted, Haggard will continue, among other things, to

take advantage of Synthes' valuable trade secrets and confidential and proprietary business information in violation of Haggard's contractual obligations.

CC106. Haggard's breaches of contract are a direct and proximate cause of Synthes' damages.

CC107. All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

CC108. The equities are with Synthes and against Haggard.

CC109. The public interests are served by ordering the relief sought by Synthes.

CC110. Synthes has no adequate remedy at law.

CC111. Haggard's acts alleged herein were performed without the consent of Synthes.

CC112. Synthes has suffered irreparable damage by Haggard's unlawful activities and Haggard's activities will continue to cause Synthes irreparable harm.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

A.      For actual damages that Synthes is entitled to recover as a result of Haggard's breach of his Innovation and Non-Disclosure Agreement with Synthes;

B.      For incidental and consequential damages as permitted by law;

C.      For a temporary restraining order and preliminary and permanent injunction compelling Haggard to comply with the terms of the Innovation and Non-Disclosure Agreement; and

D.      For all such other relief as this Court deems appropriate.

**COUNT III – BREACH OF DUTY OF LOYALTY AND/OR FIDUCIARY DUTY**

CC113. Defendant re-alleges Paragraphs CC1–CC112 as set forth above

CC114. Haggard held a position of trust and confidence as an employee of Synthes.

CC115. In equity and good conscience, Haggard was bound to act in good faith and with due regard to the interests of Synthes while he was an employee of Synthes.

CC116. Synthes was dependent upon Haggard to act only in Synthes' best interests until the end of his employment with Synthes.

CC117. As evidenced by Haggard's Colorado State Court Action, Haggard inevitably breached his fiduciary duties to Synthes by misappropriating confidential and proprietary information about Synthes, including Synthes' customer information and other institutional knowledge regarding Synthes' customer relationships, so that Globus and others could benefit from the use of such information, all in violation of Colorado common law.

CC118. As evidenced by Haggard's Colorado State Court Action, Haggard inevitably breached his fiduciary duties to Synthes by soliciting Synthes' customers to learn about and/or purchase products of Synthes' competitors after, if not before, his termination of employment with Synthes.

CC119. By operating his separate cigar business on Synthes time, Haggard breached his fiduciary obligations to Synthes.

CC120. Haggard's actions were undertaken with the specific intent to injure Synthes in its business and to destroy a significant aspect of Synthes' business in his former territory.

CC121.  Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of Haggard's tortious conduct.

CC122.  Haggard's tortious conduct is a direct and proximate cause of Synthes' damages.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

    A.    For actual damages that Synthes is entitled to recover as a result of Haggard's breaches of fiduciary duties;

    B.    For incidental and consequential damages as permitted by law; and

    C.    For all such other relief as this Court deems appropriate.

### COUNT IV - VIOLATION OF THE COLORADO TRADE SECRETS ACT

CC123.  Defendant re-alleges Paragraphs CC1–CC122 as set forth above.

CC124.  Haggard acquired access to the following, among other, Synthes confidential trade secrets during his employment with Synthes:

    A.    Customer lists, customer preferences and customer usage history;

    B.    prices, renewal dates and other detailed terms of customer and supplier contracts and proposals;

    C.    pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies;

    D.    physical security systems, access control systems, network and other equipment designs;

    E.    employment and payroll records;

    F.    forecasts, budgets and other non-public financial information;

    G.    product performance information, product technical information and product know-how, inventions, discoveries, methodologies, algorithms, formulas, protocols, reports, data, results, observations, computer programs, patent applications, strategic plans, hypotheses, research directions, developments,

improvements, drawings, designs, specifications, opinions of legal counsel, and draft or final regulatory filings; and

       H.    expansion plans, management policies and other business strategies and policies.

CC125.  Haggard has used or disclosed, or plans to use and disclose, trade secrets of Synthes without express or implied consent for the benefit of himself and Synthes' competitor, Globus.

CC126.  Haggard's misappropriation of Synthes' trade secrets was conducted in a willful and malicious manner.

CC127.  Haggard's conduct violates the Colorado Trade Secrets Act in that he has misappropriated Synthes' trade secrets, as that term is defined under the Act, and has used that information in an unlawful manner under Col. Rev. Stat. § 7-74-101 *et seq.*

CC128.  By representing Globus in his former territory and in the same capacity as during his employment with Synthes, and by selling or attempting to sell competitive products to those customers to which he sold during his employment with Synthes, Haggard inevitably will continue to use, disclose, and misappropriate Synthes' trade secrets.

CC129.  Synthes' trade secrets are not available to the general public, could not originate with another party, and were compiled at substantial expense to Synthes.

CC130.  Synthes takes substantial measures to protect the secrecy of its trade secrets, including, but not limited to, requiring employees to sign Non-Competition and Non-Disclosure Agreements.

CC131.  Synthes' trade secrets could not easily be duplicated and derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.

CC132.  Synthes' trade secrets currently provide Synthes a competitive advantage in the marketplace.

CC133.  Use of Synthes' trade secrets gives Haggard an unfair competitive advantage and compromises Synthes' competitive advantage.

CC134.  Use of Synthes' trade secrets by Haggard would unjustly enrich him.

CC135.  Haggard's conduct is a direct and proximate cause of Synthes' damages.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

A.    For actual damages that Synthes is entitled to recover as a result of Haggard's violation of the Colorado Trade Secrets Act;

B.    For incidental, consequential, and exemplary and/or punitive damages as permitted by the Colorado Trade Secrets Act;

C.    For equitable relief as permitted by the Colorado Trade Secrets Act;

D.    For Synthes' attorneys' fees and costs as permitted by the Colorado Trade Secrets Act; and

E.    For all such other relief as this Court deems appropriate.

## COUNT V - TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

CC136.  Defendant re-alleges Paragraphs CC1–CC135 as set forth above.

CC137.  Synthes has established business relations with its current and prospective customers.

CC138.  Haggard, without privilege, willfully and knowingly interfered with or attempted to interfere with and continues to attempt to interfere with Synthes' existing and prospective business relations with its customers.

CC139.  Haggard's interference has included blatant and wrongful attempts to persuade Synthes' current and prospective customers to discontinue their business relations with Synthes.

CC140.  As a direct and proximate result of Haggard's interference with Synthes' business relations, Synthes has suffered, and will continue to suffer, damages.

CC141.  Haggard's tortious conduct is a direct and proximate cause of Synthes' damages.

CC142.  Haggard's conduct evinces a willful and malicious indifference of Synthes' rights and an entire want of care.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

A.     For actual damages that Synthes is entitled to recover as a result of Haggard's tortious conduct;

B.     For incidental, consequential, and punitive damages as permitted by law;

C.     For equitable relief as permitted by law; and

D.     For all such other relief as this Court deems appropriate.

### COUNT VI-CONVERSION

CC143.  Defendant re-alleges Paragraphs CC1–CC142 as set forth above.

CC144.  Haggard has wrongfully exercised dominion and control over property belonging to Synthes—Synthes' field equipment.

30

CC145.  Haggard's actions have deprived Synthes of the rightful possession of its property and therefore converted personal property rightfully owned by Synthes.

CC146.  Haggard converted Synthes' property for his use without authorization.

CC147.  Haggard retained Synthes' property intentionally, willfully, maliciously, and without any lawful justification.

CC148.  Synthes has suffered, and will continue to suffer, damages including the loss of the converted property and its inability to use that  property in the ordinary course of its business.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

A.    For the return of all of its property in Haggard's possession or the value of such property, which is approximately $549,276.50

B.    For incidental, consequential and punitive damages as permitted by law;

C.    For injunctive relief as permitted by law;

D.    For all such relief as this Court deems appropriate.

## COUNT VI- NEGLIGENCE

CC149.  Defendant re-alleges Paragraphs CC1–CC148 as set forth above.

CC150.  In the course of his employment with Synthes, Haggard owed a duty of care to Synthes to manage and handle the field equipment that Synthes lent to him.

CC151.  Haggard breached the duty of care he owed Synthes when, upon his separation from Synthes, he failed to return and account for the field equipment Synthes loaned to him.

CC152.  Haggard's conduct evinces a reckless and malicious indifference to Synthes' rights and an entire want of care.

CC153.  Synthes has suffered, and will continue to suffer damages as a result of Haggard's breach the duty of care he owed Synthes.

WHEREFORE, Synthes demands judgment in its favor and against Haggard:

A.     For actual damages that Synthes is entitled to recover as a result of Haggard's negligence and failure to return and account for Synthes' property;

B.     For incidental, consequential and punitive damages as permitted by law;

C.     For injunctive relief as permitted by law; and

D.     For all such other relief as this Court deems just and appropriate.

**VERIFICATION**

I, Matt Shapcott, hereby state that I am Regional Manager of Synthes USA Sales, LLC; that I am authorized to take this Verification on behalf of Synthes USA Sales, LLC; and that pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America, that I have knowledge of the facts set forth in the foregoing Verified Counter-claim, other those relating to Synthes' litigation involving other parties, and that these are true and correct.   I am relying on the separate verification of others at Plaintiff Synthes as to the issues related to Synthes' litigation, to the extent not already a matter of public record.


s/Matt Shapcott
Matt Shapcott


Executed on *April 3, 2009*

**VERIFICATION**

I, Jacqueline Meister, hereby state that I am Senior Human Resources Business Partner of Synthes USA Sales, LLC; that I am authorized to take this Verification on behalf of Synthes USA Sales, LLC; and that pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America, that I have knowledge of the facts set forth in the foregoing Verified Counterclaim, relating to Synthes' litigation involving parties other than Jamie Haggard, and that these are true and correct.

s/Jacqueline Meister
Jacqueline Meister

Executed on *April 3, 2009*

Respectfully submitted this 3rd day of April, 2009.

s/ Daniel M. Combs
Daniel M. Combs
Paul F. Lewis
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street
Suite 3000
Denver, CO 80202-3622
Phone:  303.299.8477
Fax:   719.635.4576
Email: dcombs@shermanhoward.com
       plewis@shermandhoward.com

Anthony B. Haller (*application pending*)
Scott F. Cooper (*application pending*)
Donald D. Gamburg
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
Phone:       215.569.5690/5487/5330
Fax:   215.832.5690/5487/5330
haller@blankrome.com/cooper@blankrome.com/
gamburg@blankrome.com

Attorneys for Defendant-Counterclaimant

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on this 3rd day of April, 2009, I electronically filed the foregoing **DEFENDANT-COUNTERCLAIMANT'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND VERIFIED COUNTERCLAIM** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

efischer@fischerandfischerlaw.com

Erik G. Fisher
FISCHER AND FISCHER LLP
125 South Howes Street, Suite 900
Fort Collins, CO 80521

*s/Louisa Boyte*
Louisa Boyte, Assistant to Daniel M. Combs