# EXHIBIT A-6

| | |
|---|---|
| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| *Attorneys for Plaintiffs:*<br>Erik G. Fischer, #16856<br>FISCHER AND FISCHER, LLP<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone:  (970) 482-4710<br>e-mail: efischer@fischerandfischerlaw.com | Case No.:<br><br><br><br><br>Courtroom: |

## SUMMONS

To the above named Defendant: Take notice that,

You are hereby summoned and required to file with the clerk of this court an answer or other response to the attached complaint.  If service of the summons and complaint was made upon you within the State of Colorado, you are required to file your answer or other response within twenty (20) days after such service upon you.  If service of the summons and complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within thirty (30) days after such service upon you.

If you fail to file your answer or other response to the complaint in writing within the applicable time period, judgment by default may be entered against you by the court for the relief demanded in the complaint without further notice.

Dated this 20 day of March, 2009.

FISCHER & FISCHER, LLP

/s/ Erik G. Fischer
Erik G. Fischer (Reg. No. 16856)
FISCHER & FISCHER, LLP
125 South Howes Street, Suite 900
Fort Collins, Colorado 80521
Telephone: (970) 482-4710
Facsimile: (970) 482-4729

Original signature on file at the office of Fischer & Fischer, LLP
pursuant to C.R.C.P. § 121-1-26(9); Filed electronically via Lexis
Nexis File & Serve.

**This summons is issued pursuant to rule 4, Rules of C.R.C.P. as amended.  A copy of the complaint must be served with
this summons.**

| | |
|---|---|
| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| *Attorneys for Plaintiffs:*<br>Erik G. Fischer, #16856<br>FISCHER AND FISCHER, LLP<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone: (970) 482-4710<br>e-mail: efischer@fischerandfischerlaw.com | Case No.:<br><br><br><br>Courtroom: |

**COMPLAINT FOR DECLARATORY JUDGMENT**
**INJUNCTION AND DAMAGES AND JURY DEMAND**

COMES NOW Plaintiff, Jamie Haggard, by and through counsel, Fischer & Fischer, LLP, and for his Complaint for Declaratory Judgment, states as follows:

## Venue

1.     Venue is proper in the District Court for Larimer County, State of Colorado, pursuant to Colorado Constitution Article VI(9), and pursuant to C.R.C.P. Rule 98 as Plaintiff's employment was primarily within this County and State.

## Parties and Jurisdiction

2.     Plaintiff is an individual who resides at 938 W. Mountain Avenue, Fort Collins, Colorado 80521.

3.     Defendant is a corporation organized pursuant to the laws of Pennsylvania with a principal address in Pennsylvania of 1302 Wrights Lane East, West Chester, Pennsylvania 19380.

4.     Defendant operates throughout the Untied States and in Colorado, including the County of Larimer, by soliciting and selling products within the County of Larimer, State of Colorado.

## **General Allegations**

5.      Plaintiff, Jamie Haggard, was hired by Synthes Spine to commence work on April 1st of 2000.

6.      At the time Mr. Haggard was hired, Synthes Spine was fully aware that Mr. Haggard resided in the City of Fort Collins, County of Larimer, and State of Colorado.

7.      The contract executed by Mr. Haggard for employment with Synthes Spine was executed in the City of Fort Collins, County of Larimer and State of Colorado.

8.      Mr. Haggard's territory in working for Synthes Spine included areas in Northern Colorado, namely Fort Collins, Loveland and Greeley.

9.      The majority of Mr. Haggard's sales for Synthes Spine occurred in Northern Colorado.

10.     From April of 2000 until Mr. Haggard's dismissal in 2009, Mr. Haggard was not employed as an executive or in a management position for Synthes Spine.

11.     The Defendant did not hire Mr. Haggard based upon acquiring any business interest from Mr. Haggard.

12.     At the time of Mr. Haggard's dismissal, Mr. Haggard did not have in his possession any trade secrets of the Defendant.

13.     The names of doctors with whom Mr. Haggard sold Defendant's products are readily ascertainable from public documents, including but not limited to, the various phone books published and distributed in Northern Colorado.

14.     Mr. Haggard was terminated by Synthes Spine on February 16, 2009.

## **First Claim for Relief**
### **(Declaratory Judgment)**

15.     Plaintiff incorporates the above paragraphs as though fully set forth herein.

16.     Pursuant to Colorado Rules of Civil Procedure, Rule 57(b), Plaintiff is entitled to seek a declaratory judgment regarding the contractual rights between Plaintiff and Defendant.

17.     The Defendant has notified Plaintiff of its intent to enforce certain contractual provisions of the previously signed employment agreement.

18.     Pursuant to CRS 8-2-113, the contractual provisions that Defendant seeks to enforce are void.

19.     Plaintiff seeks declaratory judgment that the contractual provisions prohibiting Plaintiff from working in Northern Colorado in the same field, and calling on the same medical personnel for sales, are void, pursuant to statute.

## Second Claim for Relief
### (Injunction)

20.     Plaintiff incorporates the above paragraphs as though fully set forth herein.

21.     Defendant's conduct in attempts to enforce alleged contractual provisions prohibiting Plaintiff from working in norther Colorado violates Colorado law and, if left uncured, will bring irreparable damage to Plaintiff and his family.

22.     Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff seeks a permanent injunction enjoining Defendant from enforcing covenants not to compete that violate Colorado statute and law.

## Third Claim for Relief
### (Violation of the Colorado Wage Act CRS 8-4-109)

23.     Plaintiff incorporates the above paragraphs as though fully set forth herein.

24.     The Plaintiff in this action was terminated on the volition of his employer.

25.     At the time of termination, Plaintiff was owed approximately $16,000.00 in wages.

26.     The Defendant in this action has illegally withheld these wages claiming an unlawful setoff for certain equipment in the possession of Plaintiff.

27.     Plaintiff has returned all of Defendant's equipment in his possession, said equipment to be of the approximate value of $1 Million.

28.     The Defendant is in violation of CRS 8-4-109 as said wages have not been tendered to Plaintiff in accordance with this statute.

29.     Plaintiff is entitled to 125% of the amount of such wages.

30.     Plaintiff is also entitled to his reasonable costs and attorney fees pursuant to CRS 8-4-110.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against the Defendant as follows:

A.   That the April 1, 2000 contract between Plaintiff and Defendant be declared as void in violation of CRS 8-2-113.

B.   That the Plaintiff be awarded damages in an amount to be determined at trial based upon Defendant's violation of CRS 8-4-109.

C.   That Plaintiff is entitled to recover reasonable attorney fees and costs associated with this action.

D.   That this Honorable Court grant such further relief necessary to effectuate the legal rights between Plaintiff and Defendant.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

DATED this 20th day of March, 2009.

Fischer & Fischer, LLP

/s/ Erik G. Fischer
Erik G. Fischer (Reg. No. 16856)
FISCHER & FISCHER, LLP
125 South Howes Street, Suite 900
Fort Collins, CO 80521
Telephone: (970) 482-4710
Facsimile: (970) 482-4729
*Original signature on file at the office*
*of Fischer & Fischer, LLP, pursuant to*
*C.R.C.P. § 121-1-26(9); filed electronically*
*via Lexis Nexis File & Serve.*

Plaintiffs' Address:
938 W. Mountain Avenue
Fort Collins, Colorado 80521

4

| | |
|---|---|
| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| *Attorneys for Plaintiffs:*<br>Erik G. Fischer, #16856<br>FISCHER AND FISCHER, LLP<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone: (970) 482-4710<br>e-mail: efischer@fischerandfischerlaw.com | Case No.:<br><br><br><br>Courtroom: |

**DISTRICT COURT CIVIL CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSSCLAIM OR THIRD PARTY COMPLAINT**

1.  This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, crossclaim or third party complaint in every district court civil cases. It shall not be filed in Domestic Relations, Probate, Water, Juvenile, or Mental Health Cases.

2.  Check the boxes applicable to this case.

    ☒   Simplified Procedure under C.R.C.P. 16.1 APPLIES to this case because the party does not seek a monetary judgment in excess of $100,000.00 against another party, including any attorney's fees, penalties or punitive damages but excluding interest and costs and because this case is not a class action or forcible entry and detainer, Rule 106, Rule 120, or other expedited proceeding.

    ☐   Simplified Procedure under C.R.C.P. 16.1 DOES NOT APPLY to this case because

        ☐   This case is a class action or forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding;

        ☐   This party is seeking a monetary judgment for more than $100,000.00 against another party, including any attorney's fees, penalties or punitive damages but excluding interest and costs

☐     Another party has previously stated in its Cover sheet that C.R.C.P. 16.1 does not apply to this case.

3. ☒   This party make a jury demand at this time and pays the requisite fee.

Dated this 20 day of March, 2009.

Respectfully Submitted,

Fischer & Fischer, LLP

/s/ Erik G. Fischer
Erik G. Fischer
Original signature on file at the office of Fischer & Fischer, LLP pursuant to C.R.C.P. § 121-1-26(9); Filed electronically via Lexis Nexis File & Serve.

| | |
|---|---|
| District Court, Larimer County, Colorado<br>201 LaPorte Avenue, Suite 100, Ft Collins, CO<br>80521-2761<br><br>Plaintiff(s): JAMIE HAGGARD<br><br>v.<br><br>Defendant(s): SYNTHES SPINE | ▲ **COURT USE ONLY** ▲<br>Case Number: 09CV265<br><br>Courtroom: 5B |

## NOTICE JUDICIAL CIVIL CASE MANAGEMENT

All civil cases are subject to judicial screening and case management. This case is assigned to Judge JAMES H HIATT-5B. Trial will not be set until the Court determines that a trial setting is appropriate. Within 30-40 days of filing, your case will be reviewed and appropriate orders sent to counsel and pro se parties

It is imperative that all returns of service be filed promptly with the Court, so that the Court, when reviewing the case, can accurately assess its status.

Plaintiff's counsel shall provide a copy of this notice to all counsel (or pro se parties) who enter appearances.

The Civil Case Cover Sheet (JDF 601) required pursuant to C.R.C.P. 16.1 was to be included with your initial pleading. If it was not included, it must be filed within 15 days from the date of this notice.

Dated this 23RD day of MARCH , 2009.

Chief Judge James H. Hiatt

Copies sent to:        ATP

Revised 8/25/04

| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| --- | --- |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| *Attorneys for Plaintiffs:*<br>Erik G. Fischer, #16856<br>FISCHER AND FISCHER, LLP<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone: (970) 482-4710<br>e-mail: efischer@fischerandfischerlaw.com | Case No.: 2009CV265 |
| | Courtroom: 5B |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

COMES NOW Plaintiff, Jamie Haggard, by and through counsel, Fischer & Fischer, LLP, and for his Motion for Temporary Injunction, states that which follows:

1.      Plaintiff hereby requests that this Honorable Court grant a Temporary Restraining Order as Plaintiff's former employer is threatening enforcement of an unlawful restrictive covenant subsequent to Plaintiff's termination of employment that effectively bars Plaintiff's right to work.

2.      The Complaint filed in this action, which is attached hereto as "Exhibit A", is hereby incorporated herein.

3.      That attached as "Exhibit B" is the Sales Consultant - Confidentiality, Non-Solicitation and Non-Competition Agreement executed April 1, 2000 in the State of Colorado, County of Larimer, by Plaintiff.

4.      That attached as "Exhibit C" is the Affidavit of Plaintiff identifying his job duties for his former employer as a sales consultant.

5.      That attached as "Exhibit D" is a letter dated February 16, 2009 from Synthes Spine which identifies the unlawful restrictions that Synthes Spine intends to place on Mr. Haggard, this threat being a bar to Plaintiff's employment with his new employer, Globus Medical.

6.      Pursuant to Colorado statute, specifically CRS 8-2-113:

It shall be unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit.

(2)     Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

(a)     Any contract for the purchase and sale of a business or the assets of a business;

(b)     Any contract for the protection of trade secrets;

(c)     Any contractual provision provided for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

(d)     Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

7.      As identified in Plaintiff's Affidavit, Plaintiff was merely a sales consultant, being paid on commission for sales to various orthopedic and spine surgeons in the Northern Colorado area. Plaintiff did not sell any business to Defendant. Plaintiff was not employed as an executive or in a management position for Synthes Spine. Plaintiff does not possess any trade secrets that are usable by Plaintiff as all medical devices of Defendant are patented and different than devices sold by Plaintiff's new employer.

8.      A Temporary Restraining Order in this case will maintain the status quo until this Court can make a final determination pursuant to the Complaint filed as to the validity of the covenant not to compete which, by statute, is presumed void.

9.      As outlined in Plaintiff's Affidavit, Mr. Haggard cannot work for his new employer in spite of the fact that the Defendant terminated Mr. Haggard from his employment. Mr. Haggard has a pregnant wife and one small child to support and needs to work within the community where he owns his residence.

10.     Pursuant to the Supreme Court's guidance in *Rathke v McFarland*, 648 P.2d 648 (Colo. 1982), this Court must consider certain elements for entry of the Temporary Restraining Order.

11.     These elements require the Court to make a finding that there would be immediate irreparable injury without injunctive relief, that there is no plain, speedy and adequate remedy at law, and that there would be a reasonable probability of success on the merits at trial.

12.     In the case at bar, all three (3) elements required to enter the Temporary Restraining Order are clearly present.

13.     First, it is clear that irreparable injury will happen to the Plaintiff should this Court fail to enter the Temporary Restraining Order.

14.     As identified in Plaintiff's Affidavit, the Plaintiff will lose employment within the area that Plaintiff resides and will lose substantial income during the period in question.

15.     Without the Temporary Restraining Order, the Defendant will effectively bar Plaintiff from employment and cause irreparable injury to Plaintiff by the loss of income which could result in failure on his mortgage and other bills necessary to keep Plaintiff financially viable.

16.     The final element necessary for this Court to consider is that Plaintiff has a reasonable probability of success on the merits.

17.     As identified in this motion and Plaintiff's Complaint, these types of non-competition agreements, which bar employment, are void and Plaintiff's activities cannot, and do not, meet any of the four (4) exceptions to this unlawful right of employment.

18.     It is anticipated that Defendant will argue that Pennsylvania law should apply to this non-solicitation and non-competition agreement. The Colorado Courts have already decided that Colorado has a materially greater interest in determining enforceability of certain non-compete provisions than a state designated interest-of-law provision in employment contracts in cases where an employee was a resident of and was employed in Colorado, signed the contract in Colorado and outside state's interest as state of employer's incorporation was tangential. *See, King v PA Consulting Group, Inc.*, 485 F.3d 577, CA 10th Cir. (2007), a copy of which is attached as "Exhibit E".

19.     The balance of equity strongly favors maintaining the status quo and not allowing the Defendant in this case to threaten or to enforce an unlawful and invalid restrictions on Plaintiff's right to work.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a Temporary Restraining Order stopping enforcement of the covenant not to compete and allowing the Plaintiff

to accept employment with Globus Medical allowing Plaintiff to work in his chosen field and allowing Plaintiff to freely compete subject to an agreement not to use any trade secrets, and allowing Plaintiff to sell the products of his new company to physicians known to him, or physicians readily identifiable by resorting to media such as the phone book.

DATED this 17th day of March, 2009.

Respectfully submitted,

*Fischer & Fischer, LLP*

/s/ Erik G. Fischer
Erik G. Fischer (Reg. No. 16856)
Original signature on file at the office of Fischer & Fischer, LLP pursuant to C.R.C.P. § 121-1-26(9); Filed and served electronically via Lexis Nexis File & Serve.

4

| | |
|---|---|
| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| *Attorneys for Plaintiffs:*<br>Erik G. Fischer, #16856<br>FISCHER AND FISCHER, LLP<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone: (970) 482-4710<br>e-mail: efischer@fischerandfischerlaw.com | Case No.:<br><br><br>Courtroom: |
| **COMPLAINT FOR DECLARATORY JUDGMENT<br>INJUNCTION AND DAMAGES AND JURY DEMAND** | |

COMES NOW Plaintiff, Jamie Haggard, by and through counsel, Fischer & Fischer, LLP, and for his Complaint for Declaratory Judgment, states as follows:

## Venue

1.     Venue is proper in the District Court for Larimer County, State of Colorado, pursuant to Colorado Constitution Article VI(9), and pursuant to C.R.C.P. Rule 98 as Plaintiff's employment was primarily within this County and State.

## Parties and Jurisdiction

2.     Plaintiff is an individual who resides at 938 W. Mountain Avenue, Fort Collins, Colorado 80521.

3.     Defendant is a corporation organized pursuant to the laws of Pennsylvania with a principal address in Pennsylvania of 1302 Wrights Lane East, West Chester, Pennsylvania 19380.

4.     Defendant operates throughout the Untied States and in Colorado, including the County of Larimer, by soliciting and selling products within the County of Larimer, State of Colorado.

**EXHIBIT**

**A**

## General Allegations

5.      Plaintiff, Jamie Haggard, was hired by Synthes Spine to commence work on April 1st of 2000.

6.      At the time Mr. Haggard was hired, Synthes Spine was fully aware that Mr. Haggard resided in the City of Fort Collins, County of Larimer, and State of Colorado.

7.      The contract executed by Mr. Haggard for employment with Synthes Spine was executed in the City of Fort Collins, County of Larimer and State of Colorado.

8.      Mr. Haggard's territory in working for Synthes Spine included areas in Northern Colorado, namely Fort Collins, Loveland and Greeley.

9.      The majority of Mr. Haggard's sales for Synthes Spine occurred in Northern Colorado.

10.      From April of 2000 until Mr. Haggard's dismissal in 2009, Mr. Haggard was not employed as an executive or in a management position for Synthes Spine.

11.      The Defendant did not hire Mr. Haggard based upon acquiring any business interest from Mr. Haggard.

12.      At the time of Mr. Haggard's dismissal, Mr. Haggard did not have in his possession any trade secrets of the Defendant.

13.      The names of doctors with whom Mr. Haggard sold Defendant's products are readily ascertainable from public documents, including but not limited to, the various phone books published and distributed in Northern Colorado.

14.      Mr. Haggard was terminated by Synthes Spine on February 16, 2009.

## First Claim for Relief
### (Declaratory Judgment)

15.      Plaintiff incorporates the above paragraphs as though fully set forth herein.

16.      Pursuant to Colorado Rules of Civil Procedure, Rule 57(b), Plaintiff is entitled to seek a declaratory judgment regarding the contractual rights between Plaintiff and Defendant.

17.      The Defendant has notified Plaintiff of its intent to enforce certain contractual provisions of the previously signed employment agreement.

2

18.     Pursuant to CRS 8-2-113, the contractual provisions that Defendant seeks to enforce are void.

19.     Plaintiff seeks declaratory judgment that the contractual provisions prohibiting Plaintiff from working in Northern Colorado in the same field, and calling on the same medical personnel for sales, are void, pursuant to statute.

## Second Claim for Relief
### (Injunction)

20.     Plaintiff incorporates the above paragraphs as though fully set forth herein.

21.     Defendant's conduct in attempts to enforce alleged contractual provisions prohibiting Plaintiff from working in norther Colorado violates Colorado law and, if left uncured, will bring irreparable damage to Plaintiff and his family.

22.     Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff seeks a permanent injunction enjoining Defendant from enforcing covenants not to compete that violate Colorado statute and law.

## Third Claim for Relief
### (Violation of the Colorado Wage Act CRS 8-4-109)

23.     Plaintiff incorporates the above paragraphs as though fully set forth herein.

24.     The Plaintiff in this action was terminated on the volition of his employer.

25.     At the time of termination, Plaintiff was owed approximately $16,000.00 in wages.

26.     The Defendant in this action has illegally withheld these wages claiming an unlawful setoff for certain equipment in the possession of Plaintiff.

27.     Plaintiff has returned all of Defendant's equipment in his possession, said equipment to be of the approximate value of $1 Million.

28.     The Defendant is in violation of CRS 8-4-109 as said wages have not been tendered to Plaintiff in accordance with this statute.

29.     Plaintiff is entitled to 125% of the amount of such wages.

30.     Plaintiff is also entitled to his reasonable costs and attorney fees pursuant to CRS 8-4-110.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against the Defendant as follows:

A.   That the April 1, 2000 contract between Plaintiff and Defendant be declared as void in violation of CRS 8-2-113.

B.   That the Plaintiff be awarded damages in an amount to be determined at trial based upon Defendant's violation of CRS 8-4-109.

C.   That Plaintiff is entitled to recover reasonable attorney fees and costs associated with this action.

D.   That this Honorable Court grant such further relief necessary to effectuate the legal rights between Plaintiff and Defendant.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

DATED this 20th day of March, 2009.

                                        **Fischer & Fischer, LLP**

                                        /s/ Erik G. Fischer
                                        Erik G. Fischer (Reg. No. 16856)
                                        FISCHER & FISCHER, LLP
                                        125 South Howes Street, Suite 900
                                        Fort Collins, CO 80521
                                        Telephone: (970) 482-4710
                                        Facsimile: (970) 482-4729
                                        *Original signature on file at the office*
                                        *of Fischer & Fischer, LLP, pursuant to*
                                        *C.R.C.P. § 121-1-26(9); filed electronically*
                                        *via Lexis Nexis File & Serve.*

Plaintiffs' Address:
938 W. Mountain Avenue
Fort Collins, Colorado  80521



Received

**APR 1 4 2000**

in HR

SALES CONSULTANT

CONFIDENTIALITY, NON-SOLICITATION AND NON-COMPETITION AGREEMENT

In consideration of my employment with Synthes Spine Company, Ltd and my assignment of a specific territory representing Synthes, the receipt and sufficiency of which consideration I hereby acknowledge, I agree as follows:

ACKNOWLEDGMENTS:

I acknowledge that: (1) Synthes (USA) Ltd's business (referred to as "Synthes") encompasses a broad range of technologies, products and services that Synthes now provides and may in the future develop internally or obtain through acquisitions, merger sub-contracting or other-wise; (2) Synthes is in a highly competitive industry; (3) Synthes expends substantial time and money, on an ongoing basis, to train its employees, to develop medical, bone implant and endoscopic technologies, products and services, including, but not limited to, compression plates and screws, intermedullarv nails, external fixation devices, percutaneous devices, cranio facial implants, mandible implants, spinal implants and screws, and minimally invasive and endoscopic products, to develop and maintain a proprietary data base of prospects, maintain and expand its customer base, and improve and develop its technologies, products and services; (4) during my employment with Synthes, I will have access to, receive, learn, develop and/or conceive technical. customer, prospect, financial or other information that is proprietary and confidential to Synthes', (5) this information must be kept in strict confidence to protect Synthes' business and maintain its competitive position in the marketplace, and this information must be kept in strict confidence to protect Synthes' business and maintain its competitive position in the marketplace, and this infon-nation would be useful to Synthes' existing and potential competitors for indefinite periods of time; (6) Synthes would be irreparably harmed by my subsequent employment by a competitor of Synthes, regardless of the position or territory, due to the high likelihood or possibility that there would be inadvertent or other disclosures of Synthes' proprietary and confidential information; (7) I have received adequate consideration for signing this agreement and acknowledge that the terms and conditions of my employment have been materially enhanced as a result of entering this agreement; and (8) the restrictions in this agreement are reasonable and necessary to protect Synthes' legitimate business interests.



EXHIBIT

B

CONFIDENTIALITY:

I understand that Synthes' proprietary and confidential information includes: (1) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies; (4) physical security systems, access control systems, network and other equipment designs; (5) employment and payroll records; (6) forecasts, budgets and other non-public financial information; product performance information, product technical information and product know-how; and (7) expansion plans, management policies and other business strategies and policies. At all times during and after my employment with Synthes, I will not disclose or communicate any of this information to any competitor or other third party, or use or refer to any of this information for any purpose, or remove materials containing any of this information from Synthes' premises, except as necessary for me to properly perform services for Synthes during my employment. Upon termination of my employment, I will immediately return to Synthes all correspondence files, business card files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other materials that contain any of this information, and I will not retain any copies of those materials. I understand that these provisions apply even to information of this type that is developed or conceived by me, alone or with others, at Synthes' instruction or otherwise. I also understand that these provisions apply to all information I may receive that is confidential or proprietary to any customer or other company who does business with Synthes.

NO SOLICITATION OF CUSTOMERS & PROSPECTS:

I will not, for a period of one year after my employment with Synthes terminates for any reason, solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Synthes' business, (1) any customer of Synthes at any time during the last three years of my employment; (2) any prospect that received or requested a proposal or offer from Synthes at any time during the last three years of my employment; (3) any affiliate of any such customer or prospect, or (4) any of the individual customer or prospect contacts I established during my employment with Synthes.

NO COMPETITION IN SAME TERRITORY:

I am employed by Synthes in sales, account management or maintenance, or customer service or support, with an assigned territory, and I agree I will not, for a period of one year after my employment terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of Synthes in the territory or territories that I am now, or have been responsible for at any time during the last year of my employment with Synthes. Competitors shall be deemed any person or entity who now, or in the future, sells, or intends to sell, orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device or instrumentation technologies, products, or services.

FORMER EMPLOYERS:

I will not disclose to Synthes or use for its benefit any information that, to my knowledge, is proprietary or confidential to any of my former employers, without proper consent. I have not signed any non-competition or other contract that prohibits me from being employed by Synthes or assigning my works and ideas to Synthes.

REMEDIES:

I acknowledge that it would be extremely difficult to measure the damages that might result from any breach by me of this agreement, and that a breach may cause irreparable injury to Synthes that could not be compensated by money damages. Therefore, Synthes will be entitled to enforce this agreement by obtaining a court order prohibiting me (and any other involved) from breaching this agreement. If a court decides that any provision of this agreement is not enforceable for any reason, then the rest of this agreement will not be affected. If a court decides that any provision of this agreement is not enforceable due to my state of residence or employment, then the provision will have no effect only while I am a resident of or employed in that state. If a court decides that any provision of this agreement is too broad, then the court may limit that provision and enforce it as limited.

ATTORNEYS' FEES:

I agree to indemnify Synthes for its reasonable attorneys fees and costs incurred in enforcing the terms of this agreement should I violate any of its terms.

I intend to be legally bound by this agreement, and I intend this to be a sealed instrument. This agreement will be governed by Pennsylvania law applicable to contracts entered into and performed in Pennsylvania.

*Jamie Haggard*
Signature

JAMIE HAGGARD
Printed Name

3-25-00
Date

 **SYNTHES**

SYNTHES U.S.A.

Received

EMPLOYEE INNOVATION AND NON-DISCLOSURE AGREEMENT

APR 1 4 2000

in HR

TO SYNTHES U.S.A.:

In consideration of my continued employment by SYNTHES and of the salary or wages paid to me and intending to be legally bound hereby, I agree:

(a) to disclose and assign to SYNTHES as its exclusive property, all inventions and technical or business innovations, including computer software developed or conceived by me solely or jointly with others on company time or on my own time during the period of my employment, (1) that are along the lines of the businesses, work or investigations of SYNTHES or its affiliates to which my employment relates, or as to which I may receive information due to my employment, or (2) that result from or are suggested by any work which I may do for SYNTHES or (3) that are otherwise made through the use of SYNTHES time, facilities or materials;

(b) to execute all necessary papers and otherwise provide proper assistance (at SYNTHES' expense), during and subsequent to my employment, to enable SYNTHES to obtain for itself or its nominees, patents, copyrights, or other legal protection for such inventions or innovations in any and all countries;

(c) to make and maintain for SYNTHES adequate and current written records of all such inventions or innovations as set forth in SYNTHES operating guidelines (PD020 Patent Applications);

(d) upon any termination of my employment to deliver to SYNTHES promptly all items which belong to SYNTHES or which by their nature are for the use of SYNTHES employees only, including, without limitation, all written and other materials which are of a secret or confidential* nature relating to the business of the Company or its affiliates;

(e) not to use, publish or otherwise disclose (except as my SYNTHES duties may require) either during or subsequent to my employment, any secret or confidential information or data of SYNTHES or any information or data of others, such as, but not limited to, sales dollars or units, product technology or product development, project information, manufacturing methods or technology, reports or reporting systems, which SYNTHES is obligated to maintain in confidence; and

(f) not to disclose or utilize in my work with SYNTHES any secret or confidential information of others (including any prior employers), or any inventions or innovations of my own which are not included within the scope of this agreement.

This agreement may not be modified or terminated, in whole or part, except in writing signed by an authorized representative of SYNTHES. Discharge of my undertakings in this agreement shall be an obligation of my executors, administrators, or other legal representatives or assigns. SYNTHES, wherever used in this agreement, includes SYNTHES U.S.A. , SYNTHES MAXILLOFACIAL, SYNTHES SPINE AND SYNTHES NORTH AMERICA.

I represent that, except as stated below, I have no agreements with or obligations to others in conflict with the foregoing.

_____      _Jamie Haggard_      _4-1-00_
(Signature)                          (Print Name)                (Date)

*These terms are used in the ordinary sense, without limitation. Examples of materials, information and data which may be of a secret or confidential nature are: writings, drawings, manuals, notebooks, reports, audio/video work, prototypes, models, inventions, formulas, processes, machines, compositions, computer software, microfiche, accounting methods, business plans and information systems including such materials, information and data which are in machine readable form or otherwise and any information gained through discussions and/or meetings.

| | |
|---|---|
| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| *Attorneys for Plaintiffs:*<br>Erik G. Fischer, #16856<br>FISCHER AND FISCHER, LLP<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone: (970) 482-4710<br>e-mail: efischer@fischerandfischerlaw.com | Case No.:<br><br><br>Courtroom: |

**AFFIDAVIT OF JAMIE HAGGARD**

STATE OF COLORADO    )
                            )SS
COUNTY OF LARIMER    )

I, Jamie Haggard, being first duly sworn, depose and state as follows:

1.      I am over the age of eighteen (18) years.

2.      I have personal knowledge of the information contained within this Affidavit.

3.      I currently reside at 938 W. Mountain Avenue, Fort Collins, Colorado  80521.

4.      I am married to Gina Haggard.

5.      My wife is currently pregnant with our second child

6.      I am the Plaintiff in the action entitled Jamie Haggard v Synthes Spine.

7.      I have been in contact with Globus Medical and Globus Medical has indicated a willingness to hire me in a sales consultant position in Northern Colorado essentially covering much of the same territory previously covered in working for the Defendant.



EXHIBIT

C

8.      If the contractual language attempting to be enforced by Synthes Spine is not enjoined, I will suffer irreparable injury in that our family will not have sufficient income to remain financially viable, including payment of the mortgage and various costs and expenses required in the raising of two children.

9.      On or about April 1, 2000, I was hired by Synthes Spine as a sales consultant.

10.     I continued in that capacity until February 2, 2009 when I was terminated by Synthes Spine.

11.     During my employment, I contacted various orthopedic and neurosurgeons in the Northern Colorado area to promote and sell Synthes Spine products.

12.     At no time during my employment was I ever employed as an executive or in a management position for Synthes Spine.

13.     At no time during my employment, nor at any time, did I sell a business or trade secrets to Synthes Spine.

14.     I do not possess any trade secrets of Synthes Spine.

15.     All of Synthes Spine's products are well known in the industry.

16.     The majority of these products are protected by patents or trademarks obtained by Synthes Spine.

17.     The information regarding the doctors that I sold products to for Synthes Spine is readily attainable by any person through the use of a phone book or public information available at the various hospitals in Northern Colorado.

18.     In fact, many of my contacts were developed by using this public information when working for Synthes Spine.

19.     Any scientific information gleaned from my work with Synthes Spine is not readily transferable to my new prospective employer, Globus Medical, as the equipment sold by Globus Medical, by definition of patent law, must be different than the equipment sold by Synthes Spine.

Further, Affiant sayeth not.

Jamie Haggard

2

Subscribed and sworn to before me this 18TH
day of March, 2009 by Jamie Haggard.

Witness my hand and official seal.

My commission expires: __6-25-11__ .

_____
Notary Public

3



SYNTHES Spine
1302 Wrights Lane East
West Chester, Pennsylvania 19380
Telephone 610-719-5000

February 16, 2009

Jamie Haggard
201 Commerce, Unit 1
Fort Collins, CO  80524

Dear Jamie,

I am writing to remind you of your continuing obligations to Synthes under the Confidentiality, Non-Solicitation and Non-Competition Agreement ("Non-Competition Agreement") that you signed on March 25, 2000 and the Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement") that you signed April 1, 2000.  Copies of these Agreements are enclosed for your reference.

The Agreements prohibit you from disclosing Synthes' or its customers' confidential and proprietary information to any competitor or third party at any time.  They also prohibit you from using such information for any purpose after leaving Synthes.

The Non-Competition Agreement also prohibits you from disclosing Synthes' or its customers' confidential and proprietary information to any competitor or third party at any time.  It also prohibits you from using such information for any purpose after leaving Synthes.  The Non-Competition Agreement also prohibits you, for a period of one-year following your employment with Synthes, from soliciting the prospects or customers or their affiliates with whom you had contact for Synthes.  Finally, you are required to return all materials that belong to Synthes immediately upon the termination of your employment.  If you have not done so already, you should talk to your supervisor about returning these materials.

This letter is not intended to replace or limit your obligations under the Agreements in any way.  I am sure that you understand that Synthes takes these commitments seriously and will enforce its rights if you do not honor them.  If you have any questions about your continuing obligations, please review the Agreements.  In addition, I would be happy to confer with you if you have any questions.

We wish you well in your future endeavors.

Sincerely,

Indiya S. Hynd
HR Business Partner

enclosures



EXHIBIT
D

Westlaw.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

Page 1

**H**

United States Court of Appeals,
Tenth Circuit.
Michael J. KING, Plaintiff -
Counter-Defendant-Appellant/Cross-Appellee,
v.
PA CONSULTING GROUP, INC., a New Jersey
corporation, Defendant-
Counter-Claimant-Appellee/Cross-Appellant.
Nos. 05-1351, 05-1369, 05-1460.

May 8, 2007.

**Background:** Employee sued employer, seeking a declaratory judgment voiding disputed non-compete provisions in his contract and damages for violations of Lanham Act and tort law. Employer's parallel litigation was transferred to court and consolidated. The United States District Court for the District of Colorado, Lewis T. Babcock, J., dismissed claim that noncompete restrictions were void and, following jury trial on remaining claims, awarded employee damages on invasion of privacy claim and awarded employer damages on claim for breach of duty of loyalty and punitive damages. Employee appealed, and employer cross appealed.

**Holdings:** The Court of Appeals, Lucero, Circuit Judge, held that:
(1) noncompete provisions were enforceable under business purchase exception to general invalidity of such covenants under Colorado law;
(2) construction of contract under which sale forfeiture was not sole penalty for insufficient notice of termination was not clearly erroneous;
(3) refusal to grant additional discovery on eve of trial was not abuse of discretion;
(4) improper argument suggesting fabrication of testimony did not result in reversible error;
(5) invasion of privacy claim was for jury; and
(6) court could refuse to award attorney fees under Lanham Act to employer for prevailing on employer's claim for deceptively using his name after his resignation.

Affirmed.

West Headnotes

**[1] Contracts 95 ☞101(2)**

95 Contracts
  95I Requisites and Validity
    95I(F) Legality of Object and of Consideration
      95k101 What Law Governs
        95k101(2) k. Contracts Immoral and Against Public Policy. Most Cited Cases

**Contracts 95 ☞129(1)**

95 Contracts
  95I Requisites and Validity
    95I(F) Legality of Object and of Consideration
      95k129 Obstructing or Perverting Administration of Justice
        95k129(1) k. Agreements Relating to Actions and Other Proceedings in General. Most Cited Cases
Colorado had materially greater interest in determining enforceability of certain noncompete provisions than New Jersey, which was designated in choice-of-law provision in employment contract, as required element for determining choice of law, where employee was resident of and was employed in Colorado, he signed contract of Colorado, and New Jersey's interest as state of employer's incorporation was tangential. Restatement (Second) Conflict of Laws § 187(2).

**[2] Contracts 95 ☞101(2)**

95 Contracts
  95I Requisites and Validity
    95I(F) Legality of Object and of Consideration
      95k101 What Law Governs

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.


EXHIBIT
E

485 F.3d 577                                                                                    Page 2
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

95k101(2) k. Contracts Immoral and Against Public Policy. Most Cited Cases

**Contracts 95 ⟳129(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k129 Obstructing or Perverting Administration of Justice
                95k129(1) k. Agreements Relating to Actions and Other Proceedings in General. Most Cited Cases
Application of New Jersey law as specified in noncompete agreement was not contrary to fundamental policy of Colorado, which would have been state of applicable law under general choice of law provisions, and thus was appropriate, notwithstanding that such agreements were generally enforceable under New Jersey law and unenforceable under Colorado law, where agreement fell within exception to Colorado statute's general rule of unenforceability for business purchase agreements. Restatement (Second) Conflict of Laws § 187(2); West's C.R.S.A. § 8-2-113(2).

**[3] Contracts 95 ⟳116(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k115 Restraint of Trade or Competition in Trade
                95k116 In General
                    95k116(1) k. In General. Most Cited Cases
Colorado has a fundamental policy of voiding noncompete provisions that do not fall within one of the statutory exceptions. West's C.R.S.A. § 8-2-113(2).

**[4] Contracts 95 ⟳116(1)**

95 Contracts

    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k115 Restraint of Trade or Competition in Trade
                95k116 In General
                    95k116(1) k. In General. Most Cited Cases
Under Colorado law, naked covenant not to compete refers to a prohibition that is primarily aimed at restricting competition, rather than protecting legitimate business interests.

**[5] Contracts 95 ⟳116(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k115 Restraint of Trade or Competition in Trade
                95k116 In General
                    95k116(1) k. In General. Most Cited Cases
Under Colorado law, enforceability of noncompete provision was not dependent on whether provision cited one of statutory exceptions to statute generally voiding such provisions. West's C.R.S.A. § 8-2-113(2).

**[6] Contracts 95 ⟳116(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k115 Restraint of Trade or Competition in Trade
                95k116 In General
                    95k116(1) k. In General. Most Cited Cases
Under Colorado law, enforceability of the noncompete provisions must stand or fall on the applicability of one or more of the statutory exceptions. West's C.R.S.A. § 8-2-113(2).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
**(Cite as: 485 F.3d 577)**

Page 3

**[7] Contracts 95 ⚗116(1)**

95 Contracts
  95I Requisites and Validity
    95I(F) Legality of Object and of Considera-
tion
      95k115 Restraint of Trade or Competition
in Trade
        95k116 In General
          95k116(1) k. In General. Most
Cited Cases
Under Colorado law, noncompete provisions in ex-
ecutive employee's contract were enforceable under
business purchase exception to general invalidity of
such covenants where noncompete agreement was
executed in connection with executive's sale of
former employer's stock as part of merger, coupled
with merger agreement's explicit condition that
most of former employer's executives sign noncom-
pete agreements. West's C.R.S.A. § 8-2-113(2)(a).

**[8] Contracts 95 ⚗117(2)**

95 Contracts
  95I Requisites and Validity
    95I(F) Legality of Object and of Considera-
tion
      95k115 Restraint of Trade or Competition
in Trade
        95k117 General or Partial Restraint
          95k117(2) k. Limitations as to Time
and Place in General. Most Cited Cases
Under Colorado law, to be valid and enforceable, a
covenant not to compete must be reasonable both in
terms of duration and geographic scope.

**[9] Federal Courts 170B ⚗642**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
      170BVIII(D)2 Objections and Exceptions
        170Bk639 Motions Presenting Objec-
tions
          170Bk642 k. As to Judgment, or

Modification or Vacation of Judgment. Most Cited
Cases
Failure to sufficiently raise an issue in a motion for
judgment as a matter of law bars appellate review
of that issue.

**[10] Contracts 95 ⚗176(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k176 Questions for Jury
        95k176(2) k. Ambiguity in General.
Most Cited Cases
Whether a contract is ambiguous is a question of law.

**[11] Federal Courts 170B ⚗776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most
Cited Cases
Whether a contract is ambiguous is reviewed de
novo.

**[12] Contracts 95 ⚗176(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k176 Questions for Jury
        95k176(2) k. Ambiguity in General.
Most Cited Cases
If a contract is ambiguous, the resolution of its
proper meaning is a question of fact.

**[13] Federal Courts 170B ⚗874**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)5 Questions of Fact, Verdicts
and Findings
        170Bk870 Particular Issues and Ques-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577

Page 4

485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
**(Cite as: 485 F.3d 577)**

tions
170Bk874 k. Contracts, Damages
and Relief. Most Cited Cases
(Formerly 170Bk859)
Resolution of meaning of ambiguous contract is
subject to review on a clearly erroneous standard.

**[14] Federal Courts 170B ☞642**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
170BVIII(D)2 Objections and Exceptions
170Bk639 Motions Presenting Objec-
tions
170Bk642 k. As to Judgment, or
Modification or Vacation of Judgment. Most Cited
Cases
Appellant adequately preserved purely legal ques-
tion of whether contract was ambiguous by raising
it in his trial brief, without necessity of moving for
judgment as matter of law on issue, but did not pre-
serve challenge to jury's construction of ambiguous
agreement, without such motion.

**[15] Contracts 95 ☞202(2)**

95 Contracts
95II Construction and Operation
95II(C) Subject-Matter
95k202 Trade and Business
95k202(2) k. Restriction of Competi-
tion. Most Cited Cases
Construction of ambiguous agreements containing
noncompete agreement, which contained window
for resignations during which noncompete require-
ment would not apply and provision for salary for-
feiture for insufficient notice of resignation, was
not clearly erroneous in finding that salary forfeit-
ure was not sole penalty for insufficient notice of
termination.

**[16] Federal Civil Procedure 170A ☞1272.1**

170A Federal Civil Procedure

170AX Depositions and Discovery
170AX(A) In General
170Ak1272 Scope
170Ak1272.1 k. In General. Most
Cited Cases
District court did not abuse its discretion in refus-
ing to grant additional discovery on eve of trial
shortly after highly confidential documents in non-
compete dispute were redesignated to permit review
by former employee, rather than merely his attor-
ney, where attorney had documents in her posses-
sion for more than one year before seeking redesig-
nation and additional evidence sought through dis-
covery would not have been probative.

**[17] Federal Civil Procedure 170A ☞1973**

170A Federal Civil Procedure
170AXV Trial
170AXV(A) In General
170Ak1970 Counsel's Conduct and Argu-
ments
170Ak1973 k. Statements as to Facts,
Comments and Arguments. Most Cited Cases
Counsel for employer engaged in improper closing
argument by suggesting that former employee's
conversation with corporate counsel regarding non-
compete agreement never happened where employ-
ee's testimony on that point went unchallenged at
trial.

**[18] Federal Courts 170B ☞905**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)6 Harmless Error
170Bk905 k. Argument and Conduct
of Counsel. Most Cited Cases
Improper argument occurring when employer's
counsel suggested for first time in closing that
former employee had fabricated his testimony that
he discussed waiver in covenant not to compete
with corporate counsel did not prejudice employee;
counsel did not overemphasize argument.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577

Page 5

485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
**(Cite as: 485 F.3d 577)**

**[19] Torts 379 ⟳388**

379 Torts
    379IV Privacy and Publicity
      379IV(C) Use of Name, Voice or Likeness;
Right to Publicity
        379k386 Conduct or Misappropriation
Actionable in General
          379k388 k. Name. Most Cited Cases

**Torts 379 ⟳390(1)**

379 Torts
    379IV Privacy and Publicity
      379IV(C) Use of Name, Voice or Likeness;
Right to Publicity
        379k386 Conduct or Misappropriation
Actionable in General
          379k390 Picture, Photograph, or Likeness
            379k390(1) k. In General. Most
Cited Cases
To prove his invasion of privacy claim under Colorado law, plaintiff is required to show: (1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred.

**[20] Torts 379 ⟳404**

379 Torts
    379IV Privacy and Publicity
      379IV(C) Use of Name, Voice or Likeness;
Right to Publicity
        379k404 k. Questions of Law or Fact.
Most Cited Cases
Issues of whether former employee's name had commercial value and whether employee suffered damages in form of loss of business when employer continued to use employee's name in promotional materials was for jury in suit for invasion of privacy.

**[21] Antitrust and Trade Regulation 29T ⟳**

118

29T Antitrust and Trade Regulation
    29TII Unfair Competition
      29TII(C) Relief
        29Tk116 Costs
          29Tk118 k. Attorney Fees. Most Cited
Cases
Although no one factor is dispositive, a case may be deemed exceptional, so as to permit prevailing defendant an award of attorney fees under Lanham Act, because of (1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as well. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**[22] Antitrust and Trade Regulation 29T ⟳ 118**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
      29TII(C) Relief
        29Tk116 Costs
          29Tk118 k. Attorney Fees. Most Cited
Cases
Court could refuse to award attorney fees under Lanham Act to employer who prevailed on former executive employee's claim for deceptively using his name after his resignation to lead clients to believe he was still associated with employer, where there was nothing exceptional about case, in that claim was clearly articulated, employee's evidence of damages was not exceptionally weak, and nothing suggested that employee had acted in bad faith or in attempt to harass. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**\*580** David Charles Mastbaum, Law Office of David Mastbaum, Boulder, CO, for Plaintiff-Counter-Defendant-Appellant/Cross-Appellee.

Robert J. Stickles, Klett, Rooney, Lieber, & Schorling, P.C., Newark, NJ, (Christopher P. Dalton, Klett, Rooney, Lieber, & Schorling, P.C., Newark, NJ; Natalie Marie Hanlon-Leh, Christoph-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

Page 6

er P. Beall, and Owen Borum, Faegre & Benson, LLP, Denver, CO, with him on the briefs) for the Defendant-
Counter-Claimant-Appellee/Cross-Appellant.

Before KELLY, ALARCÓN,[FN*] and LUCERO, Circuit Judges.

FN* The Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

LUCERO, Circuit Judge.

Three cases are consolidated for purposes of this appeal, all arising from the acrimonious departure of Michael King from his former employer, PA Consulting Group, Inc. ("PA"). This dispute centers on a series of noncompete provisions contained in King's employment contract. A jury found against King on all but his invasion of privacy claim and for PA on its breach of loyalty counterclaim. King now appeals the district court's: (1) determination that the noncompete provisions were enforceable, (2) submission of his breach of contract claim to the jury, (3) eve of trial *581 discovery ruling, and (4) denial of his motion for a new trial. PA cross-appeals the district court's denial of its motion for judgment as a matter of law, and its motion for attorneys' fees. For the reasons set forth below, we **AFFIRM.**

**I**

PA is a professional consulting firm with offices in 20 countries and over 3400 employees. Although it is a New Jersey corporation with a human resources office in that state, PA is headquartered in Washington, D.C. In 2000, PA successfully acquired Hagler Bailly, Inc. ("HB"), an energy consulting firm, in a cash transaction. At the time of the acquisition, King was a Senior Vice President ("SVP") in HB's

Boulder, Colorado office. King was also an HB shareholder. As part of the merger, King sold his 10,000 HB shares for approximately $52,900. The merger was conditioned upon at least 75% of HB's SVPs signing PA employment agreements.

On June 5, 2000, in anticipation of the merger, King signed an employment contract (the "Agreement") governing his employment with PA. King lived and worked in Colorado, and the Agreement was signed in Colorado. PA drafted the Agreement, which it described as a "global agreement" used for approximately 200 partners around the world. Section 17.2 states: "This agreement and all matters arising in connection with it shall be governed by the law of the State of New Jersey and shall be subject to the jurisdiction of the New Jersey Courts." Simultaneous with the Agreement, the parties signed a "side letter" amending the terms of the Agreement, which notes that the "Agreement has been executed in anticipation of the execution of the Agreement and Plan of Merger among the Company, Hagler Bailly, Inc. and PA Consulting Group Inc. (the 'Merger Agreement') and is conditional upon the consummation of the transactions authorized by such Merger Agreement."

King agreed to several post-employment restrictions. The Agreement establishes a one-year restricted period following termination, during which the following provisions would attach:

12.2 In respect of any client of [PA] for whom you have rendered any services on behalf of [PA] during the two years preceding the termination of your employment, you will not during the restricted period, directly or indirectly, unless authorized by [PA]:

(a) solicit business from a Client, whether on behalf of yourself or another person or entity, which business is of the same or similar nature to the services you provided on behalf of [PA].

(b) encourage any client not to do business with [PA].

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577                                                                                              Page 7
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

(c) provide for such client (or offer to do so) services of the same or similar nature or assist or facilitate the provision of such services as an independent contractor or otherwise ... although notwithstanding the foregoing, you may accept full-time employment with any such client.

12.3 During the restricted period you will not ... solicit or entice away from [PA] (or attempt to do so) or accept for employment any employee of [PA] who entered employment with [PA] prior to the termination of your employment.

The side letter includes a limited exception to the post-employment restrictions: "Notwithstanding the provisions of Section 12 of the Agreement, should you terminate your employment during the 180-day period commencing 18 months following the completion of the transactions authorized *582 by the Merger Agreement, [PA] shall waive the non-compete provision contained in Section 12.2(c) of the Agreement." Section 9.6 of the Agreement provides that "[w]hen you do not provide the appropriate notice [of resignation], salary equivalent to the amount payable for the shortfall in notice will be forfeited in lieu of notice, as appropriate." The side letter sets a notice period of three months for "all Partner ranks."

King's precise job title upon joining PA is unclear. The Agreement merely states that he was appointed as a "Consultant" with PA's energy group. A document incorporated into the Agreement, entitled "Your Career as a Consultant in PA," lists "five consulting ranks: analyst, consultant analyst, consultant, principal consultant and managing consultant." It describes "consultant" as a relatively low-level position.

However, PA's head of Human Resources, James Cullens, stated in deposition testimony that King (along with the other HB SVPs) entered the company as an "associate partner." In explaining the inconsistency, Cullens noted that, as a consulting firm, PA had two types of agreements: a consultant agreement and an administrative staff agreement.

The "consultant" designation, he stated, simply distinguished King from PA's administrative staff. Cullens further testified that PA's employment agreements do not use the term "partner" because PA is not a partnership. The Agreement also incorporated a document titled "The Partner at PA," which describes the associate partner designation as follows: "All external entry candidates into the Partner Group will be designated 'as' Associate Partners. They will serve an initial period during which their track record within PA is built up, so that the Partner Election Committee has the information base it needs to confirm their Partnership." King also listed his initial position with PA as "Associate Partner" on his resume.

Upon joining PA in October 2000, King provided energy consulting services, with a focus on business development. He had several layers of management above him, but also had a group of employees working under him. King could not hire or fire workers, but was empowered to enter contracts on behalf of PA on a limited basis. PA's January 1, 2001 organizational chart indicates that King was an Associate Partner in the Energy Group-one of approximately 190 Partners at PA. It also lists King as Chairman of the Committee for Regional Development in the Americas and Canada. His total compensation in 2000 (including both HB and PA pay) was slightly over $1 million. King rose quickly through the ranks at PA; by July 2002, he was one of twelve Managing Partners worldwide and head of PA's Global Wholesale Energy Markets Practice. His anticipated compensation in 2001 was $1.3 million.[FN1]

FN1. King's actual compensation was somewhat less because he forfeited a deferred compensation package upon his resignation.

On July 28, 2002, King sent an email to Bruce Tindale, PA's COO, and Jon Moynihan, PA's CEO, informing them of his plans to "pursue the options" with National Economic Research Associates ("NERA")-a PA competitor. Shortly thereafter

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577                                                                                      Page 8
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

King sent a fax entitled "Confirmation of my resignation of July 29, 2002," indicating he believed his last day of employment would be October 26, 2002. PA acknowledged his resignation that same day, but noted "[t]here may be a couple of things to sort out, such as your leaving *583 date (which we believe is November 2nd 2002 under the terms of your contract), but that is something we can get mutual clarity on over the coming weeks as we work together to sort out the handover arrangements etc."

On September 12, 2002, King emailed Tindale and Cullens, in an effort to "close the loop on [his] departure." King stated that he provided notice on July 29, 2002, and, calculating a 90-day notice period, his final day would be October 26, 2002. By providing notice within the 180-day window period, per the terms of the side letter, he believed he was relieved of the noncompete restrictions listed in § 12.2(c) of the Agreement. PA disagreed with King's characterization. Cullens asserted that King's July 29 email was not an effective notice of resignation under the Agreement because it was unclear and was not delivered in the proper form as specified in the Agreement (via hard copy, mail, or fax). Adding three months to the date of King's August 2, 2002 fax, Cullens tabulated a final day of November 2, 2002. He also indicated that the 180-day window period ran from April 28 to October 24, which would require an employee to provide notice of termination by July 24, 2002 in order to take advantage of the § 12.2(c) waiver. King claims this was the first time PA informed him of its calculation of the window period.

King responded through counsel on September 26, 2002. He argued that PA was required to waive the § 12.2(c) restrictions as long as he terminated his employment within the window period, and amended his date of termination to October 24, 2002. Although King acknowledged he was bound by the three-month notice period, he claimed that § 9.6 of the Agreement-which states "[w]here you do not provide the appropriate notice [of resignation],

salary equivalent to the amount payable for the shortfall in notice will be forfeited in lieu of notice, as appropriate"-amounted to a liquidated damages clause. By this reasoning, King provided insufficient notice, but PA could recover only the "salary equivalent to the amount payable for the shortfall in notice," and was still obligated to waive § 12.2(c). On October 4, 2002, PA responded through counsel, reasserting its position that King's last day would be November 2, 2002 and that he would be bound by § 12.2(c).

King completed his last day of work at PA on October 24, 2002. Because his employment offer from NERA was contingent upon resolution of the noncompete provisions in the Agreement, however, he was unable to begin work with NERA until February 3, 2003. Following King's resignation, PA continued to distribute promotional materials listing King as the contact person for PA's Wholesale Energy Markets Practice. King's replacement, Todd Filsinger, directed PA employees to change King's PA voicemail message to indicate King was unavailable, but that the caller should leave a message. Filsinger also had all messages sent to King's PA email account forwarded to him.

Prior to his last day, and unbeknownst to PA, King had filed a complaint in the U.S. District Court for the District of Colorado seeking injunctive and declaratory relief regarding the enforceability of the noncompete restrictions on September 30, 2002. PA filed a complaint on October 4, 2002 in New Jersey Superior Court on the same issue. King removed the latter case to the U.S. District Court for the District of New Jersey on October 8, 2002. Finding that the contract contained a mandatory forum-selection clause, the U.S. District Court for the District of Colorado dismissed King's action on November 21, 2002. The case proceeded in New Jersey, where the court entered a preliminary injunction*584 prohibiting PA from enforcing § 12.2(c) of the Agreement. On September 10, 2003, however, this court vacated the dismissal of the Colorado case and remanded to the federal district

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

court in Colorado. King successfully moved to transfer the New Jersey case to Colorado and an Order of Consolidation was issued on October 17, 2003.

Before the Colorado district court, King filed a motion for partial summary judgment arguing that the noncompete provisions were void under Colorado law. PA filed a cross-motion, countering that New Jersey law applied, and that the noncompete provisions were valid under either state's law. The district court found that New Jersey law governed the Agreement, and that the noncompete restrictions were enforceable under either New Jersey or Colorado law. Accordingly, it dismissed King's claim that the noncompete restrictions were void. In his trial brief, King requested the district court rule as a matter of law that PA breached the Agreement by failing to waive § 12.2(c). The court declined to do so.

A jury trial was then held on the following claims: (1) King's claim that PA breached the Agreement by failing to waive § 12.2(c); (2) King's claim that PA breached its implied covenant of good faith and fair dealing by trading on his name after he left PA, and intercepting calls and emails intended for him; (3) King's claim that PA violated the Lanham Act by deceptively using his name; (4) King's claim that PA's use of his name constituted unfair competition; (5) King's claim that PA's use of his name constituted invasion of privacy; (6) PA's counterclaim that King breached his contract by disclosing confidential information to NERA; and (7) PA's counterclaim that King breached his duty of loyalty by disclosing information to NERA.

Because the evidence included a number of confidential, proprietary documents, discovery was conducted under a Consent Protective Order. The most sensitive documents were designated "Attorneys' Eyes Only," prohibiting the parties from viewing them. On December 30, 2004, the district court granted King's motion to redesignate certain documents from "Attorneys' Eyes Only" to "Highly Confidential." The documents detailed clients for

whom King worked while employed at PA, who continued to use PA following King's departure. After reviewing these documents, King requested additional documentary discovery as well as third party depositions on January 4, 2005. Noting that they were "on the eve of trial," the court denied King's request.

During trial, King testified that he spoke to Catherine McEnearney in the summer of 2002, who was at that time a Senior Counsel with PA. Although McEnearney herself did not appear in court, King testified she told him that he could avail himself of the § 12.2(c) waiver if he served notice of his termination before October 27, 2002. During closing arguments, PA's counsel addressed this testimony as follows: "Now Kathy McEnearney. We've heard some testimony about her. All we have is Mr. King's say-so.... Now what would you do if-if you were in this spot where he is, what would you do? You would claim to have had a conversation with a Kathy McEnearney." He posited two explanations for King's silence on the McEnearney conversation during his departure from PA, the "less charitable" of which "is that the conversation never happened." King did not object to this statement during closing, but did raise the issue the next day, before the case was submitted to the jury.

The jury found against King on all but his invasion of privacy claim and awarded **585** him damages in the amount of $57,672. On PA's counterclaims, the jury found that King did not breach his contract, but that he did breach his duty of loyalty. It awarded PA $90,520 in compensatory damages, plus $50,000 in punitive damages. The court determined that neither party was entitled to attorneys' fees. King subsequently moved for a new trial, arguing that PA's closing argument was improper. PA moved for attorneys' fees on King's Lanham Act claim, and filed a renewed motion for judgment as a matter of law on King's invasion of privacy claim. The district court denied all three motions.

King now appeals the district court's: (1) summary judgment ruling that the noncompete provisions of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

the Agreement were enforceable; (2) submission of his breach of contract claim to the jury; (3) denial of his request for additional discovery; and (4) denial of his motion for a new trial. PA cross-appeals the district court's: (1) denial of its motion for judgment as a matter of law on King's invasion of privacy claim; and (2) denial of its motion for attorneys' fees for defending King's Lanham Act claim.

## II

We review the grant of summary judgment de novo, applying the same legal standard employed by the district court. *Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow,* 191 F.3d 1192, 1196 (10th Cir.1999). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We review a district court's choice of law determination de novo. *Doering ex rel. Barrett v. Copper Mountain, Inc.,* 259 F.3d 1202, 1209 (10th Cir.2001). Its underlying factual determinations, however, are reviewed for clear error. *Id.*

Section 17.2 of the Agreement provides "[t]his agreement and all matters arising in connection with it shall be governed by the law of the State of New Jersey." The parties agree that § 187(2) of the Restatement (Second) of Conflict of Laws governs our review of this clause. It reads:

The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless ... (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

### A

[1] Our initial inquiry is whether Colorado has a materially greater interest in determining whether the Agreement's noncompete restrictions are enforceable. In answering this question we are guided by *Elec. Distribs., Inc. v. SFR, Inc.,* 166 F.3d 1074 (10th Cir.1999). In that case we held that Utah had a materially greater interest in determining the enforceability of certain noncompete provisions, notwithstanding the parties' **choice** of Colorado **law,** "because important policy considerations of Utah are involved in assessing the validity of the covenant not to **compete** prohibiting [plaintiff], a Utah resident, from having employment in [his field] for a period of seven years within the entire state of Utah." *Id.* at 1084.

PA correctly notes that the restrictions at issue in *Elec. Distribs.* were more severe in both duration and scope than those in the Agreement. Nevertheless, we conclude that Colorado has a materially greater interest in this issue. King is a resident **\*586** of Colorado, he signed the contract in Colorado, and his sole place of work was Colorado. The district court made much of PA's need for uniformly interpreted contracts, but the relevant interest is not PA's, but rather that of the chosen state. New Jersey's interest in the issue is at most tangential. PA is incorporated in New Jersey and maintains a human resources office there, but is headquartered in Washington, D.C. It strains credulity to suggest that New Jersey's interest in deciding whether King is bound by the Agreement's noncompete provisions approaches that of Colorado, the state in which King lives and works, and in which the contract was signed.

### B

[2] We next consider whether the application of New Jersey law to the noncompete provisions would be "contrary to a fundamental policy" of Colorado. Restatement (Second) of Conflict of Laws § 187(2). New Jersey courts will enforce a noncompete agreement that "protects the legitimate interests of the employer, imposes no undue hard-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577                                                                                                    Page 11
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

ship on the employee, and is not injurious to the public." *Solari Indus. v. Malady,* 55 N.J. 571, 264 A.2d 53, 56 (1970). Colorado's noncompete agreement policy, as codified, provides:

Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

(a) Any contract for the purchase and sale of a business or the assets of a business;

(b) Any contract for the protection of trade secrets;

(c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

Colo.Rev.Stat. § 8-2-113(2).

Although PA argues that these provisions are essentially equivalent, they are plainly not. New Jersey will enforce noncompete agreements except under specific conditions in which they are deemed unreasonable. Colorado's default is just the opposite: It will not enforce noncompete agreements unless they fall within a few narrowly-defined circumstances. Moreover, both state and federal courts have recognized Colorado's significant interest in limiting noncompete agreements. *See Dresser Indus. v. Sandvick,* 732 F.2d 783, 786 (10th Cir.1984) ("The states where the parties entered into the employment relationships-Colorado, Wyoming, and North Dakota-have a substantial interest in invalidating covenants not to compete signed within their borders."); *Nutting v. RAM Sw., Inc.,* 106 F.Supp.2d 1121, 1124 (D.Colo.2000) ("Colorado law embodies a strong public policy which disfavors covenants not to compete, protecting employees from non-competition clauses except in carefully defined

circumstances.") (quotation omitted); *DBA Enters. v. Findlay,* 923 P.2d 298, 302 (Colo.Ct.App.1996) ("Covenants not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void.").

[3] Colorado thus has a fundamental policy of voiding noncompete provisions that do not fall within one of the statutory exceptions. Unlike the Restatement's "materially greater interest" prong, under which we need only examine whether the *determination* of an issue would be problematic, the "fundamental policy" prong requires*587 us to look to whether the *application* of another state's law would violate Colorado's policy. To answer that question, we must compare the dueling state-law regimes to determine whether they would reach opposing results. If they would not, Colorado's fundamental policy limiting noncompete agreements is not offended. *See Elec. Distribs.,* 166 F.3d at 1085-86.

[4][5] King concedes that the Agreement's noncompete provisions would be enforceable under New Jersey law. King argues that they are per se invalid under Colorado law because they are "naked." For this proposition, he cites *Dresser Indus.,* which states: "A naked covenant not to compete is void under the [Colorado] statute." 732 F.2d at 788 (*citing Colo. Accounting Machs., Inc. v. Mergenthaler,* 44 Colo.App. 155, 609 P.2d 1125, 1126 (1980)). It is unclear, however, what the *Dresser Indus.* court meant by "naked covenant." King contends that a naked covenant is one that does not indicate which of the statutory exceptions provides the basis for its enforceability. PA counters that "naked" refers to a prohibition that is primarily aimed at restricting competition, rather than protecting legitimate business interests.

We are persuaded by PA's argument. *Dresser Indus.* considered whether the noncompete agreements at issue fell within several exceptions. 732 F.2d at 787-88. If Colorado law required a magic words reference to a statutory exception, the only inquiry would be whether the contested provision

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

Page 12

cited an exception. King's reading is also unsupported by the few cases using the phrase "naked covenant" to describe a noncompete covenant. *See Barran v. Comm'r,* 334 F.2d 58, 63 (5th Cir.1964) (describing a naked covenant as "not associated with a transfer of assets"); *Davee v. United States,* 195 Ct.Cl. 184, 444 F.2d 557, 562 (1971) (defining a naked covenant as "one unaccompanied by the sale of the assets of the related business"); *Sound Ship Bldg. Corp. v. Bethlehem Steel Corp.,* 387 F.Supp. 252, 255 (D.N.J.1975) (distinguishing naked covenant from those "merely ancillary to a main lawful contract"). Finally, PA correctly notes that Colorado courts have enforced several noncompete agreements that meet King's definition of "naked." *See Gold Messenger, Inc. v. McGuay,* 937 P.2d 907, 910-11 (Colo.Ct.App.1997); *Mgmt. Recruiters of Boulder, Inc. v. Miller,* 762 P.2d 763, 764-66 (Colo.Ct.App.1988); *Boulder Med. Ctr. v. Moore,* 651 P.2d 464, 465 (Colo.Ct.App.1982) (holding that a noncompete agreement was valid under two statutory exceptions, but not quoting the provision).

[6][7] Accordingly, the enforceability of the noncompete provisions must stand or fall on the applicability of one or more of the statutory exceptions. The first exception is for "[a]ny contract for the purchase and sale of a business or the assets of a business." Colo.Rev.Stat. § 8-2-113(2)(a). In holding that King fell within the business purchase exception, the district court stated:

Because PA was purchasing Hagler Bailly's business relationships, institutional knowledge, intellectual capital, and the consultancy practice as a whole, and that purchase was contingent in part on King's and the other vice presidents' moving from Hagler Bailly to PA, I conclude that King's decision to work for PA and his Agreement memorializing that decision was [sic] integral to the acquisition.

We agree. King was not merely an employee at HB-he was also a shareholder. Pursuant to the acquisition he sold his 10,000 shares for approximately $52,900. Although the employment contract and the merger agreement were not integrated, *588 the side letter addendum states that the Agreement was "executed in anticipation of the execution of the [merger agreement] ... and is conditional upon the consummation of the transactions authorized by such Merger Agreement." Moreover, the merger was conditional upon at least 75% of HB's SVPs (including King) signing PA employment agreements. In other words, as the district court correctly found, the noncompete provisions gave PA critical security in connection with its acquisition of HB. Absent those provisions, PA would have purchased the intellectual capital of HB, which included King and other senior employees, with no guarantee that the capital would not walk out the door after the merger. Although King's refusal to sign the Agreement would not, alone, have torpedoed the merger, this fact does not alter our conclusion that PA paid $100 million largely to secure the services of King and his HB colleagues.

The instant scenario is similar to that in *Boulder Med. Ctr.* There, defendant Richard Moore, M.D., was a partner in a Boulder, Colorado medical practice. 651 P.2d at 465. The partnership was dissolved and its assets transferred to a professional corporation. *Id.* Moore sold his stock in the newly formed professional corporation to the Boulder Medical Center and signed an employment contract with the Center, which included a noncompete provision. *Id.* After Moore resigned, the Center brought suit to enforce the noncompete agreement. The trial court ruled that the business purchase exception was applicable and the Colorado Court of Appeals affirmed. *Id.* Explicitly rejecting Moore's argument that the exception requires a perfect fit between a personal sale and the noncompete provision, the court of appeals concluded that Moore's interest in (1) the medical partnership, (2) a partnership that owned the practice's medical equipment, and (3) a corporation that owned real property upon which the Center was located, was sufficient to invoke the exception. *Id.* In the same vein, King's sale of HB stock, coupled with the merger agreement's explicit

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

Page 13

condition that most HB SVPs, including King, sign noncompete agreements, places the Agreement squarely within Colo.Rev.Stat. § 8-2-113(2)(a).

Nothing in *Reed Mill & Lumber Co. v. Jensen*, No. 05CA0431, 2006 WL 2691713 (Colo.Ct.App. Sept. 21, 2006), compels a different result. In that case, the parties did not dispute whether the noncompete provision fell under the business purchase exception; instead, at issue was whether the noncompete provision was reasonable. In dicta, the court noted that "[w]hen ancillary to the sale of a business, [noncompete provisions] protect the buyer's right to enjoy the business good will for which it paid." *Id.* at *2. According to King's reading of the case, the *Reed Mill* court limits § 8-2-113(2)(a) to instances in which a seller takes back customers or other good will it had sold to the acquirer, not to prospective competition from acquired employees who later leave the firm. A fairer reading is that protection of good will requires the acquirer to protect against both predation by the seller as well as the possibility of a brain drain; i.e., the intellectual capital acquired in the purchase walking off. This squares with the language of *Gibson v. Eberle*, 762 P.2d 777 (Colo.Ct.App.1988), the case upon which *Reed Mill* relies. In *Gibson*, the Colorado Court of Appeals took a broad view of the good will protected by ancillary noncompete provisions, holding that such covenants must simply protect the business as "a saleable asset." 762 P.2d at 779.

[8] Because we conclude that the Agreement's noncompete provisions fall within the business purchase exception, we need not review the district court's analysis*589 of the trade secrets and management exceptions. There is, however, the final matter of whether, notwithstanding the applicability of one or more of the exceptions of § 8-2-113(2), the noncompete provisions were "reasonable." *See Nat'l Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo.Ct.App.1984) ("[T]o be valid and enforceable, a covenant not to compete must be reasonable both in terms of duration and geographic scope."). King has not argued on appeal that the noncompete

provision is unreasonable, however, and has thus waived the issue. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n. 7 (10th Cir.1994).

Because we conclude that the Agreement's noncompete provisions would be enforceable under both New Jersey and Colorado law, enforcement of the provisions would not violate a fundamental policy of Colorado. *See Elec. Distribs.*, 166 F.3d at 1085-86. Accordingly, the district court's grant of summary judgment finding the noncompete provisions enforceable is affirmed.

## III

[9] King contends that the district court erred in submitting his breach of contract claim to the jury, rather than ruling as a matter of law that PA was required to waive § 12.2(c) of the Agreement. Although King raised this issue in his trial brief, he did not move for judgment as a matter of law. "Failure to sufficiently raise an issue in a motion for [judgment as a matter of law] bars appellate review of that issue." *Miller v. Eby Realty Group, LLC*, 396 F.3d 1105, 1114 (10th Cir.2005). Under these circumstances, we will generally review "only for plain error constituting a miscarriage of justice." *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 962 (10th Cir.2002) (quotation omitted).

[10][11][12][13] However, King argues that raising the issue in his trial brief was sufficient, because interpretation of the contract was a matter of law. *See Ruyle v. Cont'l Oil Co.*, 44 F.3d 837, 841 (10th Cir.1994) ("A party who properly raises an issue of law before the case goes to the jury need not include the issue in a motion for a directed verdict in order to preserve the question on appeal.") (quotation omitted). Whether a contract is ambiguous is a question of law that we review de novo. *Hofer v. UNUM Life Ins. Co. of Am.*, 441 F.3d 872, 880 (10th Cir.2006). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Nester v. O'Donnell*, 301 N.J.Super. 198, 693 A.2d 1214, 1220 (1997). If a contract is ambiguous,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

the resolution of its proper meaning is a question of fact "subject to review on a clearly erroneous standard." *Nunn v. Chem. Waste Mgmt., Inc.,* 856 F.2d 1464, 1467 (10th Cir.1988). In this case, the district court squarely held that the § 12.2(c) waiver provision of the Agreement was ambiguous, putting King on notice that a motion for judgment as matter of law would be necessary to preserve any challenge to the jury's determination of the Agreement's meaning.

[14] King adequately preserved the purely legal question of whether the Agreement is ambiguous by raising the matter in his trial brief. This determination we must review de novo. *See Hofer,* 441 F.3d at 880. If we find that the Agreement is subject to more than one reasonable interpretation and thus is ambiguous, then we must determine whether the district court's failure to overturn the jury's interpretation was in error. Because King did not adequately preserve his challenge to the jury's construction of the Agreement, we review this issue only for "plain error constituting a miscarriage of justice." *Dilley,* 296 F.3d at 962.

**\*590** [15] Three clauses are at issue in this dispute. First, the side letter provided "should you terminate your employment during the 180-day period commencing 18 months following the completion of the transactions authorized by the Merger Agreement, the Company shall waive the non-compete provision contained in Section 12.2(c) of the Agreement." Second, the side letter established a notice of termination period of three months. Third, § 9.6 of the Agreement states: "Where you do not provide the appropriate notice [of resignation], salary equivalent to the amount payable for the shortfall in notice will be forfeited in lieu of notice, as appropriate."

King argues that he could terminate his employment by simply walking off the job, and that regardless, § 9.6 constitutes a liquidated damages clause. PA counters that the phrase "terminate your employment" contemplates termination with notice. It further argues that § 9.6 is not a liquidated dam-

ages clause because it lacks limiting language which would suggest salary-forfeiture is the sole penalty for insufficient notice. Both interpretations are reasonable, and, as a consequence, the district court correctly found the Agreement to be ambiguous and properly submitted the issue to the jury. Furthermore, because the interpretation ultimately adopted by the jury is a reasonable one, the district court's failure to overturn it would not constitute an error under the default "clearly erroneous" standard-in other words, we are not "left with the definite and firm conviction that a mistake has been committed." *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). As a result, the plain error standard is not satisfied because there is no error, much less one that constitutes a miscarriage of justice.

### IV

King next takes issue with the district court's denial of his request for additional discovery on January 10, 2005. He claims that he was precluded from calculating and proving damages as a result of the denial. We review pretrial discovery rulings for abuse of discretion. *Shaklee Corp. v. Gunnell,* 748 F.2d 548, 550 (10th Cir.1984). A trial court abuses its discretion when it issues a ruling that is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Coletti v. Cudd Pressure Control,* 165 F.3d 767, 777 (10th Cir.1999). As we held in *Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438 (10th Cir.1993):

Trial judges exercise broad discretion in limiting issues to be tried, evidence to be used (such as by avoiding cumulative and collateral proof), the time for oral argument, and the number of witnesses and experts who can be produced. Pretrial procedures are designed to manage trials, schedule and make expeditious discovery procedures, formulate issues, and provide fair notice of witnesses and proof to be adduced by all parties to litigation.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

Page 15

*Id.* at 1449.

[16] On September 30, 2004, King moved to redesignate certain documents from "Attorneys' Eyes Only" to "Highly Confidential." At issue were documents identifying former King clients with whom PA secured engagements following King's departure. The district court granted that motion on December 30, 2004, allowing King to view these documents for the first time. Shortly thereafter, he requested additional discovery, claiming the lists were incomplete and seeking to depose some of the clients identified. Noting that they were "on the eve of trial," the court denied King's request.

As an initial matter, it appears that the additional evidence would not have been *591 even mildly probative, given that § 12.2(c) (which is enforceable) prohibited King from consulting for clients with whom he worked at PA. In any event, we conclude that the district court's order was not an abuse of discretion. Although it is unclear precisely how long King's counsel was in possession of the documents, she concedes that they were in her possession for more than a year before she filed the September 30, 2004 motion. The court's prior order, which granted the redesignation request, indicated that the new documents might allow King to identify additional information, but in no way implied additional discovery orders would be freely granted. District courts are properly granted broad discretion over discovery and scheduling matters; otherwise, they would be unable to effectively manage their caseloads. We will not impinge on that discretion here.

**V**

King's final challenge on appeal is to the district court's order denying his motion for a new trial based on PA's allegedly improper closing argument. He focuses on two statements made by PA's counsel: (1) "Now what would you do if-if you were in this spot where he is, what would you do? You would claim to have had a conversation with a Kathy McEnearney"; and (2) counsel's positing of a "less charitable" explanation for King's silence about the McEnearney conversation during his departure from PA, which "is that the conversation never happened." He further argues that, based on a telephone conversation with McEnearney, PA's counsel knew King testified truthfully.

[17][18] We review such rulings for abuse of discretion. *United States v. Latimer*, 780 F.2d 868, 870 (10th Cir.1985). It was improper for counsel to suggest the McEnearney conversation never happened when King's testimony on that point went unchallenged at trial. Nevertheless, we "will not reverse on an improper argument ... unless it obviously prejudice[s] one of the parties." *Smith v. Atl. Richfield Co.*, 814 F.2d 1481, 1488 (10th Cir.1987). Counsel did not linger on this point-rather, he suggested it in passing. We held in *Smith* that only where counsel truly overemphasizes an improper argument will we find the requisite prejudice and order a new trial. *Id.* There was no such overemphasis here, thus denying King's motion for a new trial did not rise to the level of an abuse of discretion.

**VI**

[19] We turn now to PA's arguments on cross-appeal. PA first contends that the district court erred in denying its motion for judgment as a matter of law on King's invasion of privacy claim. We review the denial of judgment as a matter of law de novo. *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 536 (10th Cir.1998). "[J]udgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1450 (10th Cir.1997). To prove his invasion of privacy claim, King was required to show: "(1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred." *Joe Dick-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577                                                                                                    Page 16
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
(Cite as: 485 F.3d 577)

erson & Assocs., LLC v. Dittmar, 34 P.3d 995, 1002 (Colo.2001). A plaintiff claiming commercial damages, such as King, must further establish the commercial value of his name. Donchez v. Coors Brewing Co., 392 F.3d 1211, 1220-21 (10th Cir.2004).

**\*592** [20] PA argues that King failed to present evidence showing his name had commercial value or that he suffered any particularized damages. Neither argument has merit. As to the first issue, PA's marketing manager, Rhea Cook, testified that King's name was included in PA's promotional materials because he was a "famous consultant[ ]" with a "high profile" who was "well known" in the industry. King introduced several advertisements issued by NERA after he joined the firm, including one printed in the Wall Street Journal, highlighting King as a "noted" management consultant and economist. Although this evidence might not place King's name in the same league as a Hollywood celebrity or a professional athlete, that was not King's burden. Our sole inquiry on appeal is whether this evidence would allow a jury to reasonably conclude that King's name held commercial value in the economic consulting realm. We are satisfied that it would.

On the second issue, PA is correct to note that King could not prove by a preponderance of the evidence that he lost any specific client as a result of PA's use of his name. King did testify, however, that PA's misuse of his name prevented him from receiving invitations to several industry conferences. He further testified that such conferences are "important marketing opportunities. It was one of the primary ways that I market my services in the industry." A reasonable jury could have concluded that, but for PA's continued use of King's name, those conference invitations would have reached King. There is no requirement, as PA suggests, that King point to a specific client that he would have procured; the marketing opportunities have value in and of themselves, value that King could have captured but for PA's wrongful conduct. Moreover, it

would be manifestly unjust to require that King name a specific lost assignment to prevail on this claim, when it was PA that effectively cut off his communication to those clients. The district court did not err in denying PA's motion for judgment as a matter of law.

## VII

[21][22] Finally, PA appeals the district court's denial of its motion for attorneys' fees incurred defending King's Lanham Act claim. We review such orders for abuse of discretion, but review the underlying legal principles de novo. Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143, 1146 (10th Cir.2000). A district court may award attorneys' fees to the prevailing party on a Lanham Act claim in "exceptional cases." 15 U.S.C. § 1117(a). Although no one factor is dispositive, a case may be deemed exceptional because of "(1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as well." Id. at 1147. In more general terms, we look to both the objective strength of a plaintiff's Lanham Act claim and the plaintiff's subjective motivations.

As to the objective weakness of King's claim, PA argues that King only settled on the subsection of 15 U.S.C. § 1125 under which he was proceeding after trial began. Nevertheless, the factual basis for this claim was clearly articulated on numerous occasions, including in King's complaint. PA also argues that King advanced no evidence that PA's conduct damaged King. However, the damages King allegedly suffered under the Lanham Act are precisely the same damages that he alleged under his invasion of privacy claim. We have already determined that King's evidence was sufficient to send his invasion of privacy**\*593** claim to the jury. We likewise conclude that the evidence was not so exceptionally weak, from an objective point of view, that PA was entitled to attorneys' fees.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

485 F.3d 577
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761
**(Cite as: 485 F.3d 577)**

PA also argues that attorneys' fees are warranted based on King's subjective intent, as well as his course of conduct throughout the litigation. In support of this claim they rely almost entirely on the damages calculations King adduced at trial.[FN2] Although King did attempt to cast a wide net in calculating his damages, PA successfully elicited several limiting concessions from him through cross-examination. There is no indication that King committed perjury, calculated his damages in a "meritless and improper manner," or attempted to harass PA. *See id.* at 1149. In short, nothing in this case appears exceptional, and the district court was well within its discretion to deny PA attorneys' fees.

> FN2. PA also conclusorily states in a footnote that King's litigation tactics increased its costs. In support of this statement, PA merely notes that it requested King drop his second claim-that the noncompete provisions lacked consideration-but that he did not do so until the trial was set to begin. We fail to see how this supports PA's claim for attorneys' fees on King's Lanham Act claim.

### VIII

The district court's judgment is **AFFIRMED** in all respects. Both King's appeal and PA's cross-appeal are **DENIED.**

C.A.10 (Colo.),2007.
King v. PA Consulting Group, Inc.
485 F.3d 577, 154 Lab.Cas. P 60,412, 2007-1 Trade Cases P 75,692, 25 IER Cases 1761

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| Larimer County, Colorado, District Court<br>201 Laporte Avenue<br>Fort Collins, CO 80521<br>Ph: 970-498-6100 | |
| JAMIE HAGGARD,<br><br>Plaintiffs,<br><br>vs.<br><br>SYNTHES SPINE, a Pennsylvania corporation,<br><br>Defendant. | COURT USE ONLY |
| | Case No.: 2009CV265<br><br><br><br>Courtroom:  5B |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

COMES NOW the Court, after having reviewed Plaintiff's Motion for Temporary Restraining Order and the accompanying documents and case law cited by Plaintiff, and hereby makes the following Findings of Fact and Conclusions of Law.

1.      Plaintiff comes before the Court requesting a Temporary Restraining Order enjoining Defendant, his previous employer, from enforcing certain language in a sales consultant agreement between the parties.

2.      The agreement was executed April 1, 2000 in the State of Colorado, County of Larimer, by Plaintiff.

3.      The agreement identifies Plaintiff as a Sales Consultant and Plaintiff has identified, in his Affidavit, the nature of his previous employment with Defendant, Synthes Spine.

4.      Plaintiff, Jamie Haggard, now seeks employment with a competitor of Plaintiff, Globus Medical, employment which is arguably restrained by the April 1, 2000 agreement.

5.      It appears to this Court that Plaintiff undisputedly was a sales person for Synthes Spine and that he did not sign any contract related to the purchase and/or sale of a business or the assets of a business.

6.     That the Defendant, Synthes Spine, is not seeking to recover the expense of educating and training Mr. Haggard.

7.     Further, the Plaintiff is not an executive, management personnel or professional staff.

8.     Further, it is conclusively established for the Court that while the agreement talks in regard to protection of trade secrets, the Plaintiff's employment with a competitor would not require any disclosure of trade secrets, if any, in Mr. Haggard's possession.

9.     Plaintiff was merely a Sales Consultant, being paid on commission for sales to various orthopedic and spine surgeons in Norther Colorado, and is one of the citizens for which the legislature, in CRS 8-2-113, instituted protection for these types of contracts.

## Findings for Temporary Restraining Order

This Court follows the decision of the Colorado Supreme Court in *Rathke v McFarland*, 648 P.2d 648 (Colo. 1982), in determining whether to enter a Temporary Restraining Order. The Court finds that the three (3) elements identified in *Rathke*, (1) that there be immediate irreparable harm; (2) that there is no plain, speedy and adequate remedy at law; and (3) that there is reasonable probability of success on the merits at trial, have been met.

In this tough economic climate, it is clear that irreparable injury is of real concern when Plaintiff has been terminated from his employment by Defendant, but has the ability to continue to work in the same field. The Plaintiff has need for employment and has identified in his Affidavit that the loss of substantial income will affect his financial viability.

Further, there is no plain, speedy and adequate remedy at law in that even in a declaratory judgment proceeding, it may take months to make a final decision on the issues thereby depriving Plaintiff of his ability to work during that time frame.

The Court further finds that, based upon the elements contained in CRS 8-2-113, Plaintiff has a high probability of success on the merits.

The Court notes that the Defendant has inserted within the contract an ambiguous reference for the application of Pennsylvania law. This Court finds that the case submitted by Plaintiff, *King v PA Consulting Group, Inc.*, 485 F.3d 577, CA 10th Cir. (2007), is poignant to the issue and believes that the Colorado courts have found that specific statutes, such as the statute in question here, indicate that Colorado has a materially greater interest in determining enforceability of these non-compete provisions where the employee is a resident of, and was employed in, the State of Colorado. For purposes of this motion, the Court adopts the holdings in *King, supra*.

In reviewing the submissions provided by Plaintiff, the Court feels that the balance of equity strongly favors allowing the Plaintiff to freely seek employment and, therefore, enjoins Defendant from attempting to restrict Plaintiff's employment in the industry. The Court believes it will be the

2

burden of the Defendant to establish, pursuant to Colorado law, whether information in Plaintiff's possession should be considered a trade secret. The Court will consider these arguments at the contested hearing to determine the continuation of this Order scheduled for _4-1-09 @ 3:00 pm in_ _Ct Rm 5B_ The Court orders Plaintiff to forthwith serve Defendant with a copy of this Order.

DATED: _3-25-09 @ 8:00 AM_

BY THE COURT:

District Court Judge

3