IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00721-CMA-KMT

JAMIE HAGGARD,

      Plaintiff-Counterclaim Defendant,

v.

SYNTHES SPINE,

      Defendant-Counterclaimant.

---

**MEMORANDUM OF LAW IN SUPPORT OF SYNTHES' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION
AGAINST JAMIE HAGGARD**

---

# TABLE OF CONTENTS

I.     OVERVIEW OF WHY SYNTHES NEEDS INJUNCTIVE RELIEF ........................ 1

II.    FACTUAL BACKGROUND ................................................................................. 2

    A.   Synthes is in the Highly Competitive Business of Medical Implants and
         Devices. ...................................................................................................... 3

    B.   The Predatory Tactics by Globus Against Synthes and its Impact on
         Haggard's Employment................................................................................. 4

    C.   Synthes' Extraordinary Efforts to Protect Its Trade Secrets. ...................... 7

    D.   Globus Takes Similar Efforts to Protect Its Trade Secrets and
         Confidential Information ............................................................................... 8

    E.   Haggard's Employment with Synthes, Sales in the Fort Collins Territory,
         and Extensive Knowledge and Access to Synthes' Trade Secrets. .......... 10

    F.   Haggard's Contractual Obligations to Protect Synthes' Trade Secrets.... 11

    G.   Haggard's Violation of His Contractual Obligations to Protect Synthes'
         Interests. ................................................................................................... 13

    H.   Haggard's Failure to Return Synthes' Field Equipment. ........................... 14

    I.   Haggard's Anticipatory Complaint and Actions in Colorado State Court.. 14

III.   ARGUMENT   SUPPORTING   WHY   THIS   COURT   SHOULD   GRANT
       SYNTHES' MOTION FOR INJUNCTIVE RELIEF. ............................................ 15

    A.   Synthes Can Show it is Likely to Prevail on the Merits of its Claims
         Against Haggard ....................................................................................... 17

         1.   Synthes Will Prevail on its Contract Claims Against Haggard....... 18

              a.   Synthes Has Valid Contracts with Haggard........................ 18

              b.   Colorado Law Does Not Affect the Enforceability of
                   Synthes' Agreements with Haggard ................................... 22

              c.   Colorado Conflict of Law Principles Support this Outcome 26

         2.   Synthes will Prevail on its Claim for Violation of the Uniform
              Trade Secrets Acts of Both Colorado and Pennsylvania............... 30

         3.   Synthes will Prevail on its Claim for Tortious Interference with
              Business Relations...................................................................... 32

         4.   Synthes Will Prevail on Its Claim for Conversion .......................... 33

    B.   An Injunction is Necessary to Prevent Immediate and Irreparable Harm
         to Synthes that Damages Cannot Adequately Compensate .................... 34

    C.   The Balance of the Equities Favors Entering the Injunction Against
         Haggard .................................................................................................... 36

    D.   Granting Synthes' Motion for an Injunction is in the Public Interest. ........ 37

IV.   CONCLUSION..................................................................................................... 38

I.    **OVERVIEW OF WHY SYNTHES NEEDS INJUNCTIVE RELIEF**

On March 20, 2009, Plaintiff Jamie Haggard ("Haggard") sued his former employer, Synthes Sales USA, LLC, ("Synthes"), in what appears to be a routine declaratory judgment action to invalidate his non-compete and non-disclosure agreement.   What his complaint belies is that his hiring by Globus Medical, Inc. ("Globus") is only the most recent theater in a nation-wide and on-going business attack by Globus against Synthes in the intensively competitive medical implant and device business.

Synthes now moves this Court for an injunction to preclude Haggard from using Synthes' trade secrets and other confidential information in the precise territory that Haggard covered for Synthes a mere four weeks before he filed this suit.   Globus was founded by former Synthes employees and Globus continues to raid talent from Synthes, even when such conduct is in direct violation of written contracts.   Moreover, the strategy is not just to hire people like Haggard, but to do so with the motive of improperly using confidential and trade secret information to improperly convert business from Synthes to Globus in the same territory.   Through his employment with Synthes, Haggard accessed and still possesses Synthes' trade secrets, the disclosure of which would cause irreparable harm to Synthes in and around Ft. Collins, Colorado.

In a strategy now finely honed, Globus recruited Haggard while he was still under protective contracts with Synthes, then Haggard abruptly and without notice filed for declaratory judgment.   This comes after Synthes separated Haggard for running another business while he was still being paid by Synthes.   Haggard is in serious debt due to the failure of his other business and is highly motivated to use the information he gained from Synthes for the improper benefit of its competitor.   In the present case, on

March 25, 2009, Haggard persuaded the Larimer County, District Court to grant an injunction *ex parte* against Synthes enforcing its contracts.  Synthes has now removed this action to federal court and asks this Court to:

- ❑ Enter a Temporary Restraining Order enforcing the contracts between Synthes and Haggard and enjoining him from disclosing Synthes' trade secrets and competing in violation of his agreements;

- ❑ Grant Synthes expedited discovery, including the deposition of Haggard and a request for documents bearing on his employment prospects with Globus;

- ❑ Allow Synthes to examine Haggard's computer for evidence of business activity;

- ❑ Schedule this matter for a Preliminary Injunction Hearing; and

- ❑ Vacate the order of the State Court that are inconsistent with this Court's injunction.

## II.  FACTUAL BACKGROUND

The facts in this matter are in two levels: (1) those involving the predatory tactics by Globus against Synthes and (2) the specific application of that dispute to Haggard.[1]

Significantly, Globus was founded by former key Synthes employees and directly competes with Synthes in the spinal implant market.  Both Synthes and Globus develop, manufacture, and market the similar - but not identical - categories of spinal products. Globus' website self-describes Globus as "the world's largest privately held spinal company, . . . driving significant technological advancements across the complete suite of spinal products, including Fusion, MIS (minimally invasive surgery), Motion Preservation and Biomaterials."[2]  Because Globus' founding was based in large part by

---

[1] The facts set forth in this Memorandum of Law are in the Verified Counterclaim that Synthes filed the same date as this Motion.

[2] See http://globusmedical.com/corporate_profile (last visited March 31, 2009).

the misappropriation of Synthes' trade secrets; the breach of contractual and fiduciary duties and the inducement, aiding and abetting of other Synthes' employees to breach their duties to Synthes, Synthes was required to sue Globus, resulting in years of litigation in the United States District Court for the Eastern District of Pennsylvania. Since the resolution of the federal litigation a little more than 18 months ago, there have been additional clashes over hiring employees, resulting in two related pending suits in the Commonwealth of Pennsylvania.

Synthes is one of the world's leading manufacturers of spinal implants and related medical instruments. It is renowned for the amount of training it provides its employees. This also makes it a likely target for the much younger Globus to try and take employees and their relationships and confidential information. Injunctive relief is necessary here to protect Synthes; Haggard is only the most recent participant in this scheme.

**A.    Synthes is in the Highly Competitive Business of Medical Implants and Devices.**

Synthes is a worldwide leader in the medical device industry. Synthes manufactures, produces, and markets medical implants and instrumentation, such as plates, screws, rods, and other devices for orthopedic surgery used for internal fixation of broken bones and for facial surgery. Synthes markets and sells instrumentation and implants including plates, screws, rods, discs and other devices for spinal surgery. Synthes markets and distributes products to medical institutions and medical professionals nationwide and globally.

Synthes is in a highly competitive business. The protection of its confidential, proprietary and trade secret information is vital in order to prevent competitors or would-

be competitors from obtaining an unfair competitive advantage.  In order to compete and to serve its customers and the patient community, Synthes invests millions of dollars annually in resources to develop its technology, systems, and products.

**B.** **The Predatory Tactics by Globus Against Synthes and its Impact on Haggard's Employment.**

Globus and Synthes not only directly compete in the marketplace, but Globus' founding is inextricably linked to concerns over the protection of Synthes' trade secrets and customer relations in this case.  In fact, Globus' founding was the subject of three years of federal litigation that concluded in August 2007.  *Synthes (USA) v. Globus Med. Inc.*, No. 04-1235, 2007 U.S. Dist. LEXIS 50812 (E.D. Pa. July 12, 2007).[3]

The litigation centered around claims against Globus for misappropriation of trade secrets and confidential information as well as claims against Globus' two top executives and founders, and former Synthes' employees, for: (1) breaching their contractual and fiduciary duties as well as duties of loyalty to Synthes; (2) unlawfully inducing other Synthes' employees to breach their agreements with Synthes – the very same agreements at issue here; and (3) aiding and abetting Synthes' employees in breaching their fiduciary duties to Synthes while still employed there.

With the help and assistance of Globus, three Synthes sales consultants arranged for Synthes' surgeon customers to visit Globus and see its products *while they were still employed with Synthes.*  These three employees coordinated their resignations from Synthes having already successfully switched the business.  Even after Synthes' individual lawsuits against these three employees were resolved by the

---

[3] *Synthes (USA) v. Globus Med. Inc.*, No. 04-1235, 2007 U.S. Dist. LEXIS 50812 (E.D. Pa. July 12, 2007)*,* an unpublished decision, is attached as Exhibit A-1.

entry of a consent order, two of these three former Synthes employees persisted in their unlawful conduct. Eventually and after a further hearing, the United States District Court for the Eastern District of Pennsylvania found these two employees to be in contempt of the consent order by virtue of their subsequent actions. Globus executives were complicit in at least some of the activities which formed the basis of the contempt finding.

These are just a few examples of Globus' previous disregard for non-compete and non-disclosure obligations raised in the course of Synthes' federal suit against Globus that were presented at trial. Through this conduct, Globus and its top-level employees demonstrated a lack of appropriate concern and respect for the contractual obligations of individuals Globus had decided to hire from Synthes. This litigation was vigorously contested and settled after a three-week trial in which evidence of the conduct described was presented before a jury. The litigation settled a year and a half ago, with Globus agreeing to pay Synthes $13.5 million and not to hire any Synthes employees for a period of one year in order to settle Synthes' claims against it and its founders. The one-year non-solicitation provision of the settlement expired on August 10, 2008. A mere four weeks after the one-year non-solicitation provision above expired, Jacqueline Myer – the former Group Manager for Synthes' Surgeon Response Group, a group dedicated to designing, manufacturing and delivering custom and specialty implants and instruments to select spine surgeons within Synthes' customer base – resigned to go work for Globus in violation of her restrictive covenants with Synthes. To protect its legitimate business interests, Synthes filed a suit in the Court of Common Pleas of Chester County, Pennsylvania against Myer stating a claim for

breach of contract and seeking injunctive relief.   (Complaint, *Synthes (USA) and Synthes Spine Company, L.P. v. Jacqueline Myer*, No. 2008-10358 (C.P. Chester County, Nov. 23, 2008), attached in Exhibit A-2)).

After a hearing on the merits of Synthes' request for a temporary restraining order ("TRO"), the court entered a TRO enjoining Myer from working for Globus pending a determination on Synthes' motion for preliminary injunction, and ordered expedited discovery in anticipation of a preliminary injunction hearing.

Relevant to the injunctive relief Synthes seeks before this Court, over the course of the Myer litigation, Synthes learned that from the date Myer commenced working at Globus until the date the court issued the TRO enjoining her from working for Globus, Myer worked at Globus without restraint.  Globus did not issue any instructions or take any reasonable precautions to protect Synthes' proprietary, confidential and trade secret information from disclosure.  Instead, Globus allowed and encouraged Myer to engage in activities on its behalf that directly related to Myer's work for Synthes and infringed on Synthes' legitimate business interests and common law rights.

The Chester County, Pennsylvania Court of Common Pleas granted Synthes' motion, enjoined Myer to comply with the terms of her Non-Competition Agreement, and specifically, to refrain from working for Globus. (Order of J. Streitel, *Synthes (USA) and Synthes Spine Company, L.P. v. Jacqueline Myer*, No. 2008-10358 (C.P. Chester County, Jan. 7, 2009), attached in Exhibit A-2)).

 As a result of the discoveries made over the course of the Myer litigation, including those described above and others, Synthes was compelled to file a separate action against Globus, again in the Court of Common Pleas of Chester County,

Pennsylvania. (Complaint, *Synthes USA LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC v. Globus Medical, Inc.* No. 09-02695 (C.P. Chester County, March 11 2009), attached in Exhibit A-2)). The suit, which is still pending, alleges claims for (1) tortious interference with contractual relations based on Globus' interference with Myer's Non-Competition Agreement; (2) tortious interference with contractual relations based on Globus' interference with Myer's Confidentiality and Non-Disclosure Agreement; and (3) unfair competition.

All told, Haggard's case is anything but a typical request to declare invalid non-compete and non-disclosure agreements and must be viewed in light of Globus' previous and continuing predatory acts.

### C.    Synthes' Extraordinary Efforts to Protect Its Trade Secrets.

Due to the nature of this industry, Synthes takes extraordinary steps to protect its trade secrets. Synthes protects its business relationships and confidential information by requiring its employees, as a condition of employment, to agree not to disclose Synthes' confidential and/or proprietary information, not to solicit Synthes' customers and not to compete with Synthes for a reasonable period of time following their employment with Synthes. Synthes requires its employees to sign an Employee Innovation and Non-Disclosure Agreement ("Non-Disclosure Agreement") which protects against the use or disclosure of confidential, proprietary, and trade secret information, defined to cover, among other things, product technology, product development information, project information, and manufacturing methods and technology. (Non-Disclosure Agreement, attached in Exhibit A-3).

Key employees in capacities which involve sales and marketing, among others, are also required to sign a Confidentiality, Non-Solicitation and Non-Competition

Agreement ("Non-Competition Agreement"). (Non-Competition Agreement, attached in Exhibit A-3). The combination of the Non-Competition and Non-Disclosure Agreements is expressly designed to protect Synthes against disclosure of confidential information, prohibiting solicitation of Synthes' customers, and prohibiting post-employment activities with or on behalf of a direct competitor, subject to reasonable scope and temporal limitations. (Exhibit A-3).

Upon separation from employment, Synthes requires its employees to return, and not retain any copies of, all correspondence files, business card files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contain any of this information. (Exhibit A-3).

### D.  Globus Also Takes Extraordinary Efforts to Protect Its Trade Secrets and Confidential Information.

Globus takes equally extraordinary efforts to protect its trade secrets and confidential and proprietary information.  In fact, it requires potential employees to sign its own, "Globus Medical, Inc. No Competition and Non-Disclosure Agreement" ("hereinafter the Globus Non-Compete").  (Globus Non-Compete, attached as Exhibit A-4).

Like Synthes, the Globus Non-Compete defines the "No Competition Territory" to include the territory in which the employee worked during the last 12 months of his or her employment. (Exhibit A-4 at p. 1).  But the Globus Non-Compete defines the "No Competition Territory" even more broadly than Synthes, so that where an employee is assigned to specific accounts versus a geographic location, it defines the "No Competition Territory" to include "the geographic area within a 10-mile radius of each assigned account." (Exhibit A-4 at p.1).

The Globus Non-Compete also requires the employee to acknowledge that he or she "will receive information and be trained in the <u>highly technical, competitive and specialized business</u> of spine surgery and spinal implants and instrumentation." (Exhibit A-4 at p. 2).   Globus defines its confidential, proprietary and trade secret information to include:

> [C]ustomer lists; product specifications and attributes; pricing information; technology development plans; forecasts; financial information; <u>sales strategies and techniques</u>; business records; models; prototypes; schematics; manuals; handbooks; literature; vendors; business terms between Company and suppliers; <u>business terms between Company and Hospitals</u>; business terms between Company and distributors; <u>business terms between Company and Medical Personnel</u>. Employee acknowledges that Company owns such Confidential Information and that Employee has no ownership interest in such Confidential Information. Furthermore, Employee acknowledges that the disclosure of such Confidential Information to unauthorized third parties, including Competitive Companies (as defined below) would cause great and irreparable harm to the Company. Furthermore, Employee acknowledges that Company has a legitimate business interest in the protection of the Confidential Information.

(Exhibit A-4 pp. 1-2 (emphasis added)).   Accordingly, in order to safeguard this information from use by competitors, the Globus Non-Compete includes four separate non-competition covenants.   It defines the "No Competition Period" as "the last 12-month period immediately following the termination of the Employment Agreement." (Exhibit A-4 at p. 2).  And  during that period, it specifically <u>prohibits the employee not to</u> <u>"directly or indirectly, either for the Employee's benefit or the benefit of another entity,</u> <u>solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to any</u> <u>customer, Hospital or Medical Personnel in the No Competition Territory</u>." (Exhibit A-4 at 2).

When employees breach the Globus Non-Compete, Globus takes aggressive steps to enforce its contract with them. Synthes is currently aware of at least two recent suits initiated by Globus to enforce and seek damages for the breach of its restrictive covenants. (Complaint, *Globus Medical, Inc. v. Michael Reeder,* No. 08-893 (S.D. Oh. Sept. 22, 2008); *see also* Complaint, *Globus Medical, Inc. v. Christine Ann Stingle,* (C.P. Chester County April 15, 2008), attached in Exhibit A-5)).

**E.      Haggard's Employment with Synthes, Sales in the Fort Collins Territory, and Extensive Knowledge and Access to Synthes' Trade Secrets.**

Haggard commenced his employment with Synthes on May 1, 2000, as a Spine Sales Consultant assigned to the Fort Collins, Colorado Territory.  His Territory also included Greeley, Loveland, Steamboat Springs and Yuma, Colorado, Scottsbluff, Nebraska and Cheyenne, Laramie, Rawlins, Torrington and Wheatland, Wyoming. Over the course of the next eight- plus years, Haggard had significant contacts with Synthes' surgeon customers and hospitals in this territory with whom he developed extensive relationships.

Synthes invested a significant amount of resources to support Haggard's business relationships with these surgeons.  This included training, providing education and workshops for surgeons and their staff, and providing custom instruments to those surgeons.   Additionally, Synthes provides its sales consultants with its proprietary database of clients and customers that contained, among other things: (1) the identity of these customers and prospects; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; and (3) pricing policies, methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies specific to those clients and/or

prospects.   Haggard completed an annual business plan that included highly confidential information and analysis about each customer and prospect in his territory. This information is not known to the general public and Synthes takes significant steps to keep this proprietary information confidential.   In addition, Haggard was uniquely positioned to learn the particular preferences in the surgeries of each physician, along with other non-public information, that aided in his ability to sell Synthes' products.

**F.    Haggard's Contractual Obligations to Protect Synthes' Trade Secrets.**

Haggard's employment was contingent on his signing the Non-Competition Agreement, which he signed on March 5, 2000.  (Exhibit A-3 at p. 4).  Haggard signed his Non-Disclosure Agreement on April 1, 2000.  (Exhibit A-3 at p. 5).

Haggard promised, among other things, not to disclose Synthes' confidential and proprietary information at any time after leaving Synthes' employ.  (Exhibit A-3).  This "proprietary and confidential information includes: (1) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; [and] (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals…" (Exhibit A-3 at p.2).

To protect Synthes' legitimate interest in maintaining the confidentiality of its customer relations, the non-competition covenant in Haggard's Non-Competition Agreement specifically provides that Haggard will not compete with Synthes in any capacity for one year following his employment.  The Agreement states:

> I am employed by Synthes in a sales, account management or maintenance, or customer services or support, with an assigned territory, and ***I agree I will not, for a period of one year after my employment terminates for any reason, work for (as an employee, consultant, contractor, agent or representative) any competitor of***

- 11 -

> ***Synthes in the territory or territories that I am now, or
> have been responsible for*** at any time during the last year
> of my employment with Synthes.

(Exhibit A-3 at p. 3 (emphasis supplied)).

Importantly for purposes of Synthes' request for preliminary and permanent injunctive relief, at the time he executed the Non-Competition Agreement, Haggard acknowledged that: (i) "Synthes expends substantial time and money, on an ongoing basis, to train its employees, …to develop and maintain a proprietary data base of prospects, maintain and expand its customer base, and improve and develop its technologies, products and services;" (ii) "Synthes would be irreparably harmed by my subsequent employment by a competitor of Synthes, regardless of the position or territory, due to the high likelihood or possibility that there would be inadvertent or other disclosures of Synthes' proprietary and confidential information"; (iii) he "received adequate consideration for signing" the Agreement; and (iii) "the restrictions in [the Agreement] are reasonable and necessary to protect Synthes' legitimate business interests."   (Exhibit A-3 at p.1).   Moreover, Haggard expressly agreed that Synthes would be "entitled to enforce this agreement by obtaining a court order prohibiting [Haggard] (and any other involved) from breaching this agreement." (Exhibit A-3 at p.3).

The restrictions in the Non-Competition Agreement are limited in scope and time. Pursuant to the Agreement, Haggard, who held a key sales position at Synthes, is prohibited from working for a competitor of Synthes for a period of only one year.  In addition, the restrictions do not impose restraints greater than necessary to protect Synthes' legitimate business interests.

**G.     Haggard's Violation of His Contractual Obligations to Protect Synthes' Interests.**

Haggard was terminated from Synthes on February 2, 2009.  Synthes separated Haggard because it learned that he was running an unrelated cigar business while he should have been working for Synthes.  It is Synthes' understanding that Haggard is now significantly in debt as a result of his cigar business' financial distress.  This means he has an incentive to act improperly for the benefit of his new employer.  Synthes understands  that  Haggard is employed or intends to be employed by Globus, in the area of medical implants and instrumentation including spinal inter-body fusion products and other devices for spinal surgery.

 In fact, Plaintiff's Motion for a Temporary Restraining Order, dated March 17, 2009, already identifies Globus as Plaintiff's "new employer."  (Pl's. Mot. Supp. TRO, attached in Exhibit A-6).  And Plaintiff's Affidavit admits that: "I have been in contact with Globus Medical and Globus Medical has indicated a willingness to hire me in a sales consultant position in Northern Colorado essentially covering much of the same territory previously covered in working for the Defendant [Synthes]."  (Pl's. Aff. Supp. TRO, attached in Exhibit A-6).

Haggard has been selling spinal products and has been involved in Synthes' marketing efforts related to these products since he was hired in 2000.  As a sales consultant, he spent over eight years interacting with Synthes' surgeon and hospital customers.  Haggard now advises that absent the enforcement of his Non-Competition and Non-Disclosure Agreements, he intends to work for Synthes' direct competitor in the *same position* and in the *same territory* he worked for Synthes.

Due to the extensive similarity in Synthes' and Globus' product and business lines and the identical nature of his new position with Globus in the same sales territory he covered for Synthes for the past eight years, it is certain that Haggard has or will use and/or disclose Synthes' confidential trade secrets to his or Globus' advantage. Haggard has or will directly violate his Non-Competition and Non-Disclosure Agreements by working for a direct competitor, Globus, in his former territory.

**H.      Haggard's Failure to Return Synthes' Field Equipment.**

Following Haggard's separation from Synthes, Synthes conducted an inventory of field equipment samples it had loaned to Haggard.  Synthes' inventory revealed that significant field equipment samples supplied to Haggard were missing. In total, this missing property is valued at $549,276.50

Despite Synthes' request, Haggard has not returned Synthes' field equipment samples that are in his possession or control.  In addition to the fact that Synthes is the rightful owner of this property, pursuant to the confidentiality provision contained in his Non-Competition Agreement, Haggard is required to return this property.  (Exhibit A-3 at p. 2).

**I.      Haggard's Anticipatory Complaint and Actions in Colorado State Court.**

On or about February 16, 2009, Synthes sent a letter to Haggard reminding him of his obligations under the Non-Competition and Non-Disclosure Agreements and included copies of those executed Agreements. (Exhibit A-7).

On March 20, 2009, Haggard filed a civil action against Synthes in the District Court of Larimer County, Colorado ("Haggard's Colorado State Action"), seeking declaratory relief that would prohibit Synthes from enforcing its contractual rights. (Pl's.

Compl., attached in Exhibit A-6). Relying only on the Plaintiff's submissions, the Larimer County District Court preliminarily granted the Plaintiff's *ex parte* Motion for a Temporary Restraining Order on March 25, 2009.  (Order, attached in Exhibit A-6). On April 1, 2009, Synthes removed Haggard's Colorado State Court Action to this Court pursuant to 28 U.S.C. § 1441.

## III.  ARGUMENT SUPPORTING WHY THIS COURT SHOULD GRANT SYNTHES' MOTION FOR INJUNCTIVE RELIEF.

Synthes meets the standard the Tenth Circuit Court of Appeals has set for obtaining injunctive relief under Federal Rule of Civil Procedure 65.  Rule 65 permits this Court to enter injunctive relief upon proper showing:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed. R. Civ. P. 65(b).  To prevail on a motion for injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, the moving party must demonstrate:  (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of  preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.  *Roda Drilling Company et al. v. Siegal et al.*, 552 F.3d 1203 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 364, 374 (2008)).  The standards for issuance of a temporary restraining order are similar to those required for a preliminary injunction.  *DuVall v. Keating,* 162 F.3d 1058, 1062 (10th Cir. 1998) (identifying the same four criteria needed to support

the issuance of a temporary restraining order or a preliminary injunction); *see also Main v. Martin*, No. 06-cv-00232-WDM-MJW, 2009 U.S. Dist. LEXIS 4675, *10 fn. 4 (D. Colo. 2009) ("The standards governing the issuance of preliminary injunction and a temporary restraining order are very similar.").[4]

In the Tenth Circuit, "[I]f the [movant] can establish that the latter three requirements tip strongly in his favor, the test is modified, and the [movant] may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).   But where a movant seeks any of the disfavored categories of preliminary injunctions, including injunctions that alter the status quo, injunctions that are mandatory as opposed to prohibitory, or injunctions that afford the movant substantially all of the relief he may recover at the conclusion of a full trial on the merits, the movant may not rely on the Tenth Circuit's modified likelihood of success on the merit standard and must make a strong showing with respect to the likelihood of success on the merits and with respect to the balance of harms.   *O'Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

Because Synthes' requested injunctive relief seeks to preserve the status quo, it is not subject to the Tenth Circuit's heightened standard.  The Tenth Circuit has defined the status quo as "the last uncontested status between the parties…" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.* 269 F.3d 1149, 1155 (10th Cir. 2001) (quoting

---

[4] *Main v. Martin*, No. 06-cv-00232-WDM-MJW, 2009 U.S. Dist. LEXIS 4675 (D. Colo. 2009), an unpublished decision, is attached as Exhibit A-1.

*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 n. 8 (10th Cir. 1991)).  And here, the last uncontested status between the parties existed before Synthes learned that Haggard had or would use and/or disclose its working in the exact same position, for a direct competitor, Globus, in the exact same territory he serviced during his employ with Synthes.

Pursuant to the Tenth Circuit's standards, Synthes satisfies the requirements necessary for injunctive relief because:  (1) Synthes has made a strong showing that it is likely to prevail on the merits of its claims against Haggard for breach of his employment agreements; (2) Synthes can demonstrate that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages if Haggard is permitted to continue to compete with Synthes and disclose and/or use Synthes' confidential trade secrets in violation of his restrictive covenants and fiduciary duty; (3) the balance of the equities favors entering the injunction against Haggard, as an injunction will properly restore the parties to the status quo as it existed immediately prior to Haggard's unlawful activities, Synthes will suffer greater injury from the refusal to grant an injunction than by granting it, and the issuance of an injunction will not substantially harm Haggard; and (4) enforcing the Agreements is in the public's interest.

### A.    Synthes Can Show it is Likely to Prevail on the Merits of its Claims Against Haggard

Synthes will prevail on the merits.  The post-employment covenants Haggard has with Synthes are valid under both Pennsylvania and Colorado Law.  In addition, both Pennsylvania's and Colorado's Uniform Trade Secrets Act Protect Synthes against Haggard's conduct.

1.     **Synthes Will Prevail on its Contract Claims Against Haggard**

Synthes has valid contracts with Haggard. Haggard's violation of these agreements is a well recognized cause of action upon which Synthes may obtain relief. Haggard's agreements with Synthes are governed by Pennsylvania law. Specifically, the Non-Competition Agreements states that Pennsylvania law governs the interpretation of the Parties' Agreement (Exhibit A-3 at p. 4). Under Pennsylvania law, Synthes right to injunctive relief is clear.[5]

a.     **Synthes Has Valid Contracts with Haggard**

It is well settled under Pennsylvania law that, in order for post-employment restrictive covenants to be equitably enforced, the covenants must be: (1) incident to an employment relation between the parties to the covenant; (2) the restrictions imposed are reasonably limited in duration and geographic extent, and (3) the restrictions imposed by the covenant are reasonably related to the protection of a legitimate business interest. *Hess v. Gebhard & Co.*, Inc., 808 A.2d 912, 917-918 (Pa. 2002) (citing *Sidco Paper Co. v. Aaron*, 351 A.2d 250 (Pa. 1976)).

The employee who is trying to avoid a restrictive covenant bears the burden of proving that the restriction is unreasonable. *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.,* 369 A.2d 1164, 1169-70 (Pa. Super. 1977). "The determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances, with the party claiming unreasonableness as a defense against

---

[5] In his State Court Action, Haggard did not contest the application of Pennsylvania law. He simply argued that the covenants were unenforceable under Colo. Rev. Stat. § 8-2-113. After addressing why Synthes has valid contracts for purposes of this element of Rule 65, Synthes addresses why Haggard's covenants with Synthes are actually enforceable Colo. Rev. Stat. § 8-2-113(2).

enforcement of the covenant bearing the burden of proof." *Wellspan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005). The Agreements here easily satisfy all of the requirements to be enforced. There is no good faith basis for Haggard to argue - nor did he in the Colorado State Court Action - that his covenants with Synthes are not valid under Pennsylvania law.

First, Haggard's restrictive covenants were ancillary to his commencement of employment with Synthes. Haggard signed the Non-Compete Agreement on March 25, 2000, the Non-Disclosure Agreement on April 1, 2000 and was hired on May 1, 2000. *Barb-Lee Mobile Frame Co. v. Hoot*, 206 A.2d 59, 61 (Pa. 1965). *See also Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838, 846 n.14  (Pa. 1957) ("The taking of employment which is terminable at will affords a sufficient 'principle transaction' or 'consideration' to support a restrictive agreement made by an employee.").

Second, the restrictive covenants are necessary to protect Synthes' legitimate business interests, which include the protection of its trade secrets. Under Pennsylvania law, the protection of trade secrets, business information, customer relationships, customer goodwill, specialized training and skills obtained from the employer are each legitimate employer interests that may be protected by restrictive covenants. *National Bus. Servs., Inc. v. Wright,* 2 F. Supp. 2d 701 (E.D. Pa. 1998); *Hess v. Gebhard & Co.,* 808 A.2d 912, 920 (Pa. 2002); *John G. Bryant Co.,* 369 A.2d at 1167-68; *Morgan's Home Equip. Corp.,* 136 A.2d 838, 846 (Pa. 1957); *Thermo-Guard, Inc. v. Cochran,* 596 A.2d at 188, 193-94 (Pa. Super. 1991), *superseded on other grounds by court rule*, Pa.R.A.P. 1316, *as recognized* by *T.M. v. Elwyn*, Inc. 950 A.2d 1050 (Pa. Super. 2008). Synthes expends significant resources in protecting its

investment in its employees, products, and confidential and proprietary information. When Haggard worked for Synthes as a Sales Consultant, he was given access to Synthes's business relationships, customer lists, and highly confidential and proprietary information regarding Synthes's products and business.

An employer's interest in confidential business information extends to preventing a former employee generally from competing with the employer for a reasonable time. *Nat'l Bus. Servs., Inc.*, 2 F. Supp. 2d at 708 (holding that defendant's proposed work for plaintiff's competitor "would violate the non-compete agreement" because, among other reasons, "[i]t is virtually inconceivable that [defendant] would be able to avoid utilizing the confidential information she learned at [plaintiff corporation] and exploiting [plaintiff's] customer goodwill); *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 479 (holding that employer was entitled as a matter of right to specific performance of the non-competition covenant because the former employee possessed extensive knowledge of employer's confidential information and thus had a "a very real opportunity to harm Quaker's legitimate business interest" by working for a competitor);   *see also Intermetro Indus. Corp. v. Kent,* No.3:CV-07-0075, 2007 U.S. Dist. LEXIS 28239, at *16 (M.D. Pa. April 17, 2007 ) ("While the Court does not doubt that Mr. Kent retains only a general understanding of Metro's strategy, pricing options, profit margins, and product information, this general information still is valuable and is not generally known to the public . . . and could be helpful to a competitor.").[6]

Third, the Agreements are reasonable in time, geography, and scope. Covenants not to compete must be limited to "such time as may be reasonably

---

[6]  *Intermetro Indus. Corp. v. Kent,* No.3:CV-07-0075, 2007 U.S. Dist. LEXIS 28239 (M.D. Pa. April 17, 2007 ), an unpublished decision, is attached as Exhibit A-1.

necessary for the protection of the employer without imposing undue hardship on the employee." *Morgan's Home Equip. Corp.*, 136 A.2d at 844. But employees trying to avoid a restrictive covenant bear the burden of proving that the restrictions are unreasonable. *National Bus. Servs.,* 2 F. Supp. 2d at 708; *John G. Bryant Co.,* 369 A.2d at 1169-1170. And Pennsylvania courts have consistently upheld restrictive covenants for terms of up to three years or more after employment ends. *See, e.g.*, *John G. Bryant*, 369 A.2d at 1166 (three years); V*olunteer Firemen's Ins. Servs., Inc. v. CIGNA Property and Casualty Ins. Agency*, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997) (three years); *DeMuth v. Miller*, 652 A.2d 891 (Pa. Super. Ct. 1995) (five years).

The restrictions in Haggard's agreement are reasonable as to time and geography. The Non-Competition Agreement prohibited Haggard from competing with Synthes and from soliciting Synthes customers or prospects only for one (1) year after termination of his employment, certainly a reasonable temporal restriction. *See National Bus. Servs.,* 2 F. Supp. 2d at 708 ("Pennsylvania courts routinely uphold one year restrictive covenants"); *Robert Clifton Associates, Inc. v. O'Connor,* 487 A.2d 947, 952–53 (Pa. Super. 1985) (enforcing one-year covenant); *Thermo-Guard, Inc,* 596 A.2d at 194 (same).

In addition, the Non-Competition Agreement prohibits Haggard from working against Synthes in his former territory, not throughout the United States, certainly a reasonable geographic restriction. As to scope, the restriction on solicitation only applies to Synthes customers, prospects and affiliates and individual customer or prospect contacts Haggard established during his employment by Synthes. *See, e.g., John G. Bryant,* 369 A.2d at 1170 (finding three-year time period prohibiting sales to

employer's competitors reasonable); *Worldwide Auditing Services, Inc. v. Richter,* 587 A.2d 772 (Pa. Super. 1991) (covenant restricting employee from contacting any of employer's clients was reasonable).  The covenants are narrowly tailored to protect only Synthes's legitimate business interests in protecting its investment in its employees and its confidential information, customer relationships, good will and reputation.   It is inherently reasonable for Synthes to want to safeguard that information and those relationships.  *See Robert Clifton Associates,* 487 A.2d at 952-53 (enforcing one-year covenant); *Thermo-Guard,* 596 A.2d at 194 (*same*); *John G. Bryant,* 369 A.2d at 1167 (enforcing three-year covenant).   For these reasons, Synthes has a reasonable likelihood of succeeding on the merits of its breach of contract claim against Haggard.

> **b.      Colorado Law Does Not Affect the Enforceability of Synthes' Agreements with Haggard**

Synthes is equally entitled to injunctive relief under Colorado law because Colorado expressly provides for enforcement of restrictive covenants to protect trade secrets:

> 8-2-113. Unlawful to intimidate worker - agreement not to compete
>
> (1) It shall be unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit.
>
> (2) Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
> . . .
> (b) Any contract for the protection of trade secrets;

Colo. Rev. Stat. § 8-2-113 (emphasis supplied).

Because the confidential information Synthes' seeks to enjoin Haggard from disclosing fits Colorado's definition of a trade secret, the Non-Competition Agreement meets Colorado's statutory exception to the prohibition of non-compete agreements. Colorado's Uniform Trade Secrets Act defines a "trade secret" as:

> . . . The whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses or telephone numbers, or other information relating to any business or profession which is secret and of value . . .

Colo. Rev. Stat. § 7-74-102(4). Colorado courts determine whether particular materials are "trade secrets" on a case-by-case basis. *Network Telecommunications, Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990) (discussing fact-specific evaluation and determining that customer lists may constitute a trade secret). The factors relevant to the identification of a trade secret include:

> (1)     the extent to which the information is known outside the business;
>
> (2)     the extent to which the information is known to those inside the business, i.e., the employees;
>
> (3)     the precautions taken by the trade secret holder to guard the secrecy of the information;
>
> (4)     the savings effected and the value to the holder in having the information as against competitors;
>
> (5)     the amount of effort or money expended in obtaining and developing the information; and
>
> (6)     the amount of time and expense it would take for others to acquire and duplicate the information.

*Colorado Supply Co. v. Stewart,* 797 P.2d 1303, 1306 (Colo. Ct. App. 1990).

Here, the trade secrets Synthes seeks to protect include not only its customer lists, but also the specific information related to each of those customers and/or prospects, contained in its proprietary data base, that Synthes has invested significant amounts to generate. *See Harvey Barnett, Inc. v. Shidler,* 338 F.3d 1125, 1129 (10th Cir. 2003) ("A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret"); *see also Gold Messenger v. McGuay,* 987 P.2d 907, 911 (Colo. App. 1997) (a trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it).

Synthes' proprietary database of clients and customers therefore contains, among other things: (1) the identity of its customers and prospects; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies, methods of delivering services and products, and (4) success marketing, sales strategies, and product development strategies.   This unique information about Synthes' customers that Haggard possesses is not otherwise available to the public, rendering enforcement of the one year territorial restriction imperative.

These enumerated categories of trade secrets are not known outside of Synthes and it is disingenuous for Haggard to argue otherwise.  Indeed, Haggard's Affidavit in support of the Temporary Restraining Order in the Colorado State Action is misleading when it states "The information regarding the doctors that I sold products to for Synthes

Spine [sic] is readily attainable by any person through the use of a phonebook or public information at the various hospitals in Northern Colorado." (Pl's. Aff. Supp. TRO in Exhibit A-6).  The listing of a surgeon or a hospital in Northern Colorado by no means indicates whether that person or entity is a customer or prospect of Synthes.  It also sheds *no* relevant light on the customer's preferences or unique information related to driving sales.

Similarly, the prices of instruments Synthes offers to each customer, renewal dates and other detailed terms of customer and supplier contracts and proposals, as well as the customer's preferences for instrumentation, methods of receiving services and products and the marketing and sales strategies applied to each person or entity, are all obviously not discernable from a phonebook.

Depending on the extent to which the holder of the customer list treats and protects the information, Colorado courts will classify customer lists as trade secrets. *Network Telecommunications*, 790 P.2d at 902 (discussing fact-specific evaluation and determining that customer lists may constitute a trade secret). As discussed earlier in this Brief, Synthes rigorously protects the secrecy of its trade secrets. *See Colorado Supply*, 797 P.2d at 1306 (the "alleged secret must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Extreme and unduly expensive procedures need not be taken.").  In addition to conditioning employment with sales consultants upon the execution of the disputed Non-Competition and Non-Disclosure Agreements, upon termination, Synthes requires its employees to return, and not retain copies of, all correspondence files, business card files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts,

budgets, notes and other material that contain any of this information and other similar information upon separation from Synthes' employment.

In addition, Synthes made significant investments in the form of training personnel, and monetary resources, to develop the trade secrets to which Haggard has been privy for the past eight years.  *See R & D Business Systems v. Xerox Corp.*, 152 F.R.D. 195, 196 (D. Colo. 1993) (finding that information, including customer lists, constituted trade secrets as defined by Colorado statute where customer list holder's president testified that the "took years to develop and was acquired at great financial cost").

Haggard's unlawful use and/or disclosure of Synthes' trade secrets for the benefit of Globus, would represent significant, but very difficult to calculate – damages and lost profits.  Because Synthes' Non-Competition Agreement with Haggard is designed to prevent the misappropriation of its protectable trade secrets under Colorado law, the Agreement fits into the "trade secrets" exception to  Colo. Rev. Stat. § 8-2-113(2).

### c.    Colorado Conflict of Law Principles Support this Outcome

Colorado conflict of law principles support this outcome.  Colorado follows the Restatement (Second) of Conflicts of Law. *See King v. PA Consulting Group*, 485 F.3d 577, 586 (10th Cir. 2007) (pursuant to Colorado law applying Restatement (Second) of Conflicts to choice of law analysis).   Under § 187(2) of the Restatement, the Court should honor the Parties' choice of Pennsylvania law unless the application of Pennsylvania law would be contrary to a fundamental policy of Colorado *and* Colorado has a materially greater interest than Pennsylvania in the determination of the particular issue:

> [T]he law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . .

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest that the chosen state in the determination of the particular issue, and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts of Law § 187(2).  Neither of these two conditions exist, so the Court should not disturb the Parties' choice of law.

With respect to the first element under § 187(2), application of Pennsylvania law would not be "contrary to a fundamental policy" of Colorado because both jurisdictions enforce non-competition and non-disclosure agreements to protect trade secrets.  *See* Colo. Rev. Stat. § 8-2-113 ("Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to . . . (b) Any contract for the protection of trade secrets"); *Xantrex Technology Inc. v. Advanced Energy Industries, Inc.*, No. 07-cv-02324-WYD-MEG,  2008 U.S. Dist. LEXIS 41206, *32. (D. Colo. 2008)[7] (Colorado's fundamental policy of limiting non-compete agreements was not offended by a non-compete that fit the trade secrets exception to C.R.S. § 8-2-113); *Thermo-Guard,* 596 A.2d at 193-94 (trade secrets of an employer are legitimate interests protectable through a restrictive covenant).

In addition to meeting an exception under C.R.S. § 8-2-113, in order to be consistent with Colorado policy, a non-compete must also be reasonable as to duration

---

[7] *Xantrex Technology Inc. v. Advanced Energy Industries, Inc.*, No. 07-cv-02324-WYD-MEG, 2008 U.S. Dist. LEXIS 41206 (D. Colo. 2008), an unpublished decision, is attached as Exhibit A-1.

and geographic scope. *Nat'l Graphics Co. v. Dilley, 681 P.2d 546* (Colo. App. 1984). And covenants not to compete that are one year or even longer have been approved by Colorado courts. *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App. 1988) (one-year non-compete clause); *Harrison v. Albright*, 577 P.2d 302, 305 (Colo. App. 1978) (five-year non-compete clause). The one-year limitation on competition to protect Synthes' confidential and trade secrets information only in Haggard's former territory, is reasonable in terms of geographic scope and duration. Accordingly, the limitation is enforceable under Colorado law and therefore it is not contrary to Colorado fundamental policy.

As to the second element under § 187(2) of the Restatement, Synthes submits that Pennsylvania has a materially greater interest in the application of its law to Haggard's contract with Synthes than does Colorado.

Synthes is engaged in a national business and seeks national uniformity of its contracts. As pertains to Haggard:

- ❑ Synthes' principal place of business is located in Pennsylvania;

- ❑ Synthes drafted the Innovation and Non-Disclosure Agreement and Non-Competition Agreement in Pennsylvania;

- ❑ Synthes countersigned Haggard's Non-Competition Agreement in Pennsylvania;

- ❑ Synthes drafted Haggard's initial offer of employment ("Offer Letter") in Pennsylvania and Haggard was required to execute his acceptance of the Offer Letter and return the executed Offer Letter to Synthes in Pennsylvania;

- ❑ At the time he accepted employment with Synthes, Haggard was made aware that Synthes' principal place of business and senior management personnel are located in Pennsylvania;

- ❑ Haggard worked "in the field" and from home, he did not have an office, and he maintained almost daily contact, via telephone, letter,

- 28 -

and electronic mail communications, with Synthes' Pennsylvania offices and employees during his employment;

❑    Haggard received a sales policies manual, an employee policies manual, benefits information, and other employee policy information as well as price lists, customer lists, product literature, brochures, and other new product information supporting materials from Synthes' Pennsylvania offices;

❑    Haggard received sales samples from Synthes' Pennsylvania offices that he then used in developing customers and potential customers;

❑    Haggard entered into purchase orders with customers, sent these purchase orders to Synthes' Pennsylvania offices, and then received commissions based on these orders;

❑    Haggard's initial budget for business expenses was determined in Synthes' Pennsylvania offices;

❑    Haggard submitted his reimbursable business expenses to and received reimbursement checks that were issued from Synthes' Pennsylvania offices;

❑    Haggard's salary and commissions were calculated, made and administered and his benefits were administered from Pennsylvania;

❑    Haggard received extensive training from Synthes' at Synthes Spine's Pennsylvania offices, and received training materials associated with these training sessions developed and provided to him in or from Pennsylvania; and

❑    Haggard received around-the-clock customer service support from Pennsylvania and maintained frequent contact via telephone, electronic mail, or other forms of communication with Synthes' customer support personnel.

Based upon the foregoing, Pennsylvania has the greater interest in this matter than Colorado. *See Xantrex*, 2008 U.S. Dist. LEXIS at *33 (deciding that although non-compete provisions affected the defendant's employment in Colorado, Canada had a greater interest in the covenant not to compete because the employer was a Canadian

business, the contract was formed and signed in Canada, and the majority of action surrounding the carrying out of/or violation of the contract occurred in Canada).

Haggard, in support of his motion for a temporary restraining order against Synthes in the Colorado State Action, incorrectly relied on *King v. PA Consulting*, 487 F.3d at 586 (10th Cir. 2007), to argue against the enforceability of Synthes' restrictive covenants with him. (Pl's. Aff. Supp. TRO in Exhibit A-6).  Specifically, Haggard cites the *King* decision for the proposition that Colorado had a materially greater interest in the application of its law to the disputed non-compete. 485 F. 3d at 586. In *King*, however, the Court actually enforced the non-compete agreement because § 8-2-113 allows for enforcement of contracts to protect trade secrets.  *Id.*  This also means that *King* has nothing to do with "the substantially greater interest" test under § 187 of the Restatement because there was no conflict of laws.   In *King,* the Tenth Circuit determined that because the non-compete fit into one of the exceptions delineated in C.R.S. § 8-2-113 and met Colorado's reasonableness requirement, the non-compete did not violate any Colorado public policy and was thereby enforceable. *Id.* at 589. Because Synthes has shown that its non-compete agreement is enforceable under Colorado law, the issue of whether Colorado has a materially greater interest in the application of its law necessarily becomes moot.

**2.      Synthes will Prevail on its Claim for Violation of the Uniform Trade Secrets Acts of Both Colorado and Pennsylvania**

Synthes can succeed on its misappropriation claims brought under either Pennsylvania or Colorado's Uniform Trade Secrets Acts, 12 Pa.C.S.A. § 5301 *et seq.* and C.R.S. § 7-74-101 *et seq.*, respectively.

Each statute includes extensive categories of protected information and each includes, among other things, "a customer list" or "listing of names." 12 Pa.C.S.A. § 5302;  C.R.S. § 7-74-102(4).[8]   The statutes also require that information must be economically valuable to the owner. 12 Pa.C.S.A. § 5302.; C.R.S. § 7-74-102.  Finally, both statutes require that the owner of the information took measures to maintain the secrecy of the information. 12 Pa.C.S.A. § 5302; C.R.S. § 7-74-102(4).

Courts in both jurisdictions are empowered to grant an aggrieved party injunctive relief on account of actual or threatened misappropriation. 12 Pa.C.S.A. § 5303(a) and C.R.S. § 7-74-103.  In both jurisdictions, "misappropriation" is defined as: the disclosure or use of a trade secret of another without express or implied consent by a person who, at the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  C.R.S. § 7-74-102(2)(b)(II)(B) and 12 Pa.C.S.A. § 5302(2)(ii)(B).

The information which Synthes seeks to protect from Haggard's misappropriation clearly satisfies the definition of a trade secret as defined by both Pennsylvania and Colorado law.  Haggard obtained this information while he was a Synthes employee and bound by the confidentiality provisions included in his Non-Competition and Non-Disclosure Agreements as well as his common law duty of loyalty

---

[8] The complete definition of a "trade secret" under the Colorado Uniform Trade Secrets Act is quoted earlier in this brief. Pennsylvania's Uniform Trade Secret Act defines a "trade secret" as: "Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use [and] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 Pa. Cons. Stat. Ann. § 5302.

not to disclose this information. By accepting or intending to accept employment with Synthes' direct competitor, Globus, in the exact same sales territory in the exact same sales consultant position, Haggard has or will misappropriate Synthes' protected trade secrets.   Accordingly, Synthes is entitled to the injunctive relief set forth in both Pennsylvania and Colorado's Uniform Trade Secrets Acts.

### 3. Synthes will Prevail on its Claim for Tortious Interference with Business Relations

If Haggard is allowed to compete in violation of his agreements and use the trade secrets he obtained from Synthes, he will commit tortious interference with Synthes' business relations.   Colorado recognizes the tort of intentional interference with prospective business relations as defined by the Restatement (Second) of Torts § 766B (1979).  *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995) (citing *Dolton v. Capital Fed. Sav. & Loan Ass'n*, 642 P.2d 21 (Colo. App. 1981)).

The Restatement (Second) of Torts § 766B (1979) provides:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979).   Accordingly, a party will be liable for tortious interference with a plaintiff's prospective contractual relations if that party intentionally and improperly interferes with such relationships.  *Amoco*, 908 P.2d at 502.

Haggard's actual or threatened misappropriation of Synthes' trade secrets through his employment with Synthes' competitor Globus- again as a sales consultant in the same territory he serviced for Synthes- will constitute a tortious interference with Synthes' contractual relations.[9] As explained throughout this Brief, Haggard, on behalf of Globus has or will improperly disclose or use Synthes' trade secrets and confidential information to solicit and sell competing products to Synthes' current and prospective customers.   In order to make sales for Globus to compete with Synthes, Haggard's disclosure and use of this confidential information cannot be characterized as anything other than intentional. As a result, Synthes will suffer damages in the form of lost sales to its customers and prospective customers.

### 4.    Synthes Will Prevail on Its Claim for Conversion

In Colorado, the tort of conversion is defined as "any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Byron v. York Inv. Co.,* 296 P.2d 742, 745 (1956). Haggard currently possesses Synthes' field equipment valued at $549,276.50.   At the time of his separation from Synthes, he was required to return any and all of Synthes' property loaned to him over the course of his employment.   In addition to Synthes' general policies regarding its property loaned to sales consultants and the fact that Synthes is the rightful owner of this property, the confidentiality provision contained in his Non-Competition Agreement also required Haggard to return this property.  Despite Synthes' request that he return this field equipment, Haggard has not complied with this request.

---

[9] "Contractual relation" is not used in a strict, technical sense as defined by the *Restatement (Second) of Torts § 766B cmt. c* (1979) and interpreted by Colorado's Supreme Court in *Amoco. Amoco*, 908 P.2d at 500. In fact, the term encompasses "[t]he relationship between potential customer and dealer." *Id.*

Accordingly, Haggard's continued dominion and control over the property is unauthorized and constitutes a conversion of Synthes' property. On this basis, Synthes is entitled to injunctive relief ordering Haggard to return the $549,276.50 worth of field equipment he has converted. *See Monatt v. Pioneer Astro Industries, Inc.*, 592 P.2d 1352, 1353 (1979) (purpose of a temporary injunction is to prevent a tort or wrong).

### B.   An Injunction is Necessary to Prevent Immediate and Irreparable Harm to Synthes that Damages Cannot Adequately Compensate

Because Colorado's Uniform Trade Secret Act ("CUTSA"), Colo. Rev. Stat. § 7-74-101 *et seq.* prohibits the actual or threatened misappropriation of trade secrets and provides injunctive relief for the same, Synthes is not required to make a showing of irreparable harm since it has alleged that Haggard possesses access to Synthes' trade secrets and either has or will disclose them to Globus.  But even though Synthes is not required to make this showing, it can easily establish that the disclosure of its trade secrets-as effected by the breach of his restrictive covenants with Synthes- will cause Synthes irreparable harm.

"[W]hen the evidence shows that the defendants engaged in, or are about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violation, irreparable harm to the plaintiffs need not be shown." *Star Fuel Marts, LLC v. Sam's East, Inc.,* 362 F.3d 639, 651-52 (10th Cir. 2004).  Here, Synthes has brought a claim for injunctive relief to enforce its restrictive covenants with Haggard which prohibit his disclosure of Synthes' trade secrets and it  has brought a separate claim under CUTSA.  CUTSA specifically provides injunctive relief stating: "[t]emporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or

threatened misappropriation of a trade secret." C.R.S. § 7-74-103. Accordingly, Synthes is not required to satisfy the "irreparable harm" element in making this claim for a preliminary injunction.

Despite the discharge of this obligation, Synthes can clearly establish that it will suffer immediate and irreparable harm unless Haggard is enjoined from breaching his Agreements. Irreparable injury is established "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 269 F.3d 1149, 1156 (10th Cir. 2001). The injury must be both certain and great and must not be merely serious or substantial. *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (10th Cir. 2001) (quotations omitted). Irreparable harm is suffered when the injury cannot be adequately compensated for in money or when the district court cannot remedy the injury following a final determination on the merits. *Id.*

The misappropriation or potential misappropriation of its trade secrets constitutes irreparable harm to Synthes. Haggard was entrusted with Synthes' confidential trade secrets and given access to Synthes' business relationships at Synthes' expense. Now, by commencing employment with a direct competitor of Synthes in the exact territory he serviced for Synthes for the past eight years, he intends to or has disclosed Synthes' trade secrets in direct violation of his restrictive covenants. The disclosure of these trade secrets, the development of which has cost Synthes incalculable hours of research, product development and marketing constitutes irreparable harm, which in the absence of injunctive relief, will continue to cause irreparable harm to Synthes.

**C.      The Balance of the Equities Favors Entering the Injunction Against Haggard**

The balance of equities favors granting Synthes the request for injunctive relief. At issue is the irreparable harm that Haggard's employment with Globus in his former Synthes territory will cause Synthes.  Haggard is only precluded from working for a direct competitor in his former territory for one year.  If Haggard wants to work in another part of the state, he can still earn a living selling what he knows.  Synthes only concern in this matter is protecting its confidential knowledge of its customers and strategies related to the specific surgeons and hospitals in Haggard's former territory.  If injunctive relief is granted, Haggard will be enjoined from working for Globus, or any other competitor of Synthes in a directly competitive position, disclosing and/or using Synthes' confidential information and trade secrets, soliciting Synthes' customers and otherwise violating his Agreements in his former territory.

The threat and harm posed to Synthes as a result of Haggard's potential or actual disclosure to Globus, Synthes' direct competitor, of its trade secrets- that is, its proprietary database of clients and customers that contains, among other things: (1) the identity of its customers and prospects; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies, methods of delivering services and products, and (4) success marketing, sales strategies, and product development strategies outweighs the harm to Haggard.  *Xantrex.*, 2008 U.S. Dist. LEXIS at *43 (holding the threat and harm posed to plaintiff as a result of  the disclosure of its trade secrets to its direct competitor outweighed any possible harm to the defendants).

The loss of employment in the same field does not merit tipping the hardships in favor of Haggard. *See Xantrex*, 2008 U.S. Dist. LEXIS at *44 (stating that defendants' argument that the employee at issue had "uprooted his family and settled his children in new schools and that there are no power companies [industry in which he worked] in Fort Collins where he could gain employment" lacked merit.)

Moreover, this Court must discount any harm that Haggard claims as a result of the requested injunction because any alleged harm to him is directly caused by his decision to breach his contractual duties to Synthes. Thus, the only "injury" to Haggard would be a restriction against unlawful behavior. This type of injury is not one with which the Court need concern itself, and certainly pales in comparison to the significant injury that Synthes will suffer in the absence of injunctive relief.

The injunction Synthes requests is very narrowly focused. It simply tracks the Agreements which Haggard signed and to which he is bound. The requested injunction would put a stop to or prevent Haggard's unlawful activities and do nothing more. Thus, the injunction Synthes requests is reasonably suited to abate the offending activity, and is narrowly tailored to do no more than that.

### D.    Granting Synthes' Motion for an Injunction is in the Public Interest.

As stated throughout this brief, Colorado protects the improper and illegal diversion of trade secrets. It has enacted a statute, the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq,* specifically in order to prevent and/or provide remedies to victims of misappropriation of trade secrets. C.R.S. § 7-74-103 (providing injunctive relief "to prevent or restrain the actual or threatened misappropriation of a trade secret.") Therefore, it is unquestionably consistent with Colorado public policy to protect the disclosure of Synthes' trade secrets by  granting Synthes' Motion for Injunctive Relief.

*Xantrex*, 2008 U.S. Dist. LEXIS at *44 ("the public interest favors entry of an injunction because the public never benefits from trade secret misappropriation.")

## IV.   CONCLUSION

For the foregoing reasons, Synthes respectfully requests that this Court enter an injunction in its favor and enjoin Haggard from violating his agreements with Synthes and set this motion for a Preliminary Injunction Hearing.

Respectfully submitted this 3rd day of April, 2009.

s/ Daniel M. Combs
Daniel M. Combs
Paul F. Lewis
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street
Suite 3000
Denver, CO 80202-3622
Phone:  303.299.8477
Fax:    303.298.0940
Email: dcombs@shermanhoward.com
       plewis@shermandhoward.com

Anthony B. Haller (*application pending*)
Scott F. Cooper (*application pending*)
Donald D. Gamburg
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
Phone:     215.569.5690/5487/5330
Fax:   215.832.5690/5487/5330
haller@blankrome.com/cooper@blankrome.com/
gamburg@blankrome.com

Attorneys for Defendant-Counterclaimant

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of April, 2009, I electronically filed a copy of the foregoing **Memorandum of Law in Support of Synthes' Motion for a Temporary Restraining Order And/Or Preliminary Injunction Against Jamie Haggard** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

efischer@fischerandfischerlaw.com

Erik G. Fischer, Esq.
FISCHER AND FISCHER LLP
125 South Howes Street, Suite 900
Fort Collins, CO 80521
*Counsel for Plaintiff*

s/Louisa Boyte
Louisa Boyte, Assistant to Daniel M. Combs