**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 09-cv-00721-CMA-KMT

JAMIE HAGGARD,

Plaintiff,

v.

SYNTHES SPINE,

Defendant.

---

# ORDER AND PRELIMINARY INJUNCTION

---

Before the Court is Defendant Synthes Spine's ("Defendant" or "Synthes") Motion for Temporary Restraining Order and/or Preliminary Injunction. (Doc. # 7.) Plaintiff Jamie Haggard ("Plaintiff") has filed a response and the Court held an evidentiary hearing on June 10, 2009. Based on the parties' pleadings and the evidence presented at the hearing, and for the following reasons, the Court GRANTS the Motion.

## INTRODUCTION

This is an employment matter. After being terminated from his job, Plaintiff sued Defendant, his former employer, to invalidate a covenant not to compete and recover unpaid wages.[1] Plaintiff began work as a Sales Consultant for Defendant in May 2000. His territory included Northern Colorado, Southern Wyoming, and Western Nebraska. As part of his employment, Plaintiff signed a "Confidentiality, Non-Solicitation and Non-

---

[1] It appears that the wage claim has now been resolved.

Competition Agreement" ("Confidentiality Agreement") on March 25, 2000, and an "Employee Innovation and Non-Disclosure Agreement" ("Innovation Agreement") on April 1, 2000. Notwithstanding the fact that Plaintiff was one of Defendant's better-performing sales consultants in the region, Defendant terminated Plaintiff on February 2, 2009, after Defendant learned that Plaintiff was running an unrelated cigar business, Cigar Caddy, while he should have been working for Defendant.

On at least one occasion prior to his termination and on multiple occasions after his termination, Plaintiff talked with senior level managers for a competitor of Defendant, Globus Medical, Inc. ("Globus"). They discussed the possibility of Plaintiff working for Globus in largely the same capacity that he worked for Defendant, *i.e.*, as a sales consultant headquartered in Northern Colorado. The discussions were serious, and at some point before the hearing on this Motion, Plaintiff even traveled to Globus' Pennsylvania headquarters and toured Globus' manufacturing facility. Plaintiff also testified that he had conversations relating to employment with at least three other competitors of Defendant.

Defendant claims that Plaintiff's discussions and potential switch to Globus is part of a grand scheme by Globus to steal Defendant's employees, trade secrets, and customers in the lucrative medical implant and device business. Indeed, Defendant and Globus previously engaged in a three-year-long federal lawsuit in Pennsylvania over trade secrets that Defendant claims Globus misappropriated. Defendant argues that

Globus continues to raid Defendant's employee ranks and that Plaintiff's potential hiring is part of that pattern.

Plaintiff struck preemptively against enforcement of the Confidentiality and Innovation Agreements by filing a declaratory judgment lawsuit in state court. (*See* Doc. # 1, Ex. A-1.) The state court granted an *ex parte* temporary restraining order ("TRO") enjoining Defendant from enforcing the restrictive provisions in the Confidentiality and Innovation Agreements on March 25, 2009.[2] Defendant removed the matter to this Court on April 1, 2009, and filed counterclaims and a number of motions,[3] including this request for preliminary injunctive relief against Plaintiff. Plaintiff responded to removal by filing a Motion to Remand**,** which the Court the Court denied at the hearing on the Motion for Preliminary Injunction.

**THE RESTRICTIVE COVENANTS AT ISSUE**

The Confidentiality and Innovation Agreements actually contain multiple restrictive covenants with varying time, geographic, and scope restrictions. The three covenants relevant in this case are the: "Non-Solicitation Covenant," "Non-Competition Covenant," and "Non-Disclosure Covenant."

---

[2] After entry of the state court TRO, the parties stipulated to an injunction that enjoined Plaintiff from taking competitive employment until the date of the hearing on the Motion for Preliminary Injunction in this Court. Given this Order, the stipulation is now moot.

[3] Defendant's other motions have either been withdrawn or addressed in separate orders by the Court.

In the Non-Solicitation Covenant, Plaintiff agrees that he will not:

> solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Synthes' business, (1) any customer of Synthes at any time during the last three years of [his] employment; (2) any prospect that received or requested a proposal or offer from Synthes at any time during the last three years of [his] employment; (3) any affiliate of any such customer or prospect, or (4) any of the individual customer or prospect contacts [he] established during [his] employment with Synthes.

In the Non-Competition Covenant, Plaintiff agrees that, for a period of one year, he will not:

> work for (as an employee, consultant, contractor, agent or representative) any competitor of Synthes in the territory or territories that [he is] now, or [has] been responsible for at any time during the last year of [his] employment with Synthes.

Both the Non-Solicitation and Non-Competition Covenants are contained in the Confidentiality Agreement. Also noteworthy is the fact that the Confidentiality Agreement specifies injunctive relief as the preferred remedy should Plaintiff breach the Non-Solicitation or Non-Competition Covenants.

The Innovation Agreement contains the Non-Disclosure Covenant. That Covenant states that Plaintiff shall:

> not . . . use, publish or otherwise disclose . . . either during or subsequent to [Plaintiff's] employment, any secret or confidential information or data of Synthes or any information or data of others, such as, but not limited to, sales dollars or units, product technology or product development, project information, manufacturing methods or technology, reports or reporting systems, which Synthes is obligated to maintain in confidence

Plaintiff does not contest the applicability and enforceability of the Non-Disclosure Covenant. Thus, the real issue is whether Defendant is entitled to a preliminary

injunction enjoining Plaintiff from violating the Non-Solicitation and Non-Competition Covenants by taking competitive employment with Globus or another competitor.

**DISCUSSION**

## I. CHOICE OF LAW

A preliminary issue in this matter is deciding which law to apply: Pennsylvania or Colorado? The Confidentiality Agreement contains a one-line choice of law provision that states: "This agreement will be governed by Pennsylvania law applicable to contracts entered into and performed in Pennsylvania." However, Plaintiff argues that Colorado law should apply because Colorado has a "materially greater interest in determining the enforceability of certain non-compete provisions" if, as in this case, the employee is a resident of and employed in Colorado. (Doc. # 30 at 13.)

A federal court sitting in diversity will usually apply the forum state's choice of law rules. *See Klaxson Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-97 (1941); *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994); *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 793 (10th Cir. 1998). Thus, this Court should look to Colorado choice of law rules.

Colorado has adopted the Restatement (Second) of Conflict of Laws § 187 approach to contractual choice of law provisions. *See Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. Ct. App. 1994); *see also Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003); *ADT Sec. Servs., Inc. v.*

*Apex Alarm, LLC*, 2006 WL 650166, *5 (D. Colo. Mar. 13, 2006). Section 187 states in relevant part:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . . (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187. In other words, Colorado courts will enforce contractual choice of law provisions unless a party can prove the twin requirements of § 187.

Under the facts of this case, those two elements are: (1) application of Pennsylvania law would be contrary to a fundamental policy of Colorado and (2) Colorado has a materially greater interest than Pennsylvania in determination of the enforceability of the restrictive covenants. "To succeed on a claim that the chosen law contravenes a fundamental policy of the forum state, the policy must be a substantial one." *Hansen*, 876 P.2d at 113. It appears that Plaintiff meets those elements in this case.

Plaintiff cites to *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 585-86 (10th Cir. 2007), which held that Colorado, rather than New Jersey, law should apply to a covenant not to compete, notwithstanding a New Jersey choice of law provision in the parties' employment agreement. The Tenth Circuit Court of Appeals noted that the employee in *King* lived and worked in Colorado, and the parties has signed the

agreement in Colorado, thereby giving Colorado a substantial interest in the outcome of the case and the application of its law. Conversely, the Tenth Circuit found New Jersey's interest in the application of its law merely "tangential" because, although the employer was incorporated in New Jersey, it was headquartered in Washington, D.C. *Id*. As such, the Tenth Circuit Court of Appeals found that Colorado had a materially greater interest in resolution of the dispute than did New Jersey. *King* also noted that Colorado's strong public policy statement regarding covenants not to compete, as reflected by C.R.S. § 8-2-113(2), conflicted with New Jersey's more laissez faire approach to the issue. *Id.* at 586.

Defendant responds that this Court should follow an unpublished decision by a different judge in this district addressing Colorado and British Columbian law. *See Xantrex Tech Inc. v. Advanced Energy Indus., Inc.*, 2008 WL 2185882, *11-*12 (D. Colo. May 23, 2008). In *Xantrex*, Judge Daniel found no conflict between application of Colorado and British Columbian law in a case involving enforcement of a covenant not to compete. However, *Xantrex* differs from this case because, as Judge Daniel noted, British Columbian and Colorado law did not conflict. Both laws start from the position that a covenant not to compete is invalid unless it meets certain exceptions. Moreover, Judge Daniel concluded that the contract at issue in *Xantrex* was signed in Canada and the majority of the business actions surrounding enforcement and potential breach of the contract took place in Canada. Thus, he questioned whether Colorado had a materially greater interest as required by the Restatement.

*King* appears to be more applicable in this case. First, the parties do not dispute that Plaintiff lived and worked in Colorado, and that his threatened employment with Globus means he will continue to do so in the future. Moreover, Plaintiff signed the Confidentiality and Innovation Agreements in Colorado. Additionally, Defendant has a large facility in Monument, Colorado. As such, this case is distinguishable from *Xantrex* because the contract in that case was signed in British Columbia, the employer had a limited presence in Colorado, and the majority of the events at issue took place in British Columbia. Thus, the Court concludes that Colorado has a materially greater interest in enforcing its contract and employment laws in this case than does Pennsylvania, whose only strong connection to this case is Defendant's corporate headquarters.[4]

Second, although both Colorado and Pennsylvania disfavor covenants not to compete, differences between the state's respective laws make application of Pennsylvania law contrary to Colorado's fundamental public policy regarding covenants not to compete. Under Colorado law, as expressed in C.R.S. § 8-2-113(2), a covenant not to compete is void *ab initio* unless the party seeking to enforce the covenant can show that it meets a statutory exception. *See, e.g., DBA Enters. v. Findlay*, 923 P.2d

---

[4] Defendant lists a number of events, which it argues connect Pennsylvania to this lawsuit. However, the activities that Defendant lists occurred in the past and are corollary to the events at issue on the Motion for Preliminary Injunction. For example, Defendant does not argue that a large potion of the actions surrounding the violation of the restrictive covenants has occurred or will occur in Pennsylvania. *Cf. Xantrex*, 2008 WL 2185882 at *12 (finding, in part, that because "the actions surrounding the carrying out of/or violation of the contract occurred in Canada," Colorado did not have a materially greater interest than Canada).

298, 302 (Colo. Ct. App. 1996) ("Covenants not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void."); *Management Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 762, 765 (Colo. Ct. App. 1988). In contrast, Pennsylvania follows the rule of reasonableness and places the burden on the employee to show that a restrictive covenant should not be enforced because it is unreasonable. *See John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.* 369 A.2d 1164, 1169-70 (Pa. Super. 1977).[5] Pennsylvania also allows for enforcement of covenants not to compete in a wider variety of circumstances than the four statutorily enunciated situations in C.R.S. § 8-2-113. *See, e.g., Hess*, 808 A.2d at 920 (noting that covenant not to compete may be used to protect "unique or extraordinary skills"). These distinctions between Colorado and Pennsylvania law regarding the burden of enforceability are critical and they reflect that application of Pennsylvania law in this case may violate the fundamental public policy of Colorado. Thus, the facts of this case make *King* more analogous than *Xantrex*, because *King* dealt with similar distinctions between Colorado and New Jersey law, whereas *Xantrex* dealt with the relatively similar laws of Colorado and British Columbia. Therefore, for purposes of the preliminary injunction, the Court will apply Colorado law.

---

[5] This is not to say that Pennsylvania will automatically enforce a restrictive covenant. To enforce a covenant not to compete under Pennsylvania law, the covenant must be: (1) incident to an employment relation between the parties; (2) reasonably limited in duration and geographic extent; and (3) the restrictions imposed must be reasonably related to the protection of a legitimate business interest. *See Hess v. Gebhard & Co.*, 808 A.2d 912, 917-18 (Pa. 2002).

Now that the Court has decided to apply Colorado law to this Motion, the primary issue becomes the enforceability of the Non-Solicitation and Non-Competition Covenants contained in the Confidentiality Agreement.[6] As discussed below, this issue has many interrelated components. First, the Court must look at the Colorado statute on covenants not to compete. Second, if the Court concludes that the statute does not bar enforcement of the Non-Competition Covenant, it must examine the reasonableness of the time, geographic, and scope restrictions therein. The Court will then address whether Defendant has met its preliminary injunction burden.

## II. ENFORCEABILITY OF COVENANTS NOT TO COMPETE UNDER C.R.S. § 8-2-113

In Colorado, C.R.S. § 8-2-113 governs enforcement of a covenant not to compete. As is relevant to this case, C.R.S. § 8-2-113(2) states:

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> (b) Any contract for the protection of trade secrets.

As noted above, a covenant not to compete is void *ab initio* unless it fits within one of the statutory exceptions. *See DBA*, 923 P.2d at 302 (citing § 8-2-113(2)(a)); *Management Recruiters* 762 P.2d at 765 (citing § 82-113(2)(b) & (d)).

To meet the trade secret exception, the primary purpose of the covenant not to compete must be the protection of trade secrets and the covenant must be reasonably

---

[6] At the preliminary injunction hearing, Plaintiff conceded that the Non-Disclosure Covenant protecting disclosure of Defendant's trade secrets was enforceable.

limited in scope. *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1133 (10th Cir. 2003); *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. Ct. App. 1997). In *Gold Messenger*, the Colorado Court of Appeals looked to the preamble and the substantive provisions of the contract in that case to determine whether the covenant not to compete was drafted with the purpose of protecting trade secrets. 937 P.2d at 910. The Court has done the same in this case, in addition to hearing the parties' evidence presented at the hearing.

A. Purpose Of The Non-Competition Covenant

Both the Confidentiality and Innovation Agreements reflect that the purpose of the Non-Competition Covenant contained in the Confidentiality Agreement was the protection of trade secrets. For example, in the "Acknowledgments" portion of the Confidentiality Agreement, Plaintiff agrees that he:

> will have access to, receive, learn, develop and/or conceive technical, customer, prospect, financial or other information that is proprietary and confidential to Synthes [and that] this information must be kept in strict confidence to protect Synthes' business and maintain its competitive position in the marketplace, and this information would be useful to Synthes' existing and potential competitors for indefinite periods of time.

Moreover, an entire provision in the Confidentiality Agreement is dedicated to describing the various proprietary information that Defendant sought to protect by virtue of the Non-Competition Covenant. Conversely, there are no other provisions in the Confidentiality Agreement regarding unrelated subjects, *e.g.,* job responsibilities, pay or salary; the contract is focused strictly on the treatment of proprietary and confidential information by sales consultants. Thus, review of the written documents suggests that

the primary purpose behind the Non-Competition Covenant was the protection of information that Defendant considered to be trade secrets.

Additionally, Defendant's corporate representative, Matthew Shapcott, who testified at the hearing, stated that a primary business purpose behind requiring sales employees to sign the Confidentiality and Innovation Agreements was protection of Defendant's "business interest and trade secrets." Indeed, Mr. Shapcott stated that Defendant required all of its sales consultants to sign similar restrictive covenants to preclude disclosure of Defendant's proprietary information. Conversely, Plaintiff has not identified any other purpose Defendant might have in requiring Plaintiff to agree to the Non-Competition Covenant. Thus, it appears that the primary purpose of the restrictive covenants contained in the Confidentiality Agreement is to protect Defendant's trade secrets.

B. Reasonably Limited To Protection Of Trade Secret Information

The Court also concludes that the restrictive covenants meet the second prong of the trade secret statutory exception because they are reasonably limited in scope to protection of Defendant's trade secrets. For example, the Non-Competition Covenant only precludes Plaintiff from working for companies that compete with Defendant in the particular medical device fields in which Defendant operates, "orthopedic, bone fixation, maxillofacial medical, endoscopic and/or spinal implant device or instrumentation technologies, products or services." Thus, Plaintiff could still work in the medical sales industry, even in the medical device industry as long as he avoided Defendant's niche

of that industry. Additionally, as discussed in more detail below, the geographic and time restrictions in the restrictive covenants do not impose an unnecessary burden on Plaintiff and are well tailored to trade secret protection. For example, Mr. Shapcott and Plaintiff testified at the hearing that much of Defendant's product-development-related trade secret information tends to dissipate into the realm of public knowledge within roughly one year after being created, *i.e.*, the information remains secret for approximately one year. As such, the one-year limitation in the Non-Competition Covenant reasonably protects Defendant's product-development trade secret information, without going beyond what is necessary.

For the reasons described above, the Court concludes that the primary purpose of the restrictive covenants is the protection of Defendant's trade secrets and that the restrictive covenants are reasonably limited in scope to protecting Defendant's trade secrets. Thus, the restrictive covenants fit within the trade secret exception, C.R.S. § 8-2-113(2)(b), to the general statutory bar on covenants not to compete.

## II. TRADE SECRET PROTECTION

Implicit within the review of a covenant not to compete for the protection of trade secrets is the question of whether "trade secrets" are really at issue? *See Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005); *Management Recruiters*, 762 P.2d at 766 (citing *Gulick v. A. Robert Stawn & Assocs., Inc.*, 477 P.2d 489 (Colo. Ct. App. 1970) (not selected for official publication)).

A. Definition Of Trade Secret

"What constitutes a 'trade secret' is a question of fact for the trial court." *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1341 (Colo. Ct. App. 1984). The Court has two relevant guides to aid in determining what constitutes a trade secret. First, the Colorado version of the Uniform Trade Secrets Act defines a trade secret as:

> the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

C.R.S. § 7-74-102(4); *see also Harvey Barnett*, 338 F.3d at 1129 (discussing trade secret protection under C.R.S. § 7-74-102). Second, the Colorado Court of Appeals has listed a six-factor test for courts to use in determining whether information warrants trade secret protection. *Porter*, 680 P.2d at 1341. Those six factors are:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Id.*; *see also Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. Ct. App. 1990).

The fact that certain components of information are well-known or publicly available does not preclude trade secret protection. If the combination or organization of the information is unique and offers the compiler of the information a competitive advantage, it is protectable. *See Harvey Barnett*, 338 F.3d at 1129. Thus, a court should not isolate each piece of information when deciding whether to afford it trade secret protection. Instead, "A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994) (quotations omitted); *see also Harvey Barnett*, 338 F.3d at 1129.

B. Trade Secret Protection Is Warranted In This Case

Based primarily on the testimony at the hearing, the Court concludes that two general types of information in this case warrant trade secret protection: Defendant's customer data and product development information. Moreover, the written agreements and hearing testimony reflect that Plaintiff had access to both types of trade secret information.

1. *The Confidentiality And Innovation Agreements Describe Various Types Of Trade Secret Information*.

The Confidentiality and Innovation Agreements identify several categories of information within the two general types noted above that merit trade secret protection.

For example, the Confidentiality Agreement lists the following items as being Defendant's proprietary and confidential information:

(1) customer and prospect identities, including their specific requirements, addresses and telephone contacts;
(2) prices, renewal dates and other detailed terms of customer and supplier contracts;
(3) pricing policies, logistics methods, marketing and sales strategies, product know-how, product technologies and product development strategies;
(4) physical security systems, access control systems and network designs;
(5) employment and payroll records;
(6) forecasts, budgets and other non-public financial information, product information and product know-how; and
(7) expansion plans, management policies and other business strategies.

The Innovation Agreement is more brief; it lists "any secret or confidential information or data of Synthes or any information or data of others, such as, but not limited to, sales dollars or units, product technology or product development, project information, manufacturing methods or technology, reports or reporting systems, which Synthes is obligated to maintain in confidence." Although these agreements may not be enough to support trade secret protection by themselves, Plaintiff's written acknowledgments were further supported and clarified by evidence presented at the hearing.

2. *Product Development Trade Secrets*

Testimony from Mr. Shapcott and Plaintiff confirmed that the product information and product know-how described in the Confidentiality Agreement meets the legal definition for trade secret. For example, both Mr. Shapcott and Plaintiff testified regarding product development information that Plaintiff became privy to while

employed by Defendant. Both men noted that only a select group of sales consultants within Defendant's organization knew about new product development and that such information was virtually unknown to those outside of Defendant's company.
Mr. Shapcott also noted that in the fast-moving medical device industry, the timely development of new products is critical to Defendant's ability to compete with other companies and that inadvertent or intentional disclosure of new product information could result in competitive catastrophe. Moreover, although he did not identify a specific dollar figure, Mr. Shapcott stated that Defendant spent large sums of money developing product information, including money to gather feedback from doctors and other professionals.

In an attempt to preclude trade secret protection for Defendant's product development information, Plaintiff testified that competing sales representatives knew generally about new products that each other's companies were developing. However, this testimony does not alter the trade secret protection afforded to Defendant's product development data. The rumor and scuttlebutt type of information about which Plaintiff testified does not amount to the type of detailed product development data (like the aforementioned doctor feedback) that Plaintiff learned while employed by Defendant. Moreover, the fact that competitors might have their own information regarding Defendant's products does not automatically take the data created by Defendant outside of the realm of a trade secret. Indeed, Plaintiff could not identify one instance of a competitor having lawful access to any of the specific product development

information that Plaintiff learned from doctors and others within Defendant's organization. If anything, isolated instances of a competitor's knowledge about Defendant's products implies only that other competitors may have misappropriated Defendant's trade secrets.

3. *Customer Data Trade Secrets*

Testimony also revealed that, as part of his job, Plaintiff developed detailed information regarding his customers (doctors and hospitals within his sales territory) that meets the standard for trade secret protection. He developed information regarding his customers' surgical specialities, business preferences, and contact people within their hospitals or physician groups. It is undisputed that Plaintiff developed and documented this information as part of his employment for Defendant. Thus, Defendant rightfully argues that this information belongs to Defendant and that it is subject to trade secret protection.

Plaintiff argues that much of the customer information he obtained for Defendant, *e.g.,* doctors' names, practice areas and telephone numbers, could be gleaned from public sources like a phone book or the internet; thus he argues that it is not trade secret information. However, Plaintiff admitted that much of the information he used to sell Defendant's products was obtained solely as a result of his employment with Defendant and the relationships he established with his customers. Plaintiff stated that it took him years to develop his customer information and that a "stranger" could not

develop the same type of information about the doctors and hospitals in his territory from a phone book or website.

Defendant also introduced various company documents that compiled and organized the customer information developed by Plaintiff during his tenure with Defendant. Mr. Shapcott stated that Defendant relied on these documents to set budget and sales goals in Plaintiff's territory and that the information contained therein would not be available to the public. This detailed customer information is exactly the type of information that, when organized in a unique manner as Defendant has done in this case, is entitled to trade secret protection. *See, e.g., Rivendell*, 28 F.3d at 1045; *cf. Colorado Supply*, 797 P.2d at 1306-07 (finding that customer and pricing lists were not trade secrets because they were easily obtainable via public sources of information).

Plaintiff again attempts to avoid trade secret protection of customer data protection by arguing that other sales representatives from competing companies had similar customer databases to the ones developed by Defendant. However, the fact that other companies or representatives might have their own sets of customer data does not remove the trade secret protection from Defendant's customer data. Trade secret protection does not require novelty or invention, *Rivendell*, 28 F.3d at 1045, so it is entirely plausible (and, indeed, probable) that more than one medical device manufacturer has trade secret information covering the customer base in Plaintiff's territory.

4. *Defendant's Protective Measures*

Regarding the measures taken by Defendant to protect the confidentiality of its trade secret information, Mr. Shapcott stated that anyone involved with product development was required to sign a non-disclosure agreement – even surgeons outside of the company who were merely consulting with Defendant signed restrictive covenants. Defendant also obtained patents whenever necessary to preclude competitors from misappropriating Defendant's intellectual property. Mr. Shapcott testified that Defendant had various electronic measures in place to prevent disclosure of sensitive company information. One such measure was a "kill e-mail" that Defendant would send to a sales consultant after termination of employment. When the former sales consultant opened the e-mail, any of Defendant's files and e-mails stored on the consultant's computer were automatically deleted.[7] These types of protective measures go beyond normal business activities and they demonstrate that Defendant considered its trade secret information valuable and worth protecting.

In short, Defendant presented sufficient evidence to establish that trade secret information is at issue in this case and that Plaintiff had access to such information. Therefore, the Court will now turn to the second step of the analysis of a covenant not to compete under Colorado law – the reasonableness of the time, geographic, and scope restrictions.

---

[7] Plaintiff acknowledged receiving a kill e-mail, but contends that he did not open it and, thereby, avoided its effect.

**III. REASONABLENESS OF TIME, GEOGRAPHIC, AND SCOPE RESTRICTIONS**

The fact that the restrictive covenants meet the statutory exception does not end the analysis. The Court must now determine whether each of the contested restrictive covenants is reasonable.

The reasonableness inquiry revolves around the covenant's geographic and time restrictions, as well as the scope of prohibited activity and the level of hardship that the covenant inflicts on the employee. *See, e.g., Reed Mill & Lumber Co., Inc. v. Jensen*, 165 P.3d 733, 736 (Colo. Ct. App. 2006). Colorado Courts have not adopted a rule of thumb regarding reasonableness; the analysis is case-by-case, based on the facts before the court. *See Nutting v. RAM S.W., Inc.*, 106 F. Supp. 2d 1121, 1126-27 (D. Colo. 2000).

A. <u>The Non-Solicitation Covenant</u>

The Non-Solicitation Covenant precludes Plaintiff from soliciting Defendant's customers for just one year, which is well within the realm of enforceable agreements. Indeed, Colorado courts have repeatedly upheld covenants not to compete that restricted an employee for longer than one year. *See, e.g., Zeff, Farrington & Assocs., Inc. v. Dilley*, 446 P.2d 813, 814 (Colo. 1969) (upholding three-year, 200-mile restriction); *Weber v. Nonpareil Baking Co*. 274 P. 932 (1929) (upholding perpetual

covenant); *Taff v. Brayman*, 518 P.2d 298 (Colo. Ct. App. 1974) (upholding two-year, 65-mile restriction).[8]

However, the Non-Solicitation Covenant raises two interrelated issues. First, it omits any geographic limitation, *i.e.*, the restriction is worldwide. The lack of a geographic limitation has troubled courts before. *See Nutting*, 106 F. Supp. 2d at 1127. In *Nutting*, the party seeking to enforce a restrictive covenant did not demonstrate that his business was worldwide or that worldwide protection was necessary for the protection of the trade secret information at issue. Thus, the Court found the restriction overly broad and void. *Id.*

In this case, Defendant has alleged that it is an international business with customers around the globe. Defendant's worldwide presence notwithstanding, Plaintiff only sold within a limited territory based in Ft. Collins, Colorado. Thus, the Court concludes that the lack of a geographic restriction in the Non-Solicitation Covenant requires revision under the facts of this case. There is no reason to prohibit Plaintiff from contacting customers outside of his former sales territory because, in contacting customers outside of his former territory, he would not necessarily be using protected information he developed or learned while employed by Defendant. As such, the worldwide restriction on solicitation is unreasonably broad.

---

[8] Although these cases pre-date the adoption of C.R.S. § 8-2-113(2), the measure of reasonableness adopted in these cases still applies.

Second, and in a similar vein, the Non-Solicitation Covenant may be overly restrictive in terms of the scope of prohibited activities. The Non-Solicitation Covenant does not distinguish between contacting Defendant's customers generally and Defendant's customers that Plaintiff actually learned of or came into contact with while working for Defendant. *See, e.g., Mulei v. Jet Courier Serv., Inc.*, 739 P.2d 889, 892 (Colo. Ct. App. 1987) ("Only confidential information acquired during the course of employment may be protected . . . . Information already known to competitors or readily ascertainable elsewhere cannot be protected as confidential.") (internal citations omitted) *reversed on other grounds* 771 P.2d 486 (1989).

In *Management Recruiters*, the Colorado Court of Appeals affirmed the trial court's narrow interpretation of a non-solicitation provision that, as drafted, would have limited a former employee from soliciting any of his former employer's customers, even those with whom the employee did not have contact. 762 P.2d at 765-66. The trial court essentially re-wrote the covenant in that case to prohibit the employee from contacting only those former customers with whom Plaintiff actually dealt with at his former employer. *Id.*

The Court concludes that a similar interpretation of the Non-Solicitation Covenant is warranted in this case. Enforcing the Non-Solicitation Covenant as drafted would preclude Plaintiff from relying on general customer information known throughout the industry. Plaintiff did not develop or use this general information during his employment with Defendant and to that extent, it is not proprietary to Defendant. As such, it is

entitled to little or no trade secret protection. By precluding Plaintiff from using general customer information, the Non-Solicitation Covenant runs afoul of Colorado's public policy in favor of allowing employees to openly compete in the job market. Put another way, the Non-Solicitation Covenant unreasonably prohibits Plaintiff from using non-protected information. Thus, the failure to distinguish between customers known to Plaintiff and those unknown to Plaintiff, like the worldwide geographic prohibition, requires modification of the Non-Solicitation Covenant. The Court will mimic the interpretation adopted by the *Management Recruiters* court and interpret the Non-Solicitation Covenant to preclude Plaintiff from contacting only those customers with whom Plaintiff had actual contact during his employment with Defendant.

B. The Non-Competition Covenant

In this case, the Non-Competition Covenant limits Plaintiff from working for one of Defendant's competitors within Plaintiff's former sales territory. The Covenant prohibits competition for one year after Plaintiff's employment was terminated.

The Court notes that the one-year time restriction in the non-competition provision is reasonably tailored to protection of Defendant's customer data and product development trade secrets described above. Regarding the customer data trade secrets, Mr. Shapcott and Plaintiff stated that much of the proprietary customer information could be re-developed by Defendant within a year. Thus, the one-year limitation precludes Plaintiff from unfairly capitalizing on Defendant's trade secrets because, by the time one year has passed, the sales consultant for Defendant who

replaced Plaintiff will have developed her own customer data for Plaintiff's former territory.

The one-year limit is well-tailored to protection of product-development data, as well. According to Mr. Shapcott's testimony, a large portion of Defendant's product development information will be either superfluous, outdated, or have become public knowledge within one year of its creation, so it will have lost its trade secret status. As such, the one year restriction is reasonable to prevent Plaintiff from unfairly capitalizing on his possession of confidential product development data, but not so long that it unduly hinders Plaintiff's ability to find work in his chosen field.

Unlike the Non-Solicitation Covenant, the geographic restriction in the Confidentiality Agreement appears to be reasonable and narrowly-tailored to protection of Defendant's trade secrets. Indeed, the Non-Competition Covenant might be considered too narrow to fully protect Defendant from inadvertent disclosure of product development trade secrets. To wit, if Plaintiff went to work for a competitor outside of his former territory, the Non-Competition Covenant would not be at issue, but, despite the Non-Disclosure Covenant, Plaintiff would presumably still have the potential to inadvertently disclose product-development trade secrets. Regardless, by limiting Plaintiff only in his former sales territory, the Non-Competition Covenant strikes a proper balance between preserving Defendant's customer data trade secrets and allowing Plaintiff to work in his chosen field.

The scope of activity prohibited by the Non-Competition Covenant is also reasonable vis-a-vis the protection of trade secrets. The Non-Competition Covenant precludes Plaintiff from working for Defendant's competitors in the medical device industry. Even within that industry it only prohibits Plaintiff from taking employment with certain types of companies, those that manufacture similar devices or offer similar services to Defendant's devices and services. The Non-Competition Covenant does not, for example, preclude Plaintiff from working in unrelated industries.

The sum of the restrictions in the Non-Competition Covenant reflect that the Covenant is wholly reasonable under the circumstances of this case.

C. Severance Of The Restrictive Covenants Is Unnecessary

At the hearing, Plaintiff argued that the Court should sever the Non-Competition and Non-Solicitation Covenants and enforce only the Non-Disclosure Covenant. *See, e.g., Management Recruiters*, 762 P.2d at 765-66; *Colorado Accounting Machs. v. Mergenthaler*, 609 P.2d 1125 (Colo. Ct. App. 1980). Plaintiff contends that the goal of trade secret protection would best be served by strict enforcement of the Non-Disclosure Covenant in the Innovation Agreement without resorting to enforcement of the Non-Competition and Non-Solicitation Covenants. Plaintiff further argues that severance is appropriate because the Court should interpret the restrictive covenants in the narrowest manner possible, while still protecting Defendant's trade secrets.

In opposition to severance, Defendant argues that the Non-Competition and Non-Solicitation Covenants are necessary to protect against intentional and inadvertent

disclosure of trade secret information. According to Defendant, competitive employment by Plaintiff would necessarily result in the Plaintiff's use of customer data and product development information. Mr. Shapcott testified that if Plaintiff began employment with Globus or another competitor, Plaintiff would be unable to avoid using the customer data trade secrets that he developed during his tenure with Defendant, whether Plaintiff intended to use the customer information or not.

The Court agrees with Defendant. The nature of the industry and Plaintiff's job responsibilities reflect that a significant potential for inadvertent disclosure or use of Defendant's protected customer data exists in the event Plaintiff takes any competitive employment. There is simply no way that Plaintiff would be able to do his job for a competitor without using the customer data that he built up while employed by Defendant. The fact that Plaintiff has conceded to enforcement of the Non-Disclosure Covenant implies as much. Therefore, the Court declines to sever the Non-Competition and Non-Solicitation Covenants from the Confidentiality and Innovation Agreements.

## IV. PROPRIETY OF A PRELIMINARY INJUNCTION

Finally, the Court reaches the issue of whether Defendant is entitled to a preliminary injunction.

### A. The Elements Of A Preliminary Injunction

A preliminary injunction has four elements that a movant must establish:

(1) substantial likelihood of success on the merits;

(2) irreparable injury if an injunction is not entered;

(3) injury to the Defendant if an injunction is not entered will outweigh injury to the Plaintiff if an injunction is entered; and

(4) an injunction would not be adverse to the public interest.

*See Doubleclick*, 402 F. Supp. 2d at 1254-55; *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp*., 269 F.3d 1149, 1154 (10th Cir. 2001). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion*, 269 F.3d at 1154.

The Tenth Circuit Court of Appeals has found that certain types of injunctions require the movant to establish that the four injunction factors weigh "heavily and compellingly" in its favor. *Dominion*, 269 F.3d at 1154-55. *See also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). These disfavored injunctions include: (1) an injunction that disturbs the status quo; (2) a mandatory injunction; and (3) an injunction that affords the movant substantially all of the relief it seeks to recover at trial. *O Centro*, 389 F.3d at 975.

*O Centro* defined the "status quo" as the "last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 981 (citing 11A Wright & Miller § 2948, at 136). An injunction is typically "mandatory" if it alters the "status quo." However, not all mandatory injunctions alter the status quo, the true test for a mandatory injunction is whether the injunction will "affirmatively require the non-movant to act in a particular way, and as a result place the issuing court in a position where it may have to provide ongoing supervision." 389 F.3d at 979. An injunction falls under the third disfavored category if it would render a trial on the merits largely or

completely meaningless. *See Prairie Band of Potwatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001).

B. The Heightened Burden Does Not Apply In This Case

Plaintiff argues that this case requires application of the heightened burden because Defendant's request falls under one of the disfavored types of preliminary injunctions. However, the Court disagrees.

Regarding the status quo, Plaintiff contends that the last uncontested time between the parties was after the state court entered its TRO. This argument borders on ludicrous since, by that time litigation had already ensued, and the Court cannot say that it was a peaceable status between the parties. Instead, the last uncontested state between the parties was either before Defendant terminated Plaintiff or before Plaintiff filed his state court lawsuit. Under either scenario, the Confidentiality and Innovation Agreements were in force at the time, so an injunction enforcing those agreements would not alter the situation.

This conclusion on the status quo also relates to the second category of disfavored injunction, mandatory versus prohibitory relief. Since Plaintiff is not currently working for a competitor, *i.e.*, violating the restrictive covenants, Defendant's proposed injunction would not require Plaintiff to act in any affirmative manner or alter his current behavior. Nor would Defendant's proposed injunction require the Court to supervise Plaintiff's day-to-day activities. Thus, the preliminary injunction sought by Defendant is not affirmative; rather, it is prohibitory in nature.

Whether the injunction falls into the third category is a closer call because a preliminary injunction would provide Defendant with a majority of the relief it would receive at a trial. However, Defendant has also pleaded counterclaims for damages, including conversion, tortious interference with contracts, etc., so the injunction would not render a trial on the merits largely or completely meaningless.

C. Defendant Is Entitled To A Preliminary Injunction

Based on the evidence before the Court and for the reasons described in this Order, the Court concludes that Defendant is entitled to a preliminary injunction.

1. *Substantial Likelihood Of Success On The Merits*

Defendant has shown a substantial likelihood of success on the merits of its breach of contract and misappropriation of trade secrets counterclaims. As noted above, the Court concludes that the Non-Competition Covenant, Non-Solicitation Covenant (in modified form) and the Non-Disclosure Covenant are enforceable under Colorado law. Moreover, Plaintiff essentially concedes that his employment with Globus or another competitor would constitute breach of the Non-Competition and Non-Solicitation Covenants, so that aspect of the merits is not really at issue.[9]

*2. Irreparable Injury*

A party may establish irreparable harm by showing that a court would not be able to grant an effective monetary remedy for the injury caused by the non-movant's

[9] Plaintiff also admitted during the hearing that were it not for this litigation, he would likely already have begun employment for Globus or another competitor in his former territory.

conduct. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.2d 1149, 1156 (10th Cir. 2001). In other words, if money damages would not compensate the movant, the damage is irreparable. Injunctive relief is especially appropriate in non-competition cases because of the difficulty in proving money damages caused by illicit competition. *See DBA*, 923 P.2d at 302.

Defendant contends that this case involves the potential misappropriation of trade secrets and that because the Colorado Uniform Trade Secrets Act provides for injunctive relief as a remedy for misappropriation, Defendant need not prove irreparable harm if it can show that Plaintiff violated or is about to violate the Act. *See Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004) ("[W]hen the evidence shows that the defendants engaged in, or are about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violation, irreparable harm to the plaintiffs need not be shown."). *See also* C.R.S. § 7-74-103 (noting that temporary and final injunctions may be granted "to prevent or restrain actual or threatened misappropriation of a trade secret").

Regardless of the lesser burden, the Court concludes that Defendant has satisfied this element. Defendant presented evidence at the hearing establishing that if Plaintiff intentionally or inadvertently disclosed Defendant's customer data and product development trade secrets to a competitor, money damages would not compensate Defendant for the resulting injury. Regarding customer data trade secrets, Mr. Shapcott and Plaintiff both testified that a sales consultants' goodwill with a particular customer

drives medical device sales. Thus, if Plaintiff is allowed to appropriate that goodwill, which belongs to Defendant, and use it for a competitor, Defendant could not be compensated by money damages because money cannot buy goodwill. Likewise, Plaintiff's intentional or inadvertent disclosure of product development trade secrets to a competitor and the resulting loss of competitive advantage could not be undone by money damages. As such, the Court finds that Defendant has shown it will suffer irreparable harm if Plaintiff is not enjoined from violating the restrictive covenants.

3. *Balance of Harms*

Defendant has also shown that the balance of the equities tips in its favor. This factor is simply a comparison between the injury Defendant would suffer should no preliminary injunction enter, *e.g.*, loss of goodwill, competitive disadvantage, etc., versus the injury Plaintiff would suffer if the preliminary injunction does enter, *e.g.,* loss of livelihood in chosen field.

If Plaintiff were allowed to violate the restrictive covenants, Defendant's injury caused by violation would be permanent and irreparable; Defendant would not be able to un-disclose or re-cloak any trade secrets exposed by Plaintiff. In contrast, Plaintiff's injury would be temporary because he would only be precluded from working in his chosen profession in his former territory until trial or February 2010, whichever comes first. Moreover, to the extent that any equitable concerns should be factored in, Plaintiff admitted that he spoke with a Globus representative prior to his termination and he acknowledged that but for this litigation, he would willfully violate the terms of the Non-

Competition and Non-Solicitation Covenants. These willful violations of a written contract erode Plaintiff's equitable position in this case. Therefore, the Court concludes that this factor supports entry of a preliminary injunction.

4. *Public Interest*

The fourth element requires Defendant to show that entry of a preliminary injunction would not be adverse to the public interest. Plaintiff argues that Colorado has a strong distaste for non-competition agreements and that a preliminary injunction would run afoul of this policy. Although Plaintiff is generally correct, the Colorado legislature has created an exception to the prohibition on covenants not to compete when the covenant relates to protection of trade secrets. This exception appears in both the Uniform Trade Secrets Act and in the exception to the statutory bar in C.R.S. § 8-3-112(2). Thus, a preliminary injunction enforcing the restrictive covenants in this case does not violate the public interest.

5. *Security Under Federal Rule 65(c)*

Federal Rule 65(c) states that the movant must give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Neither party addressed this issue in either the briefing or at the hearing. However, Plaintiff testified that Defendant paid him a salary (comprised primarily of sales commissions) of approximately $200,000 in 2008. Since the restrictive covenants prohibit Plaintiff for

working for one year, one year's salary seems appropriate as the basis for security in the event that Plaintiff has been wrongfully enjoined by this Order.

**CONCLUSION**

For the reasons described above, the Court concludes that, subject to the revisions to the Non-Solicitation Covenant described above, the Confidentiality and Innovation Agreements should be enforced in this case. The Court further concludes that Defendant has established that a preliminary injunction is appropriate in this case to prevent immediate, irreparable harm to its goodwill and competitive position in the Northern Colorado medical device market.

Accordingly, Defendant's Motion for a Preliminary Injunction (Doc. # 7) is GRANTED.

The Court FURTHER ORDERS AS FOLLOWS:

1. Plaintiff shall comply with the Confidentiality and Innovation Agreements as modified herein and shall:

(a) refrain from using, disclosing, or revealing any trade secrets belonging to Defendant;

(b) refrain from directly or indirectly, or in any other capacity whatsoever, working for any competitor of Defendant in any capacity in any of the territories for which he was responsible over the course of his last year of employment with Defendant;

(c) refrain from directly or indirectly, or in any other capacity whatsoever, soliciting or contacting Defendant's customers with whom Plaintiff had contact during the last three years of his employment, any prospect that received or requested a proposal or offer from Plaintiff at any time during the last three years of his employment, any affiliate of any such customer or prospect, and any of the individual customer or prospect contacts he established during the last three years of his employment with Defendant;

(d) refrain from using, disclosing, or revealing any confidential and proprietary information belonging to Defendant; and

(e) refrain from disparaging Defendant in any way to any competitor, customer or prospective customer of Defendant.

2. For the duration of this Order, Defendant shall immediately cease and desist and is further enjoined from undertaking all competitive activities on behalf of Globus or any other entity involving the sale or promotion of products which directly compete with Defendant in Plaintiff's former sales territory and with the customers included within it;

3. For the duration of this Order, Plaintiff is enjoined from disclosing any of Defendant's confidential and proprietary information and he shall hold it in the strictest of confidence. He shall not divulge, disclose or reveal said information to any third party or use such information for any purpose, including, but not limited to, any business in which Plaintiff has an interest or by which he is employed or may become employed.

4. To the extent he has not already done so, Plaintiff shall immediately return any and all confidential and proprietary information belonging to Defendant in whatever form such information exists, including, but not limited to, any and all documents and copies thereof that are currently in his possession.

5. Plaintiff shall maintain and hold all records, documents and other forms of information including that stored in electronic form which relate to the allegations in the Counterclaim including, but not limited to, those which reflect the dates and times of any of his contacts with Globus or its representatives, Defendant's customers and prospective customers, and other information, the preservation of which is essential to the fair conduct of this litigation.

6. To the extent he has not already done so, Plaintiff shall return to Defendant all of Defendant's property still in his possession.

7. Any Orders issued by any other court, which affect the subject matter of this litigation, including without limitation the Orders issued in *Jamie Haggard v. Synthes Spine*, Case No. 2009-CV-265 (District Court for Larimer County, Colorado, March 2009), are hereby vacated. See U.S. Const. art. VI.

8. Plaintiff shall comply in all respects with his obligations under the Innovation Agreement, including refraining from disclosure of any secret or confidential information or data of Defendant or any information or data that Defendant is obligated to maintain in confidence.

9. This Order shall become effective when Defendant posts a surety bond with the Clerk of this Court in the sum of two hundred thousand dollars ($200,000.00), in order to secure the payment of any costs and damages that may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

10. This Order will terminate on the earliest occurrence of the following: (1) February 2, 2010; (2) completion of a trial in this matter; (3) or future order from this Court.

11. Termination of this Order shall not affect Plaintiff's obligation to otherwise comply with the Innovation Agreement, including Plaintiff's duty to refrain from disclosure of any secret or confidential information of Defendant. The Innovation Agreement will remain in full force and effect, unless a future Court order dictates otherwise.

IT IS FURTHER ORDERED that Defendant shall serve a copy of this Order on Plaintiff or counsel for Plaintiff by personal service, overnight mail, facsimile, electronic mail, and/or this Court's electronic filing system, together with a copy of the accompanying papers within ten (10) days of the date hereof.

DATED: June 12, 2009

BY THE COURT:

Christine M Arguello

CHRISTINE M. ARGUELLO
United States District Judge